**LAW OFFICES OF GREGORY A. YATES, P.C.**
16830 Ventura Blvd., # 250
Encino, California 91436
TEL. (310) 858-6944; FAX. (818) 905-7038

**DANIEL C. MORGAN & ASSOC.**
5851 Thille Street, Suite 103
Ventura, California 93003
TEL: (805) 815-4610; FAX: (805) 800-1880

Attorneys for Plaintiffs, TOMAS BARRERA, SR., individually and as a Personal Representative of THE ESTATE OF TOMAS BARRERA, JR.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA LAZOS, et al, | Case No. CV 08-02987 RGK (SHx) |
| Plaintiff, | |
| vs. | PLAINTIFFS' MOTION IN LIMINE NO. 6 TO PRECLUDE DEFENDANTS FROM REFERRING TO SALINAS' EMPLOYMENT RECORDS AND JOB APPLICATIONS AS CONFIDENTIAL AND/OR BEING SUBJECT TO A PROTECTIVE ORDER |
| CITY OF OXNARD, et al, | |
| Defendants. | |
| TOMAS BARRERA, SR. | |
| Plaintiff, | |
| vs. | |
| CITY OF OXNARD, et al, | |
| Defendants. | |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Plaintiffs, MARIA LAZOS and TOMAS BARRERA, SR., individually and as representatives of the ESTATE OF TOMAS BARRERA, hereby move this Court for an order precluding Defendants from referring to Salinas' employment records and/or job applications as confidential or being subject to a protective order.

This motion is based upon the ground that any confidentiality of the records has been waived. This motion is further based on the attached Memorandum of

1   Points and Authorities, the pleadings and papers on file in this action and upon such

2   of argument and evidence as may be presented prior to or at the hearing of this

3   motion.

4

5   Dated: June 23, 2009          LAW OFFICES OF GREGORY A. YATES, P.C.

6

7                                 GREGORY A. YATES
                                  Co-Counsel for Plaintiffs,
8                                 TOMAS BARRERA, SR., individually and as a
                                  Personal Representative of THE ESTATE OF
9                                 TOMAS BARRERA, JR.

10  Dated: June 26, 2009          LAW OFFICES OF JENNY SCOVIS

11

12

13                                JENNY SCOVIS
                                  Counsel for Plaintiff,
14                                MARIA LAZOS, individually and as a Personal
                                  Representative of THE ESTATE OF TOMAS
15                                BARRERA, JR.

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION IN LIMINE TO PRECLUDE TREATING EMPLOYMENT RECORDS AS CONFIDENTIAL
- 2 -

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.

3

## DEFENDANTS HAVE WAIVED THE CONFIDENTIALITY OF THE

4

## DOCUMENTS

5  Prior to this incident, Defendant SALINAS has been involved in the shooting

6  of Oliverio Martinez. Mr. Martinez filed a lawsuit, entitled *Martinez v. City of*

7  *Oxnard, et al*, CV 98-9313 FMC (AJWx). During the course of discovery in this

8  matter, Plaintiff Martinez obtained some of Salinas' employment records and job

9  applications. These records were obtained pursuant to a protective order.

10  During the trial in the *Martinez* case, Plaintiff called Dr. Randolph Nutter to

11  testify. On April 4, 2007, Dr. Nutter testified regarding Salinas' job applications with

12  the OPD. These records were introduced and admitted into evidence, and were *not*

13  filed under seal. Dr. Nutter's testimony was in open court. Salinas' job application

14  was read into the record by Mr. Paz, counsel for Plaintiff. Pertinent pages of Dr.

15  Nutter's trial testimony transcript are attached hereto as **Exhibit "A."**

16  Further, at his deposition in the *Martinez* case, taken on April 13, 2005, Dr.

17  Nutter testified to Salinas' pre-employment applications and employment records

18  with OPD, which were part of the records produced by the Defendants. Dr. Nutter's

19  deposition testimony and these documents *were not marked confidential and were not*

20  *submitted under seal*. These documents and the testimony indicated that Salinas had

21  failed his pre-employment psychological evaluation with the LAPD.

22  Furthermore, at the deposition of Chief Art Lopez, taken on July 15, 2005,

23  Chief Lopez testified to the records from LAPD concerning Salinas' job applications,

24  including psychological assessments and letters informing him he had been

25  disqualified. These documents were also read into the record word for word. Chief

26  Lopez' deposition testimony, including the exhibits, *were not marked confidential*

27  *and were not submitted under seal*.

28  ///

It is well established that a party who voluntary discloses confidential information, waives their confidentiality.   Therefore, it is submitted that these documents are now a matter of public record, and any confidentiality, whether by way of protective order or otherwise, has been waived.

## II.

## CONCLUSION

Based on the above, it is respectfully requested that the Court preclude Defendants from referring to Salinas' employment records and/or job applications as confidential or being subject to a protective order.

Dated: June 26, 2009          LAW OFFICES OF GREGORY A. YATES, P.C.


GREGORY A. YATES
Co-Counsel for Plaintiffs,
TOMAS BARRERA, SR., individually and as a Personal Representative of THE ESTATE OF TOMAS BARRERA, JR.

Dated: June 26, 2009          LAW OFFICES OF JENNY SCOVIS


JENNY SCOVIS
Counsel for Plaintiff,
MARIA LAZOS, individually and as a Personal Representative of THE ESTATE OF TOMAS BARRERA, JR.

EXHIBIT "A"

1

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA

3      WESTERN DIVISION

4      THE HONORABLE FLORENCE-MARIE COOPER, JUDGE PRESIDING

5

6   OLIVERIO MARTINEZ,                     )
                                           )
7                  Plaintiff,              )
                                           )
8                                          )
           vs.                             )  No. CV 98-9313 FMC(AJWx)
9                                          )
    CITY OF OXNARD; THE OXNARD POLICE      )
10  DEPARTMENT; CHIEF ART LOPEZ, ANDREW    )
    SALINAS, MARIA PENA, et al.,           )
11                                         )
                   Defendants.             )
12  _____)

13

14

15      REPORTER'S TRANSCRIPT OF THE TESTIMONY OF
                DR. RANDOLPH NUTTER

16

17          Los Angeles, California

18        Wednesday, April 4, 2007

19

20

21                              PAT CUNEO, CSR 1600, CRR, CM
                                Official Reporter
22  CERTIFIED                   United States Courthouse
                                Roybal Federal Building
23  COPY                        Room 181-E
                                255 East Temple Street
24                              Los Angeles, California 90012
                                (213) 626-0197
25

2

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:    LAW OFFICES OF R. SAMUEL PAZ
                          SONIA MERCADO & ASSOCIATES
 3                        BY:  R. SAMUEL PAZ, ATTORNEY AT LAW
                          and  SONIA MERCADO, ATTORNEY AT LAW
 4                        5701 W. Slauson Avenue, Suite 202
                          Culver City, California  90230
 5                        (310) 410-2981
                          samuelpaz@msn.com
 6                        soniamer2002@yahoo.com

 7   FOR THE PLAINTIFF:    THE LAW OFFICES OF JOHN BURTON
                          BY:  JOHN BURTON, ATTORNEY AT LAW
 8                        414 South Marengo Avenue
                          Pasadena, California 91101
 9                        (626) 449-8300

10   FOR THE DEFENDANTS:   LAW OFFICES OF ALAN E. WISOTSKY
                          BY:  ALAN E. WISOTSKY, ATTORNEY AT LAW
11                        and  JEFFREY HELD, ATTORNEY AT LAW
                          and  JAMES S. EICHER, JR., ATTORNEY AT LAW
12                        300 Esplanade Drive
                          Suite 1500
13                        Oxnard, California  93030
                          (805) 278-0920
14                        lawyers@wisotskylaw.com

15

16

17

18

19

20

21

22

23

24

25
```

1    LOS ANGELES, CALIFORNIA; WEDNESDAY, APRIL 4, 2007; 8:03 A.M.

2                              -oOo-

3              THE COURT:  Next witness for the plaintiff.

4              MR. PAZ:  Yes, Your Honor.  We would like to call

5    Dr. Randolph Nutter to the stand.

6              THE COURT:  Okay.  Let me read an instruction to

7    the jury before this witness takes the stand.

8              You are instructed that evidence concerning the

9    employment history of Officer Salinas, including evaluations

10   by the Los Angeles Police Department, coworkers at the

11   Oxnard Police Department, testimony of this next witness, is

12   all admitted for a limited purpose.

13             It is relevant on the question of whether the

14   Oxnard Police Department is liable to the plaintiff for

15   failure to adequately train, hire, or supervise

16   Officer Salinas.  It may not be considered by you for any

17   other purpose.

18             Thank you.

19             **RANDOLPH NUTTER, PLAINTIFF'S WITNESS, SWORN**

20             THE COURT:  Please stop there, sir.  Please raise

21   your right hand to be sworn.

22             Do you solemnly swear that the testimony you're

23   about to give in the proceedings pending before this court

24   shall be the truth, the whole truth, and nothing but the

25   truth, so help you God?

4

```
 1              THE WITNESS:  I do.

 2              THE COURT:  Thank you.

 3              Be seated in the witness chair, please.

 4                   (Pause in the proceedings.)

 5              THE COURT:  Did we remove the exhibits from the

 6    last witness?  If not, please do so.

 7                   (Pause in the proceedings.)

 8              MR. WISOTSKY:  May I walk through the well?

 9              THE COURT:  Sure.

10                   (Pause in the proceedings.)

11              THE COURT:  Would you state and spell your name

12    for the record, please, sir.

13              THE WITNESS:  Randolph A. Nutter.  N-u-t-t-e-r.

14              THE COURT:  Your first name again was?

15              THE WITNESS:  Randolph.  R-a-n-d-o-l-p-h.

16              THE COURT:  Thank you.

17                        DIRECT EXAMINATION

18    BY MR. PAZ:

19    Q.   Good morning, Dr. Nutter.

20    A.   Good morning.

21    Q.   Would you tell the jury what is your profession, sir?

22    A.   I'm a clinical psychologist.

23    Q.   And how long have you been doing clinical psychology?

24    A.   Since about 1979, 1980.

25    Q.   And would you please describe what is your professional
```

1   background, sir.

2   A.   I have a Ph.D. in clinical psychology from the United

3   States International University.   I have a Master's Degree

4   from Pepperdine University and a Bachelor of Science Degree

5   in psychology from Brigham Young University.

6   Q.   And do you have a particular relationship with the

7   Oxnard Police Department?

8   A.   Yes.

9   Q.   And would you describe that, please.

10  A.   I did their preemployment psychological examinations.

11  Q.   And how long did you do those preemployment

12  psychological evaluations?

13  A.   From about 1980 to about 2004 or '05.

14  Q.   Okay.   And were you the only psychologist that did that

15  work for the Oxnard Police Department?

16  A.   Yes.

17  Q.   And before you started working for Oxnard, what kind of

18  work did you do then?

19  A.   I was hired by the Ventura County Sheriff's Department

20  as their chief psychologist, and I did preemployment

21  psychological examinations for them on new hires from about

22  1979 to 2001, I think.

23  Q.   Now, have you also performed the kinds of services that

24  you do, that is, screening police officers -- screening

25  candidates who want to become police officers for other law

1   enforcement agencies in the County of Ventura?

2   A.    Yes, I did.

3   Q.    And would you tell us which ones were those?

4   A.    Well, there's Oxnard PD and Santa Paula Police

5   Department, Santa Barbara PD, Santa Barbara Sheriff's

6   Department.

7   Q.    Okay.

8   A.    There might be some more.  I can't think right at this

9   moment.

10  Q.    Okay.  And in doing this psychological evaluations,

11  what relationship -- let me ask it this way.  Is there any

12  sort of standards that are set forth by the Police Officers

13  Standards and Training, what's been referred to as the POST?

14  A.    Yes.

15  Q.    And would you describe those, please.

16  A.    For a psychological examinations of police officers,

17  POST, Police Officers Standards and Training, set the

18  guidelines; and they mandated the type of psychological test

19  that should be used; and it went into a law sometime later.

20          The first test is the Minnesota Multiphasic

21  Personality Inventory which is the MMPI; and the second test

22  is one of three, 16PF or a CPI test which, along with

23  interviews and background information, is used by the

24  psychologist to determine the psychological fitness of a

25  prospective peace officer.

1   Q.   And why don't you explain to the jury.  What's the

2   purpose of having a preemployment screening, a psychological

3   screening, in order to evaluate a candidate for work?

4   A.   Well, years ago, to hire a police officer, basically,

5   there was no psychological examination; and over the years,

6   they -- Police Officers Standards and Training and police

7   scientists determined that police officers were committing

8   crimes and police officers were behaving like the people

9   they were arresting.

10          So they did some research and determined that you

11  should have some standards when you hire police officers;

12  and there should be medical standards, physical agility

13  standards, psychological standards, background standards.

14          So those were put into effect.  So for the

15  psychological portion, they determined that there are

16  certain traits that are found in successful police officers;

17  and they wanted those traits to be developed and to be -- to

18  see if they were present in applicants; and you would also

19  be able to screen out prospective police applicants that did

20  not meet these standards.

21  Q.   Now, Doctor, as I understand it, part of what you do is

22  you administer tests and part of what you want to look at is

23  the past employment, the person's life experiences, to sort

24  of put the two together and find out what kind of person he

25  is, right?

1    A.   Yes.  During the interview, you would want to get as

2    much background information as possible -- social history,

3    family history -- to determine the whole package of the

4    applicant.

5    Q.   Why do you want to look at someone's past as it relates

6    to what they're going to do as a police officer?

7    A.   Well, a lot of times the past -- people's past behavior

8    determines future behavior or can give you an idea of future

9    behavior.

10        So if an applicant has a scattered past or has

11   relationship problems or has drug abuse issues or anger

12   management issues, those are flags that you would want to

13   talk about in the interview to determine, along with the

14   psychological tests, if those are the people you would want

15   to be your police officers and giving them a gun and powers

16   of arrest and those types of things.

17   Q.   Now, would you explain just briefly then what kind of

18   factors are you looking for when you evaluate a police

19   officer or, for that matter, a reserve candidate for police

20   officer work?

21   A.   Well, you're looking for -- first of all, you're

22   looking for applicants that do not have anger management

23   issues, do not have any type of pathology, are not

24   depressed.

25        You don't want applicants that have relationship

1   issues that they can't deal with -- substance abuse issues,

2   prior arrests, prior drug use.  Those types of things you

3   would not want.

4          When you're interviewing someone and you're doing

5   the interview, the background, you're putting them all

6   together.  You would want your psychological test to show

7   that they are free of all these things and free of any job

8   relevant pathology so that you could certify that they're

9   suitable.

10  Q.   Anger -- you mentioned good anger management control.

11  Is that the ability to control one's temper?

12  A.   Yes.  You know, police officers are confronted daily

13  with citizens that don't like them and are upset by them;

14  and they have to be able to handle their own anger.

15          They have to be able to not get upset and control

16  their emotions and handle citizens in an appropriate manner.

17  Q.   Do you look to see whether someone is impulsive as

18  opposed to controlled?

19  A.   Yes.  You want people -- you want to hire applicants

20  that are not impulsive people because impulsivity in police

21  work would be a negative trait.  You would want applicants

22  to be police officers that think through behavior, that

23  don't automatically rush to do something and then have to

24  try to undo it later.

25  Q.   Do you have -- do you look to see if a person has a

1  past of good problem-solving skills?

2  A.    Yes.   You would want someone that solves problems well,

3  you would want someone that has good judgment, you would

4  want someone who is stable emotionally; and these are things

5  that are determined not only by life history and family

6  background but also the psychological tests.

7  Q.    And, finally, what is, in terms of your evaluation,

8  what do you look for in terms of a person's maturity?

9  A.    Well, you would want to hire applicants for police

10  officers that are mature.   You -- if you hire applicants

11  that are immature, then there's a probability they're going

12  to have to grow up within that department and the department

13  is going to have to be somewhat parental.

14          You would want applicants that are mature,

15  established applicants that know their abilities, know their

16  limitations, people that are mature.   You would want to

17  screen out immature people.

18  Q.    Now, are you familiar with California Government Code

19  Section 1030 entitled "Minimum Standards for Peace

20  Officers"?

21  A.    Yes.

22  Q.    Would you describe to the jury, what is that statute?

23  What does that law do?

24  A.    That law, or statute, says that police officers have to

25  be free of mental disease and medical -- certain medical

1  conditions and physical conditions.

2  Q.   Without reading it, does it sound like to be free or be

3  found free from any physical, emotional, or mental

4  condition --

5  A.   Yes.

6  Q.   -- that might adversely affect the exercise of the

7  power of a peace officer?

8  A.   That's true, yes.

9  Q.   Now, is one of the minimum qualifications established

10  by Government Code Section 1031 is that the candidate must

11  be of good moral character as determined by a thorough

12  background investigation?

13  A.   Yes.

14  Q.   Now, would you explain to the jury, because this is

15  where it gets into your area of expertise, would you explain

16  to the jury, what's the interrelationship between the

17  psychological evaluation that you and every other police

18  psychologist do and the background investigation?

19  A.   Well, the background investigation comes before the

20  psychological examination; and the department who is going

21  to refer the applicant for the psychological evaluation and

22  prospectively hire him does a thorough background check on

23  the applicant.

24            They go and make house calls.  They get into their

25  background.  They interview family members.  They interview

1    significant others.  They run a prior record check.  They

2    check for narcotics use.

3          They do a very extensive background so, literally,

4    the person's life is in a book prior to being hired so that

5    the department knows what they're getting when they hire

6    this individual.

7    Q.    Now, are you familiar with the hiring process at most

8    departments?

9    A.    Yes.

10   Q.    It's a pretty standardized process?

11   A.    Yes.

12   Q.    How does the, in your view, how does the process begin

13   if, for example, I want to go out and be an officer tomorrow

14   and I want to -- you know, what's the first steps I would

15   take?

16   A.    You would walk into the police department you want to

17   work for and you ask for an application and you fill that

18   application out and you return it to that same police

19   department.

20         And then someone from their personnel division

21   will call you; and they'll go over the application and see

22   if you meet their requirements, if you have anything that

23   would keep you from working for them; and then they ask more

24   questions and you fill out more forms and they start the

25   background process.

Q.   Now, is one of the forms that they use known as a personal history questionnaire?

A.   Yes.

Q.   And explain, how does that work?

A.   The applicant fills out where he lives, where he was born, his parents, his wife, his significant other, their children.

He fills out people's names, people's addresses, phone numbers, so the police department can contact them and see what kind of character and what kind of person this applicant is.

Q.   Now, Doctor, in the 25 years you've been doing preemployment psychological screening for police officers, what is your preference as far as getting the background material so you can interrelate them with the psychological tests that you give?

A.   I would like to get all the background information.  I would like to get as much information on an applicant as I can get.

Q.   And why is that?

A.   Well, because then I have the whole picture in front of me.  I know exactly what the person is about, how they've lived their life, how they've related with other people, how they get along with other people; and I don't have to rely on just what they tell me.  I can verify prior marriages,

1   prior employment, issues with prior employment.  The whole

2   package is right there.

3   Q.    Okay.  Now, Doctor, do most law enforcement agencies

4   that you work with provide you with background information?

5   A.    No, not -- no, they don't.

6   Q.    And does Oxnard provide you with background

7   information?

8   A.    No.

9   Q.    Okay.  And have they ever provided you with background

10  information?

11  A.    No.

12  Q.    Now, if you don't have the background information

13  then, how are you then do your evaluation if you don't have

14  that information?

15  A.    Well, when the person -- someone will refer the person

16  to me for the examination; and at that time I'll ask --

17  sometimes it's a secretary, sometimes it's a sworn peace

18  officer -- I'll ask them:  What is their background like?

19  Have they used drugs?  I ask some types of questions that

20  I'll get some answers to.

21          Then I'll talk to them, interview them; and

22  they'll take the test and everything; and then I'll ask them

23  my list of questions for the interview that I need to know

24  to make sure they have -- don't have any mental conditions

25  that would be -- that they could not do their job.

1    And I rely on them to tell me the truth.  You

2    know, I've been doing it long enough.  Sometimes, I can spot

3    people that aren't telling me the truth.  But I'm not a

4    polygraph machine, and I miss it.

5    So I -- if I have -- if something glares out at

6    me, I'll call the department back; and I'll say:  I have a

7    question about this or I have a question about that; and

8    they'll usually let me know if that's the truth or it's not

9    the truth.

10   Q.   Now, over the last 25 years, have you developed a

11   standard list of questions that you ask a candidate when you

12   don't have the background materials?

13   A.   Yes.

14   Q.   And how do you start?

15   A.   Well, I'll get their -- I already have their name.

16   Then I'll get their age.  I'll ask them where they work, how

17   long they've worked there, and basically what they do.

18   I'll ask them if there's been any problems at

19   their employer.  If they've been disciplined with their

20   employer.  You know, I'm looking for a stable employment

21   record.

22   If they tell me that's not so, it's scattered

23   employment, then I'll go back to find out the longest

24   employment, what they've had, have they been fired.  Those

25   kinds of employment issues.

16

1          I ask them if they've ever been a police officer.

2    If they have, have they ever been disciplined as a police

3    officer.  Have they ever had any internal investigations

4    that were founded.  Have they been in any shootings.

5          Do they get along with their peers, their fellow

6    officers.  Have they had any prior psychological

7    examinations.  If they had, did they pass them; did they

8    fail them.

9          And once we have all those established and

10   there's -- and I don't have to go on to other areas from

11   their answers, then I'll get into:  Have you ever been

12   sexually abused.  Have you ever been the victim of any

13   domestic violence.  Have you ever used drugs.  Have you been

14   in the military.  Have you been in any car accidents that

15   are your fault.  Have you been arrested.

16          I ask about the father, the mother, siblings.  I

17   ask them who they live with.  Their relationship.  Have they

18   ever hit the person they've been involved with out of anger.

19   Their education.

20          Have they been in counseling.  Have they been

21   prescribed medication for depression or stress from a

22   physician.  Have they been in the care of a psychiatrist or

23   psychologist.

24   Q.    Let me stop you there, Doctor.

25   A.    Sure.

1

1    Q.    Now, when you -- if you ask somebody:  Have you ever

2    worked for a law enforcement agency or have you ever worked

3    for another police department or applied as a police

4    officer, do you ask if people have applied to be a peace

5    officer?

6    A.    Yes, I have.

7    Q.    Okay.  Now, if the candidate says:  No, I haven't

8    applied to be a police officer, how can you without the

9    background materials find that out?

10   A.    Well, I can't unless the way the person answers me, if

11   he's nervous or she's nervous or if there is some clue that

12   I pick up from the interview, I might call the department

13   and say:  Has this person ever been a police officer or

14   applied anywhere?  But I usually just take what they tell

15   me.

16   Q.    So if a candidate, for example, has worked at a

17   department for a number of months and understands and

18   knows about the hiring process and that you're not going to

19   get the background materials, is there a greater risk that

20   somebody who is coached about what Mr. Nutter is going to

21   ask or Dr. Nutter is going to ask can get past you?

22   A.    Sure.  Yes.

23   Q.    Now, do you have an opinion as to whether this kind of

24   policy where you don't get the background materials, whether

25   that defeats the purpose of Government Code Section 1031(f)

1  that requires that they be found free of any physical,

2  emotional, or medical conditions that might adversely affect

3  the powers of a police officer?

4  A.   I think that the spirit of the Government Code would be

5  the physician or the psychologist that's determining whether

6  an applicant is free of these things, the assumption is they

7  have all the information to make that determination.

8        If they only have half that information, then it's

9  harder to make the determination:  Are they free of any

10 medical or psychological conditions.

11 Q.   Now, are you aware of whether Oxnard Police Department

12 has changed this policy of not providing the background

13 information to the psychologists?

14 A.   I was told that they now send the entire background

15 package to the psychologist that's doing their

16 preemployment.

17 Q.   Now, when you have a blind system, that can lead to the

18 hiring of a person like Mr. Salinas who, in your case, may

19 have not been totally candid in your interview; is that

20 correct?

21 A.   Yes.

22        MR. EICHER:  Objection, Your Honor.  That's

23 argumentative.  No foundation for that.

24        THE COURT:  It's argumentative.  I'll sustain it,

25 and it's 12 o'clock so we'll take our fifteen-minute break.

1        MR. PAZ:  Very well, Your Honor.  Thank you.

2            (The jurors exited the courtroom.)

3                    (Recess.)

4            (The jurors entered the courtroom.)

5        THE COURT:  You may continue with direct.

6        MR. PAZ:  Thank you, Your Honor.

7   Q.    Just before we broke, Dr. Nutter, I -- just to clear up

8   one point, I asked you a question about whether most law

9   enforcement agencies provide background materials to you;

10  and I think your answer was in the negative; is that

11  correct?

12  A.    Yes.

13  Q.    Okay.  Now, would you describe for the jury what kind

14  of background materials do you get typically when you're

15  starting these interviews?

16  A.    Well, I'll get some verbal information over the

17  telephone from the background investigator or the secretary.

18  Q.    Okay.

19  A.    Sometimes Oxnard would send me a polygraph on the

20  applicant, and other departments would send me perhaps a

21  poly or part of a personal history statement.  Something

22  along those lines.

23  Q.    Now, if a person -- from your experience with Oxnard,

24  if a person was a prior law enforcement candidate or

25  applicant or reserve officer or police officer, would that

1  be the kind of background information you would receive?

2  A.   Usually, yes.

3  Q.   Now, getting back to the question I had asked you just

4  before we broke, I think you said -- you were talking about

5  the policy of not having any background materials on an

6  officer or not be provided with the background materials.

7       Can this policy lead to the hiring of a person who

8  is not honest?

9  A.   Yes.

10 Q.   And then you described that because there is no way to

11 go back and find out if they aren't?

12 A.   That's correct.

13 Q.   Okay.  Now, during this case, you were provided with

14 some materials that were given to you from myself, from my

15 office, that were prepared by the Oxnard Police Department

16 which was the background materials.  Do you recall that?

17 A.   Yes.

18 Q.   And we have that attached as Exhibit 53, and that's

19 just to your left there.

20 A.   (Looking at document.)

21 Q.   And I'm not going to ask you to look at it yet.

22 A.   Okay.

23 Q.   And I just want to also say you also received some

24 background materials from the Los Angeles Police Department;

25 and we've marked those as Exhibit 97 and those are the one

1  to your left.

2  A.   Yes.

3  Q.   Okay.  Now, what do you base -- well, let me ask you

4  this now.  You see the deposition up there, the deposition

5  of Randolph Nutter just before you?

6  A.   Yes.

7  Q.   And would you look at Exhibit No. 1?

8  A.   On this one here?

9  Q.   Yes, sir.  On the deposition.

10  A.   (Looking at document.)

11  Q.   And I'd like to have that marked as Exhibit 201, Your

12  Honor.

13              THE COURT:  Hold on a second.

14                  (Exhibit 201 marked for I.D.)

15              THE WITNESS:  Yes.

16  BY MR. PAZ:

17  Q.   What is that, Doctor?

18  A.   That's a copy of my index card that I use in my office

19  on every applicant.

20  Q.   Okay.  And that particular index card, for whom is

21  that?

22  A.   For Andrew J. Salinas.

23  Q.   Now, you conducted two evaluations of Andrew Salinas;

24  is that right?

25  A.   Yes.

1   Q.   And the first was for the position of reserve officer

2   on October 2 -- October 12th, 1995?

3   A.   Yes.

4   Q.   And then there was a second one on May 14th, 1996,

5   for the position of police officer, right?

6   A.   Yes.

7   Q.   Now, in the 25 years you've been doing these

8   evaluations, had you developed a routine practice as to when

9   you begin your interview and you ask these questions about

10  law enforcement, prior law enforcement experience,

11  application, preemployment screening for police work?

12         First tell the jury about how many of these such

13  interviews have you done where you follow this pattern?

14  A.   Almost every interview I've ever done I asked.

15  Thousands, probably.

16  Q.   Now, did you have a particular routine or habit in

17  which you would record information about prior law

18  enforcement information?

19  A.   Yes.

20  Q.   Would you describe that, please.

21  A.   When I find out if an applicant has been a police

22  officer before or worked at a department in some capacity, I

23  would make a note of that on my index card for future

24  reference.

25  Q.   Okay.   And the index card that you're looking at marked

1   as Exhibit 201, is that the index card that you prepared

2   when you did the interview of Mr. Salinas?

3   A.   Yes.

4   Q.   Okay.  Now, was it your custom and practice then to put

5   -- why don't you describe the information you would put down

6   assuming you that you had been told that the applicant had a

7   prior preemployment psychological evaluation and whether

8   they had applied for reserve or police officer.  What would

9   put down?

10  A.   I would put down where, what agency gave him the

11  preemployment psychological, the date, and the position he

12  was applying for and if he'd passed or not.

13  Q.   And did you keep these cards as a part of your

14  permanent business activities for the Government Code

15  Section 1031 evaluations?

16  A.   Yes.

17  Q.   And you kept it for every single interviewee that

18  you've done for all these years?

19  A.   Yes.

20  Q.   Okay.  Now, would you tell the jury, do you have any

21  indication on that card that Mr. Salinas had any prior law

22  enforcement experience?

23  A.   No.

24  Q.   Now, sir, does that -- what, in your opinion, what

25  conclusion can you draw from that, the fact of the absence

1   of an entry in your permanent records of your interviews?

2          MR. EICHER:  Your Honor, I object.  This is pure

3   speculation at this point.

4          THE COURT:  Overruled.

5          I'll allow the answer.

6          THE WITNESS:  I was not told about his prior

7   employment.

8   BY MR. PAZ:

9   Q.   Now, if you were not told by the department and you

10  were not told by Salinas that there was any prior

11  preemployment psychological evaluations with LAPD, is there

12  any way that you could go back and check?

13         MR. EICHER:  Your Honor, I'm just going to object.

14  It lacks foundation to form that question as to

15  Officer Salinas; what he was told.

16         THE COURT:  Well, I don't think he's -- I think

17  it's just a hypothetical question so I'll allow it in that

18  sense.

19         THE WITNESS:  If no one told me, there'd be no way

20  for me to check, no.

21  BY MR. PAZ:

22  Q.   And that's the weakness of this process?

23  A.   Yes.

24  Q.   When you were first subpoenaed for a deposition in this

25  case, up until that point, had you seen the background

2

1    information on Mr. Salinas?

2    A.   No.

3    Q.   All you had was your card?

4    A.   Yes.

5    Q.   Now, when you came for the deposition, were you

6    provided the background materials on Mr. Salinas that was

7    developed by the Oxnard Police Department?

8    A.   Yes.

9    Q.   And did those -- did those documents show that

10   Mr. Salinas was not honest with you during your evaluation

11   in other particulars?

12   A.   Yes.

13              MR. EICHER:  Your Honor, I'm going to object at

14   this point.  Essentially, this is improper expert opinion

15   based upon inadmissible hearsay reports.

16              THE COURT:  I think the way the question is

17   phrased it's objectionable.  Sustained.

18              MR. PAZ:  I'll repeat it.

19   Q.   Did you review the records?

20   A.   At your office?

21   Q.   Yes, sir.

22   A.   Yes.

23   Q.   And that was just before the deposition, correct?

24   A.   Yes.

25   Q.   Now, did you find from the review of those records that

1   Mr. Salinas had not told you the truth during the course of

2   his interview with you?

3         MR. EICHER:  Same objection, Your Honor.  These

4   reports are inadmissible hearsay and this opinion here by an

5   expert is not admissible at this time.

6         MR. PAZ:  I'm just asking a preliminary question,

7   a foundational question, Your Honor.

8         THE COURT:  All right.  Go ahead.

9         THE WITNESS:  Could you repeat that?  I'm sorry.

10        MR. PAZ:  Sure.

11        May I have the court reporter repeat it?

12        THE COURT:  Well, if you're going to ask the same

13  question, then we're going to end up with the same problem.

14        MR. PAZ:  Okay.

15        THE COURT:  In terms of the records, the court has

16  indicated that the records are admissible in order to

17  determine whether it would make a difference to this witness

18  had he seen them.

19        I don't think it's appropriate to ask him if in

20  his opinion Officer Salinas was telling the truth and so

21  that question is objectionable.

22        MR. PAZ:  Okay.

23  Q.   Then let me turn your attention then to Exhibit 97.

24  A.   (Searching through documents.)

25  Q.   And that would be page 009.

1   A.   That is not in this transcript here.

2   Q.   No, no.   It's in the white book on your left; the

3   exhibit book.

4        THE COURT:   I don't know what volume 97 would be

5   in.

6             (*Pause in the proceedings.*)

7        THE WITNESS:   09?

8        MR. PAZ:   Yes, sir.

9        THE COURT:   You find it?

10       THE WITNESS:   Yes.   Thank you very much.

11       Yes, I have it.

12            (*The exhibit was displayed on the screen.*)

13       MR. EICHER:   All right.   At this time,

14  anticipating what documents are being shown to the jury, I'd

15  like to request a sidebar.

16       THE COURT:   Okay.   You want to take it down while

17  we go to sidebar?

18       MR. PAZ:   Sure.

19            (*The following was held at the bench:*)

20       MR. EICHER:   Your Honor, I think at this point

21  it's improper to display these documents from LAPD on two

22  counts.   One, it's going to call for speculation from this

23  witness and it lacks foundation that these records would

24  have been available.   None of that foundation has been laid

25  and to put them in front of the jury now is inappropriate.

1          MR. PAZ:  Your Honor, the records are being

2     offered for the information from this point of view of the

3     psychologist as to whether or not he was given information

4     during the course of the interview.

5          THE COURT:  Well, one of the questions that I

6     think you're raising -- and I wasn't sure, although in your

7     opening statement, or Mr. Burton's opening statement, you

8     indicated, Mr. Burton, that at the time of this evaluation

9     the Oxnard police had possession of the LAPD records but did

10    not turn them over.  I'm hearing from you that is not

11    correct?

12         MR. EICHER:  That's not correct.  I would like to

13    ask for an offer of proof if they were available to the

14    Oxnard Police Department.

15         THE COURT:  I mean, I don't know.

16         MR. PAZ:  No, they did not have them.  At the time

17    of the evaluation, the Oxnard Police Department did not have

18    them.  What it was --

19         THE COURT:  What is this?

20         MR. EICHER:  This is a psychological assessment

21    report from the LAPD files.

22         THE COURT:  From LAPD?

23         MR. PAZ:  And so the foundation for this is that

24    this is a kind of report Mr. Nutter would use in his

25    profession and it's the kind of assessment that -- it has

1   the information.

2          It was not disclosed by Mr. Salinas during the

3   personal interview so it's coming in to show, one, that the

4   information was withheld from him.  It was withheld because

5   of the policy of not -- withholding even the simplest

6   personal statements so in the Oxnard records Mr. Salinas

7   says:  I went to LAPD and I applied.  However, Mr. Nutter,

8   as he's testified, never received that information from

9   Mr. Salinas.

10          THE COURT:  We have two different things going

11   here.  One is the fact that he had previously applied to

12   LAPD.  That information should have come from Mr. Salinas;

13   and if it didn't, the jury can draw whatever inference it

14   wants to draw from that.

15          But if these records were not available to Oxnard

16   PD, Oxnard PD could not have turned it over to him.

17          MR. PAZ:  The point is they were available.  If

18   you want me to lay a foundation first, I can introduce the

19   document that says they were invited to call and that

20   they -- they sent an inquiry, a standard inquiry form to

21   LAPD; and LAPD wrote back and says:  Please -- if you want

22   to come see the records, please call 213-485, et cetera; and

23   so they were available to them.

24          THE COURT:  Okay.

25          MR. EICHER:  That is not a proper foundation.  In

1  fact, there is testimony of an expert that Mr. Paz is aware

2  of, an LAPD chief that worked at the time, who indicated

3  that the call to review the file was simply a telephonic

4  review.  They don't have a witness to come in here and say

5  that.

6          MR. PAZ:  That also has no foundation.  He is

7  speculating.

8          THE COURT:  Okay.  It still goes to maybe the

9  issue of whether Oxnard PD should have done more to get the

10  records.  That's an argument that goes to the *Monell* issue.

11  But as far as what these records say, I can't see any way

12  you can put that in front of the jury.

13          Oxnard didn't have it.  This witness never saw it.

14  The only way it would become relevant is for its truth and

15  it's clearly hearsay.

16          I said that, you know, the background is going to

17  be material on the question of what was known or should have

18  been known.  But if no one had it, then I think the only

19  argument you can make is that there was information

20  available through LAPD that they didn't go look at or didn't

21  make the phone call or whatever.

22          MR. PAZ:  Your Honor, the assessments that were

23  done are all based on the materials that Mr. Salinas and the

24  background materials that Salinas provided to the LAPD.

25  What we're trying to prove is that those -- he then was able

3̲

1   to go to Oxnard and say those things.

2          THE COURT:  Right.

3          MR. PAZ:  And, therefore, he was able to get hired

4   by virtue of the policy of no background, you don't get it,

5   I don't have to tell you.

6          THE COURT:  Mr. Salinas --

7          MR. PAZ:  Well, if I can't have the conclusions of

8   the doctor, without the doctor coming to testify, then --

9          THE COURT:  That's all right.

10          MR. PAZ:  -- I can call him.

11          THE COURT:  If you get a witness from L.A., then

12   they certainly can talk about what they knew and what they

13   learned.  But not from this witness.

14          MR. PAZ:  Even though he laid the foundation he is

15   a psychologist and relies on these kinds of documents?

16          THE COURT:  Right.  No.

17    (The following was in open court in the jury's presence.)

18   BY MR. PAZ:

19   Q.  We'll come back to this in a few minutes or some other

20   time, Doctor.

21          Let us turn your attention to the records that

22   were prepared by the Oxnard Police Department; and those

23   would be Exhibit 53.  If you could get those before you.

24   A.   Yes.  Page number 3079?

25   Q.   Yes.  It starts with 3079.

1   A.   Okay.

2   Q.   Now, are these the background materials that you saw on

3   April 13th, 2005, when you were, you were going to be

4   deposed?

5   A.   Some of them, yes.

6   Q.   Okay.  Now, turn your attention then to -- let me ask

7   you some global questions first.

8          Now, had you -- if it would have been within your

9   ability to have seen the background information that was

10  developed by Oxnard, would you have -- would it have been

11  your professional opinion that Mr. Salinas would be

12  qualified to be a peace officer from the psychological point

13  of view?

14          MR. EICHER:  Your Honor, I object at this point.

15  There's no foundation as to what specific documents he's

16  talking about.

17          THE COURT:  You may answer the question if you

18  understand it.

19          THE WITNESS:  No.

20  BY MR. PAZ:

21  Q.   You do understand the question?

22  A.   That if I would have seen the background information,

23  from reading the background information, do I think he would

24  have been a suitable candidate for a police officer.

25  Q.   Yes; that's the question?

1   A.   And my answer would be no, he would not be.

2   Q.   Okay.  Now, let me bring your attention to Exhibit 53.

3   That would be page 3245 and -47.

4        I'm sorry.  3245.

5   A.   3245?

6   Q.   Yes, sir.

7                    (Pause in the proceedings.)

8            MR. PAZ:  I'm sorry.  Wrong page.

9                    (Pause in the proceedings.)

10  BY MR. PAZ:

11  Q.   Yes.  3256 is the right page.

12  A.   (Searching through documents.)  Yes, I have that.

13           (The exhibit was displayed on the screen.)

14  BY MR. PAZ:

15  Q.   Now, this is a personal inquiry questionnaire that was

16  prepared for the applicant Andrew Salinas to be a police

17  officer; and it was sent to a person who was his supervisor,

18  Beverly Steele.

19       Now, is this one of the documents that you

20  reviewed?

21  A.   At your office, yes.

22  Q.   Yes.  All right.

23       Now, going to Question No. 6.  There's an entry

24  there.  Question No. 6:  Are you convinced the applicant is

25  honest?

1          And this -- just so I lay the foundation on the

2    next page -- this is November 1, 1995; and I'll be putting

3    up the second page.

4          Is that correct?

5    A.    Yes.

6    Q.    Okay.  That's on the second page, and it's signed by

7    Beverly Steele?

8    A.    Yes.

9    Q.    And it -- when was your interview of Mr. Salinas, the

10   first one?

11   A.    If I could review that card again.  It was '95.

12   Q.    What month?

13   A.    It would be October 12th, '95.

14   Q.    And the second one?

15   A.    Was May 14th, '96.

16   Q.    Okay.  So in between that time on November 1st, 1995,

17   Mr. Salinas's supervisor where he's working as a clerk had

18   an opinion that the applicant was honest.

19          And then it goes on and says:  Is applicant --

20   No. 7:  Is the applicant reliable?  Answer:  No.

21          And it says "Comment.  Not in a working

22   relationship where other work depends on his completing

23   work."

24          Question No. 8.  Now, let's go back another

25   second.  At the time you do your interview with the

1   applicant, I think you said you asked them questions about

2   their employment and how they're getting along in their

3   work?

4   A.   Yes.

5   Q.   Now, is that the kind of question then that if someone

6   had told you that they were not having a good relationship

7   with their supervisor as a police clerk, is that the kind of

8   question then that you would have wanted to follow up with?

9   A.   Yes.

10  Q.   And what would you do -- if someone was honest with you

11  and told you:  I'm having a little trouble at my job as a

12  clerk, what would be, as a reviewing psychologist, what

13  would be your practice then to go and determine or make --

14  or ascertain what's going on?

15  A.   Well, I would ask him what kinds of trouble, who is

16  your supervisor, or what's going on.  I'd probably talk to

17  the background person and say, you know, so and so told me

18  that they're having problems.  What are the problems; trying

19  to determine exactly what the issues are.

20  Q.   Number 8 indicates -- Question No. 8 -- I'll zoom in on

21  it a little bit.

22           *(The exhibit was displayed on the screen.)*

23  BY MR. PAZ:

24  Q.   "Would you trust applicant with confidential matters?"

25  And that one says:  "Unable to form an opinion."

1          Then if I could then turn your attention down to

2    the bottom of that page.  Question No. 17.  "In your opinion

3    is the applicant emotionally stable?

4          "Answer:  No.  Comment:  Needs to mature."

5          Now, is that -- let me just go then to the next

6    page which is Exhibit No. 53 which is 2057.  That's the next

7    page for you, Dr. Nutter.

8    A.    Okay.

9    Q.    It says, "Question 19:  Do you know anything else about

10   the applicant which should be investigated before

11   appointment to this position considering such things as

12   maturity, loyalty, common sense, judgment, tolerance,

13   .ability to recognize own limitations, et cetera.

14          "Answer:  Uses poor judgment in prioritization of

15   workload."

16          Now, is that the kind of thing that would be a

17   negative indicator for a person who you're going to entrust

18   with the responsibilities of a law enforcement agent?

19   A.    I would like to follow up on that, yes.

20   Q.    Now, there's a reference to a -- the center of the

21   page, it says -- No. 22 -- the question is "Would you want

22   the applicant to be a police officer (or reserve officer)

23   for the city in which you live and to be responsible for the

24   safety of you or your family?

25          "Answer:  No.

1          "If no, why?

2          "At this time applicant needs to focus on current

3     job and not take it for granted that he will be going to the

4     police academy in January."

5          Now, did Mr. Salinas -- well, let me ask it this

6     way.  Is this the kind of information that had you known

7     that he was not having a good experience at his work as a

8     clerk, is that the kind of things that you would then want

9     to have known so you could make an assessment as to whether

10    or not he should be hired?

11    A.    Yes.

12    Q.    Now, No. 25.  "How did applicant react to company

13    policy rules and procedures?

14          "Answer:  Resisted.

15          "Comment:  Applicant does what he wants to do

16    instead of job priority."

17          And the next one down, it says -- No. 27 --

18    "Please check any problems affecting the applicant's work."

19    And it has "disciplinary problems, unable to follow

20    instructions"; and the comment is "applicant at sometimes is

21    insubordinate."  Do you see that?

22    A.    Yes.

23    Q.    How would that affect, in your professional opinion as

24    a psychologist who reviews police candidates, if the past is

25    some indication of the future, how would that play out on

1    the field when a person now has the responsibility to obey

2    civil rights, respect the rights of others, and has the

3    power to use a gun and use force?

4    A.   That would be a big deal.  I think that would be a big

5    negative.  That would not be good at all.

6    Q.   All right.  Now, Dr. Nutter, there was a period of

7    time -- strike that.

8              Let me give you another application which is on

9    page 3256.

10   A.   (Searching through documents.)

11   Q.   Let's see.  I'm sorry.  Let me go back to 3250.

12                      (Pause in the proceedings.)

13             MR. PAZ:  If I may just have a moment, Your Honor.

14   I'm sorry.

15             THE COURT:  Yes.

16                      (Pause in the proceedings.)

17             MR. PAZ:  Let me give you this one, Your Honor.

18   Let me give you this one, Dr. Nutter.  This is on 3254.

19             (The exhibit was displayed on the screen.)

20   BY MR. PAZ:

21   Q.   This is the application of -- it's another one of these

22   personal inquiry questionnaire, and it's also of

23   Andrew Salinas.  It's to a Mr. David King at AMSEC

24   International.  It says that he worked with the applicant.

25   He was employed for three months in 19 -- from apparently