1   Jenny Scovis, Esq., State Bar No. 87026
    Kim D. Scovis, Esq., State Bar No. 182059
2   **LAW OFFICES OF KIM D. SCOVIS**
    223 East Thousand Oaks Boulevard, Suite 412
3   Thousand Oaks, California  91360
    Telephone: (805) 496-6413   Facsimile: (805) 379-3966
4

5   Attorneys for Plaintiff, MARIA LAZOS as an individual, and *THE ESTATE OF*
    *THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*
6

7

8                       UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10

11  MARIA LAZOS, *THE ESTATE OF*           )   Case No. CV08-02987-RGK (SHx)
12  *THOMAS BARRERA, By and Through its*    )
    *Successor in Interest, MARIA LAZOS*    )   (consolidated w/ CV 08-05153 RGK )
13                                          )
              Plaintiff,                    )
14                                          )   **PLAINTIFFS MOTION IN LIMINE**
    vs.                                     )   **NO. 10 TO EXCLUDE ANY EVIDENCE**
15                                          )   **THAT   TOMMY   BARRERA**
    CITY OF OXNARD; OXNARD POLICE           )   **ASSAULTED AND/OR BATTERED**
16  DEPARTMENT; POLICE CHIEF JOHN           )   **ANY   OTHER   INDIVIDUAL**
    CROMBACH; ANDREW SALINA, and            )   **UTILIZING A KNIFE**
17  DOES 1-10                               )
                                            )
18                                          )
              Defendants.                   )
19  _____        )   DATE: August 11, 2009
                                            )   TIME:
20  AND CONSOLIDATED ACTION                 )   DEPT: "850"

21

22        Plaintiffs, MARIA LAZOS, TOMAS BARRERA and *THE ESTATE OF THOMAS*

23  *BARRERA BY AND THROUGH ITS SUCCESSORS IN INTEREST MARIA LAZOS and*

24  *TOMAS BARRERA* do hereby submit their Motion in Limine seeking an Order Excluding all

25  Evidence that decedent, Tommy Barrera, was involved in any altercations, prior to the

26  incident at issue in this action,  wherein Tommy Barrera is alleged to have assaulted and/or

27  battered  an individual unrelated to this action, utilizing a knife and/or any other weapon.

28        Defendants have alleged that Decedent became involved in an altercation with a

1   "confidential witness" and that during this alleged altercation Tommy Barrera showed the

2   confidential informant the knife that was supposedly concealed in Barrera's pant leg. Barrera

3   allegedly revealed the knife in a manner specifically designed to threaten and/or cause fear

4   in the informant's mind.  Defendants further allege that Tommy reached for his pant leg with

5   the intent to brandish the knife, but became too scared to do so when the confidential

6   informant  pulled his gun out..

7          There dangers connected with the introduction of any evidence attempting to prove

8   the above referenced allegations are numerous . This allegation is extremely prejudicial,

9   constitutes hearsay, is not relevant to any issue, and constitutes character evidence.

10   Second, there is no privilege when the trial court determines that the informer may be able

11   to give testimony necessary to a fair determination of the issue of guilt or innocence in a

12   criminal  case or of a material issue on the merits in a civil case to which the government is

13   a party (Supreme Court Standard 510(c)(2)).  In the case at bar, the "confidential witness"

14   will only be able to testify as to what his **speculations** were as to what Tommy Barrera's

15   intended to do during an unrelated incident.   This unrelated incident, if brought before the

16   trier of fact, does is nothing more than thinly veiled character evidence, not relevant to any

17   issue in this case, and brought for the sole purpose of prejudicing the trier of fact..

18          In the absence of redeeming probative value, exclusion of evidence because of its

19   capacity for prejudice has long been the practice in federal courts. Of course, the evidence

20   must be unfairly prejudicial, not merely prejudicial, to be excludable under Rule 403. United

21   States v. Brandon, 521 F.3d 1019, 1026 (8th Cir. 2008) (``Unfair prejudice does not refer to

22   the legitimate probative force of the evidence, but rather its capacity to lure a jury into

23   declaring guilt for an improper reason"). Evidence that is relevant will, of necessity, be

24   prejudicial, else it would not be relevant. See, e.g., United States v. Suggs, 374 F.3d 508, 516

25   (7th Cir. 2004). The prejudice must be ``unfair." Dollar v. Long Mfg., N.C. Inc., 561 F.2d

26   613, 618 (5th Cir. 1977). The prejudice that Rule 403 contemplates as being sufficient to

27   warrant exclusion of relevant evidence must result in an adverse impact beyond its tendency

28   to prove the fact or issue that makes the evidence relevant in the first place. See, e.g., United

1 | States v. Murillo, 288 F.3d 1126, 1137 (9th Cir. 2002)

2 |     The victim's character is usually not an essential element of a defendant's claim of self

3 | defense. Thus, a victim's specific acts are generally not admissible to prove that the victim

4 | had the character trait of being aggressive and was, therefore, in all probability, the first

5 | aggressor, even though opinion and reputation testimony would be available to the defendant

6 | to support the propriety of the jury's following that inferential evidentiary train. See, e.g.,

7 | United States v. Gulley, 526 F.3d 809, 819 (5th Cir. 2008) (prior specific acts were not

8 | admissible to prove murder victim's alleged propensity for violence, because plain language

9 | of Rule 405(b) limits use of specific instances of conduct to prove essential elements of

10 | charge or defense, and victim's character was not essential element of defendant's self

11 | defense claim in ``strict sense'' because self defense claim could be proven whether victim

12 | had violent or passive character); United States v. Gregg, 451 F.3d 930, 933–935 (8th Cir.

13 | 2006)

14 |     Evidence that might induce the jury to conclude that the defendant in a criminal case

15 | probably committed the crime with which he or she is charged because earlier bad acts

16 | indicate he or she is of bad character is also ``prejudicial'' in the sense that properly brings

17 | into play the protective provisions of Rule 403. See, e.g., Huddleston v. United States, 485

18 | U.S. 681, 691–92, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), (evidence of prior bad acts is

19 | admissible under Rule 404(b) only if: (1) it is offered for a proper purpose; (2) it is relevant;

20 | (3) Rule 403's balancing reveals its probative value is not substantially outweighed by its

21 | potential for unfair prejudice; and (4) pursuant to Rule 105, the trial court, on request, gives

22 | limiting instruction to jury); United States v. Curtis, 280 F.3d 798, 802 (7th Cir. 2002)

23 | (almost any bad act evidence simultaneously condemns by besmirching character and by

24 | proving one or more facts for which such evidence is admissible under Rule 404(b)). So, too,

25 | is evidence that might lead to a defendant's conviction for a crime he or she may not have

26 | committed, in the belief that a ``preventive'' conviction is necessary to keep the defendant

27 | from committing other bad acts his or her bad character indicates he or she will commit in

28 | the absence of such a conviction. Old Chief v. United States, 519 U.S. 172, 191–192, 117

1   S. Ct. 644, 136 L. Ed. 2d 574 (1997). Indeed, any evidence is unduly prejudicial under Rule

2   403 when its sole probative value is to show a criminal defendant's propensity to commit the

3   crime charged in the indictment. See, e.g, United States v. Thomas, 321 F.3d 627, 630–633

4   (7th Cir. 2003) (when defendant was charged with being felon in possession of firearm, trial

5   court abused its discretion under Rule 403 when it admitted photograph of defendant's tattoo

6   of two crossed pistols, because it had no probative value other than to show defendant's

7   propensity to possess guns).

8         The Confrontation Clause of the Sixth Amendment provides: ``[i]n all criminal

9   prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against

10  him … .'' The Confrontation Clause, of course, means more than that the accused has a right

11  to see and know the identity of the witnesses against him or her. It means that, when it is

12  applicable, the accused will have the right to cross-examine the witness concerning the

13  evidence he or she has given on the prosecution's behalf. See, e.g., Maryland v. Craig, 497

14  U.S. 836, 845, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (``The central concern of the

15  Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant

16  by subjecting it to rigorous testing in the context of an adversary proceeding before the trier

17  of fact''); California v. Green, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)

18  (when prosecution offers declarant's out-of-court statements against accused and declarant

19  is unavailable, trial court must decide whether Confrontation Clause permits prosecution to

20  deny accused his or her usual right to force declarant ``to submit to cross-examination, the

21  `greatest legal engine ever invented for the discovery of truth.' '').

22         Taken literally, the Confrontation Clause could mean that no evidence of out-of-court

23  statements is admissible against an accused in a criminal prosecution unless the declarant is

24  available to testify, or that no evidence of out-of-court statements is admissible unless the

25  accused has an opportunity to cross-examine the declarant. No court, however, has adopted

26  such a stringent interpretation of the Confrontation Clause. See, e.g., United States v. Inadi,

27  475 U.S. 387, 394–398, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986) (out-of-court statements

28  by co-conspirators of accused are admissible even though declarant is unavailable to testify

1  and accused has had no opportunity to cross-examine declarant); Mattox v. United States,

2  156 U.S. 237, 240–244, 15 S. Ct. 337, 39 L. Ed. 409 (1895) (evidence of prior testimony of

3  deceased witnesses is analogous to evidence of dying declaration, which is admissible in

4  criminal prosecution even though accused had no opportunity to cross-examine declarant).

5      The Supreme Court has ``disclaimed any intention of proposing a general answer to

6  the many difficult questions arising out of the relationship between the Confrontation Clause

7  and hearsay." United States v. Inadi, 475 U.S. 387, 392, 106 S. Ct. 1121, 89 L. Ed. 2d 390

8  (1986). The interaction between the hearsay rule and its panoply of exclusions and

9  exceptions, on the one hand, and the Confrontation Clause, on the other, is largely dependent

10  on the characteristics of the hearsay evidence that is offered into evidence and whether the

11  accused has had an opportunity to question the declarant concerning the subject matter of the

12  statement.

13  The Supreme Court has ``disclaimed any intention of proposing a general answer to the many

14  difficult questions arising out of the relationship between the Confrontation Clause and

15  hearsay." United States v. Inadi, 475 U.S. 387, 392, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986).

16  The interaction between the hearsay rule and its panoply of exclusions and exceptions, on

17  the one hand, and the Confrontation Clause, on the other, is largely dependent on the

18  characteristics of the hearsay evidence that is offered into evidence and whether the accused

19  has had an opportunity to question the declarant concerning the subject matter of the

20  statement.

21      Exclusion of the out-of-court statement even though the defendant against whom it was

22  offered had an adequate opportunity to cross-examine the declarant when the prosecution

23  failed to show that the declarant was unavailable to testify at the trial. Crawford v.

24  Washington, 541 U.S. 36, 57, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (testimonial

25  statements of witnesses absent from trial have been admitted only when the declarant is

26  unavailable, citing Barber v. Page, 390 U.S. 719, 722–725, 88 S. Ct. 1318, 20 L. Ed. 2d 255

27  (1968)).

28

1 • Exclusion of out-of-court statements when the defendant against whom they were

2 offered did not have an opportunity to cross-examine the declarant. Lilly v. Virginia, 527

3 U.S. 116, 134, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999);  Roberts v. Russell, 392 U.S. 293,

4 294–295, 88 S. Ct. 1921, 20 L. Ed. 2d 1100 (1968) (per curiam); Bruton v. United States,

5 391 U.S. 123, 126–128, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968

6 In this instant action, we have an unidentified individual, who will allegedly testify

7 not just to Tommy Barrera's acts,as to acts that could certainly be classified as criminal, but

8 to his and/or the Defendants *subjective interpretation* of those acts.

9 ``Unfair prejudice'' can occur because the trial court made an insufficient effort to avoid

10 obvious dangers. See, e.g., Gray v. Genlyte Group, Inc., 289 F.3d 128, 139 (1st Cir. 2002)

11 . It can also occur because the theory on which the evidence was offered was designed to

12 elicit a response from the jurors that the evidence itself did not justify. See, e.g., United

13 States v. Pineda-Torres, 287 F.3d 860, 863–864 (9th Cir. 2002) (expert evidence of structure

14 of drug smuggling operation should have been excluded as unfairly prejudicial when

15 government offered no evidence that defendant was part of drug smuggling operation,

16 because evidence unfairly suggested that defendant was member of drug smuggling operation

17 and therefore knew drugs were in car he was driving); United States v. Zaccaria, 240 F.3d

18 75, 79 (1st Cir. 2001) (in absence of showing of exceptional circumstances, trial court

19 properly rejected on ground of undue prejudice defendant's attempt to impeach government

20 witness by showing he remained silent in response to government interrogation). Moreover,

21 ``unfair prejudice'' may be the result of the admission of prejudicial evidence when the

22 offering party has other, less prejudicial, evidence that it could have used equally effectively

23 to prove the same consequential fact. See, e.g., United States v. Kornegay, 410 F.3d 89, 96

24 (1st Cir. 2005) (whether offering party has other less prejudicial evidence to prove same

25 consequential fact is part of Rule 403's analysis).

26 The Federal Rules of Evidence do not define character. Nevertheless, character is a

27 generalized description of a person's disposition or a general trait, such as honesty,

28 temperance, or peacefulness. Character is not synonymous with habit; the admissibility of

1   evidence of a person's habits is treated in Federal Rule of Evidence 406. See § 406.5. Habits

2   are more specific than traits of character. ``Habit'' connotes a regular practice of responding

3   to a particular kind of situation with a specific type of conduct, while ``character'' connotes

4   a general predisposition to act regularly in a particular way without regard to the specific

5   situation the person with the particular character trait faces.

6          Character is also distinct from reputation. Character is what a person is, while

7   reputation is what other people think a person is. Thus, reputation is one of the ways of

8   evidencing character. Methods of proving character are generally governed by Federal Rule

9   of Evidence 405.  It also precludes the use of evidence of other acts of a party to prove

10   circumstantially  the  character  of  that  person  for  the  purpose  of  proving,  again

11   circumstantially, that the person acted in conformity with that character trait. It specifically

12   permits, however, proof of other acts of a person for the purpose of proving circumstantially

13   consequential facts the substantive law requires the proffering party to prove to make out a

14   prima facie case, such as identity, intent, and the like, or for the purpose of proving

15   foundational facts, such as motive, from which those necessary consequential facts can

16   properly be inferred. Fed. R. Evid. 404(b)

17          *Federal Rules of Evidence §404* states: " Character Evidence Not Admissible

18   to Prove Conduct; Exceptions; Other Crimes.

19   (a)  Character evidence generally.—Evidence of a person's character or a trait of character

20   is not admissible for the purpose of proving action in conformity therewith on a particular

21   occasion, except:

22   (1)  Character of accused.—In a criminal case, evidence of a pertinent trait of character

23   offered by an accused, or by the prosecution to rebut the same, or if evidence of a trait of

24   character of the alleged victim of the crime is offered by an accused and admitted under Rule

25   404(a)(2), evidence of the same trait of character of the accused offered by the prosecution;

26

27   (2)  Character of alleged victim.— In a criminal case, and subject to the limitations imposed

28   by Rule 412, evidence of a pertinent trait of character of the alleged victim of the crime

1  offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait

2  of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut

3  evidence that the alleged victim was the first aggressor;

4  (3) Character of witness.—Evidence of the character of a witness, as provided in Rules 607,

5  608, and 609.

6  (b) Other crimes, wrongs, or acts.Evidence of other crimes, wrongs, or acts is not admissible

7  to prove the character of a person in order to show action in conformity therewith. It may,

8  however, be admissible for other purposes, such as proof of motive, opportunity, intent,

9  preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon

10  request by the accused, the prosecution in a criminal case shall provide reasonable notice in

11  advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of

12  the general nature of any such evidence it intends to introduce at trial. [Adopted Jan. 2, 1975,

13  effective July 1, 1975; amended Mar. 2, 1987, effective Oct. 1, 1987; Apr. 30, 1991, effective

14  Dec. 1, 1991; Apr. 17, 2000, effective Dec. 1, 2000; Apr. 12, 2006, effective Dec. 1, 2006.]"

15        In this instant case, decedent was never even charged criminally or even civilly

16  accused of committing the alleged assault and/or battery of the "confidential witness".  The

17  evidence is extremely prejudicial, does not have any probative value, deprives Plaintiffs of

18  their right to a fair trial, constitutes hearsay and speculation, etc.   Therefore, this motion

19  must be granted in it's entirety.

20  DATED: June 26, 2009                    LAW OFFICES OF KIM D. SCOVIS

21

22

23                                         JENNY SCOVIS
                                           Attorneys for Plaintiff
24

25  DATED: June 26, 2009                    LAW OFFICES OF GREGORY A. YATES

26

27                                         GREGORY A. YATES
                                           Attorneys for Plaintiff
28

# Exhibit "1"

# OFFICE OF THE DISTRICT ATTORNEY
## COUNTY OF VENTURA

November 11, 2008

*Copy*

REPORT ON THE SHOOTING OF THOMAS BARRERA
BY OXNARD POLICE DEPARTMENT SERGEANT ANDREW SALINAS
ON OCTOBER 3, 2007

GREGORY D. TOTTEN
DISTRICT ATTORNEY

## TABLE OF CONTENTS

Introduction ................................................................................................ 1

Statement Of Facts ..................................................................................... 2

Statement Of Sergeant Andrew Salinas ................................................... 3

Statement Of Crime Scene Analyst Kristin Rogahn ................................. 7

Statement Of Assistant Medical Examiner Janice Frank .......................... 7

Statement Of Pamela Rabidoux ................................................................ 8

Statement Of Veronica Tafoya .................................................................. 8

Statement Of Delia Ramirez ...................................................................... 9

Statement Of Elias Olmos .......................................................................... 9

Statement Of Margaret Olmos ................................................................... 9

Statement Of Antonio Mendoza ............................................................... 10

Statement Of Elsa Cervantes ................................................................... 10

Physical Evidence ..................................................................................... 10

Officer Reaction Times And Shooting Dynamics In Lethal Force Encounters ............. 12

Background Of Thomas Barrera ............................................................... 18

Legal Principles ........................................................................................ 19

Analysis .................................................................................................... 20

Conclusion ............................................................................................... 23

# INTRODUCTION

On October 3, 2007, at approximately 3:21 a.m., Sergeant Andrew Salinas of the Oxnard Police Department was on patrol on 5th Street near G Street when he saw Thomas Barrera (age 22) attempting to break into a pickup truck parked on 5th Street. Sergeant Salinas was in a full uniform in a marked Oxnard Police Department patrol car.

Sergeant Salinas attempted to detain Barrera, who fled eastbound down the street toward Hobson Way. Barrera threw an object, which turned out to be a set of wrenches, at Sergeant Salinas, who had ordered Barrera to stop. After throwing the wrench set at Sergeant Salinas, Barrera pulled out a knife and turned toward Sergeant Salinas, who was 5 to 7 feet away from him. As Barrera turned toward Sergeant Salinas swinging the knife, Sergeant Salinas fired four shots. Barrera was hit with three shots and died from his wounds.

The District Attorney's Office has a 24-hour on-call officer-involved shooting team available to all Ventura County law enforcement agencies to assist in the investigation of officer-involved shootings. On October 3, 2007, at approximately 5:00 a.m., Senior Deputy District Attorney Richard Simon and District Attorney Senior Investigator Mike McKendry were notified of the shooting and responded to the scene.

The Oxnard Police Department conducted a detailed investigation of the shooting. This investigation included interviews with all known witnesses, collection of physical evidence, preparation of detailed scene diagrams, photographs of all evidence and surrounding areas, and

1

requests for the Ventura County Sheriff's Department crime laboratory to perform forensic testing of various evidence items collected.

The Oxnard Police Department's investigation reports were submitted to the District Attorney's Office for the purpose of determining whether the shooting of Barrera by Sergeant Salinas was justified and, if not, whether criminal charges should be filed.   The scope of the District Attorney's review was limited to those issues.

Senior Deputy District Attorney Richard Simon, who drafted this report, conducted the District Attorney's review.   The District Attorney's review included: viewing the scene of the shooting; examining over 500 pages of reports and documents detailing interviews of witnesses, including Sergeant Salinas; reviewing autopsy records; viewing scene and autopsy photographs; reviewing background information on Thomas Barrera; and listening to tape recorded interviews.

After a complete review of all the evidence, it is the conclusion of the District Attorney that Sergeant Andrew Salinas acted lawfully when he shot Barrera, and Barrera's resulting death was a justifiable homicide.

<u>STATEMENT OF FACTS</u>

The statement of facts is based upon the statement of Sergeant Salinas, as well as physical evidence collected, photographed, and/or tested from the scene of the shooting.   The details of the shooting death of Thomas Barrera will be contained in the statement of Sergeant Salinas.

2

After the shooting took place, Sergeant Salinas participated voluntarily in a walkthrough of the scene, followed by a detailed interview conducted by Oxnard Police Detectives Chase and Mancha. Also present with Sergeant Salinas during the interview was his attorney, Howard Lieberman.

A walkthrough is a procedure in which the officer who was involved in a shooting retraces the events with investigators. A walkthrough involves literally walking through the incident from the point of first contact until the actual shooting. This involves the officer relating what was going through his mind at each step. Walkthroughs are re-creations that are both audiotaped and videotaped.

The Oxnard Police Department conducted a neighborhood canvas to see if any actual eyewitnesses to the shooting existed. No eyewitnesses were found.

### STATEMENT OF SERGEANT ANDREW SALINAS

On October 3, 2007, at 3:21 a.m., Sergeant Salinas was eastbound on 5th Street, driving alone in his marked patrol car. As he was approaching the intersection of 5th Street and G Street, he saw a blue-over-white, 1982 Chevrolet pickup truck (see Attachment 1, Vehicle 1) just east of G Street. He noticed that the passenger door was open and saw an orange bicycle on the sidewalk next to the open door. (See Attachment 2 for photograph of truck and bicycle, and Attachment 3 for diagram of the area.) Sergeant Salinas then drove to the next intersection and made a U-turn. As he was making the U-turn, he notified dispatch via police radio that he was investigating

3

suspicious circumstances and stopped at the location where his car was still parked after the incident. (See Attachment 1, V-2.) This area was well-lit by a streetlight near the location of the parked truck.

As Sergeant Salinas approached the truck, he saw the suspect, later identified as Thomas (Tommy) Barrera (age 22). Sergeant Salinas saw Barrera at the front of the truck. This is the first time Sergeant Salinas was aware of Barrera's presence. Barrera began walking away toward the middle of 5th Street.

Barrera stood 6'3" and weighed 233 pounds at the time of his death. Once he neared the middle of 5th Street, he fled westbound and Sergeant Salinas advised dispatch that he was in foot-pursuit. He gave his location as he was pursuing what he described as a suspect of a burglary in progress. Sergeant Salinas was standing at a light pole near the front of the truck when Barrera began fleeing. Barrera was running in the street alongside the cars parked on the north side of 5th Street. Sergeant Salinas crossed the street as he began chasing Barrera. As Barrera reached the north corner of G Street and 5th Street, he was about 10 to 15 feet ahead of Sergeant Salinas.

Once Barrera reached the Honda Civic (Vehicle 15 on Attachment 1), he ran onto the south sidewalk, and Sergeant Salinas crossed over onto the sidewalk in his pursuit. Barrera continued running on the sidewalk until he reached Vehicle 21 (see Attachment 1), at which point he moved back onto the street and Sergeant Salinas continued to pursue him there. Sergeant Salinas yelled toward Barrera to stop on several occasions and even yelled that he (Salinas) was a marathon runner and that he would eventually catch Barrera. This did not deter Barrera from

4

fleeing, as Barrera continued running westbound without hesitation. As Sergeant Salinas continued to pursue Barrera, he was slowly closing the gap between the two of them. Barrera was periodically looking over his left shoulder as he continued to flee.

When they neared the spot marked No. 4 on Attachments 1 and 4, Barrera turned to his right and with his right hand threw an object at Sergeant Salinas. Barrera turned by pivoting his body in the direction of Sergeant Salinas. Sergeant Salinas could tell by the way Barrera's hand was cupped that the object was not a knife or a gun, so he did not draw his firearm at that time. Sergeant Salinas estimates that Barrera was about 15 feet away when the object was thrown. As the object was thrown, Sergeant Salinas turned his body away and the object glanced off him and landed on the ground. The object turned out to be a folding wrench set. (See Attachment 5.) Salinas thought Barrera may have said something as he was throwing the object, but he does not know what it was.

After being struck by the wrench set, Sergeant Salinas sprinted toward Barrera and closed the gap between them to about 8 to 10 feet. As Barrera continued fleeing, Sergeant Salinas drew his Beretta 9-millimeter handgun. He did this because Barrera had already thrown an object at him, was continuing his flight, and Salinas had closed to a more dangerous proximity to Barrera. When Salinas got to within 5 to 7 feet of Barrera, Barrera began to turn toward Salinas and Salinas could see the shiny blade of a knife in Barrera's right hand. Barrera began to swing his right hand around toward Salinas with the knife blade up. Barrera was swinging the knife toward Salinas as he was turning to face him. This occurred all in one motion. As soon as Salinas saw this, Salinas raised his firearm and then began to fire. Barrera began to turn away

from Salinas, sheltering his own body by moving his body to his left with his side and back facing Salinas as Salinas fired four shots. As he was going to the ground, Barrera dropped the knife to the ground. Salinas heard the knife fall. (See Attachment 6 for ledger listing objects and corresponding numbers, and Attachment 7 for photo of the knife.) Salinas believes Barrera was 5 to 7 feet away from him when he fired the shots. By the time Sergeant Salinas fired his last shot, Barrera was staggering and went down. Sergeant Salinas then jumped on him and handcuffed him. Sergeant Salinas was standing in the area between No. 4 and No. 6 of Attachments 1 and 3 when he fired his duty weapon.

Immediately after handcuffing Barrera, Sergeant Salinas notified dispatch that shots were fired and that the suspect was down. A backup officer arrived soon after and Salinas told him that the suspect tried to stab him.

When asked what was going through his mind when he fired, Sergeant Salinas said that he was in fear for his life due to the fact that Barrera had a knife. He said that in training he was taught a 21-foot rule that essentially means that if a subject is within 21 feet of an officer and is armed with a knife, the officer's life is very much in danger due to how quickly that gap can be closed before a shot can be fired.

Barrera was standing in the area between Nos. 2 and 4 on Attachment 1 when Sergeant Salinas fired his first shot. The entire chase covered two blocks and approximately 540 feet.

The tool set that was thrown at Sergeant Salinas was collected and sent to the crime lab.

<u>STATEMENT OF CRIME SCENE ANALYST KRISTIN ROGAHN</u>

Crime scene analyst Kristin Rogahn was able to recover over 60 blue fibers from the tool set. Sergeant Salinas' uniform and the blue pants worn by Thomas Barrera were provided to Ms. Rogahn for comparison purposes.

Initial microscopic analysis revealed a red and black polymeric material in the pocket of Barrera's jeans as well as in the trace evidence recovered from the set of Allen wrenches. No such material was found in Sergeant Salinas' uniform. Ms. Rogahn concluded that the fibers from the wrenches came from inside Thomas Barrera's pants pocket.

<u>STATEMENT OF ASSISTANT MEDICAL EXAMINER JANICE FRANK</u>

On October 3, 2007, at 10:25 a.m., Dr. Janice Frank of the Ventura County Coroner's Office performed the autopsy on decedent Thomas Barrera. The cause of death was determined to be three gunshot wounds. No definitive shot sequence could be determined, so the numbered sequences were randomly selected. For a location of the wounds, see Attachment 8, which is an anatomical diagram of the victim's body showing bullet entrances. Gunshot wound No.1 entered the upper back and perforated both lungs and the heart. The gunshot wound entered the upper back at a 60-degree upward angle. The direction of fire was left to right. Gunshot wound No. 2 entered the lower back and perforated the spinal cord. Gunshot wound No. 2 entered straight without any significant variation on the angle. Gunshot wound No. 3 entered Mr. Barrera's right

buttock at a slightly upward angle. The direction of fire was right to left. This wound would not have been fatal by itself. Bullets from gunshot wounds Nos. 1 and 2 were recovered at autopsy. Gunshot wound No. 3 exited the left anterolateral thigh and was not recovered. Sergeant Salinas did not recall his exact position relative to Barrera at the time of the shooting. Dr. Frank explained that the thigh is actually slightly higher than the lower buttock. This explains how gunshot wound No. 3 exited the thigh after having entered the buttock at a slightly upward angle.

A toxicology screen was done on Mr. Barrera from a blood sample. Mr. Barrera did not have any alcohol in his system, but he did test positive for methamphetamines, opiates and marijuana.

## STATEMENT OF PAMELA RABIDOUX

Pamela Rabidoux lives at 837 5th Street. This location is close to the corner of Hobson Way and 5th Street where the shooting took place. She said she was sleeping when she heard noises from outside. She stated she could hear yelling, but was unable to make out anything that was said. She said she heard about four shots right after the yelling.

## STATEMENT OF VERONICA TAFOYA

Veronica Tafoya (age 33) lives at 500 Hobson Way #1. This residence is on the corner of 5th Street and Hobson Way, which is the intersection where the shooting occurred. She told Officer Enrique Alvarez that she was half asleep when she heard somebody yelling, "Hey, don't shoot me, man." She said she then heard three shots. She then went to check on her kids and after that

she saw police officers and police cars on her street.   Her house is approximately 30 yards from the scene of the shooting.

### STATEMENT OF DELIA RAMIREZ

Delia Ramirez lives at 500 Hobson Way #2.  This is the corner of 5th Street and Hobson Way right next to the residence of Veronica Tafoya.   She told Officer Alvarez that she heard numerous bangs outside, after which she heard someone yell, "Give me your hands."  She did not see any of the actual shooting or any of the events leading up to it.

### STATEMENT OF ELIAS OLMOS

Elias Olmos (age 50) lives at 452 South H Street.  This residence is at the north corner of 5th Street where the shooting occurred.   He said he was sleeping when he was awakened by a commotion outside of his house.  He heard a voice yell, "Get your ass on the ground."  He then heard four shots in quick succession.  He heard a different voice say, "No, don't."  Olmos said he got up, put on some clothes and went outside.  He saw an officer handcuffing a downed man. The officer was asking the man if he was all right.

### STATEMENT OF MARGARET OLMOS

Elias Olmos' wife Margaret was interviewed and she said she heard a male voice yelling, "Stop running.  Stop running."  She then heard four or five gunshots in rapid succession.  She and her

daughter Sara went outside afterwards and she saw the police officers asking a handcuffed man what his name was. Sara said she heard four gunshots, but did not hear anything else.

## STATEMENT OF ANTONIO MENDOZA

Antonio Mendoza (age 30) was contacted by police outside of 837 5th Street. This is the same residence as witness Pamela Rabidoux. He said he was lying down in his living room when he heard what he knew was a foot-pursuit. He heard the officer yell, "Get down on the ground, stop running. You better get your ass down on the ground." He said he then heard feet stopping and heard five or six shots immediately after. When Mendoza got outside, he saw that the officer was on top of the man and was handcuffing him and asking him what his name was.

## STATEMENT OF ELSA CERVANTES

Elsa Cervantes (age 33) also lives at 500 Hobson Way in apartment #4 and she said she was lying in bed when she heard footsteps outside that sounded like running. She heard someone yell, "Ahh," and then heard four or five shots in rapid succession.

## PHYSICAL EVIDENCE

The Silverado pickup truck that Barrera attempted to break into belonged to Luis Garcia. Garcia is the resident at the home in front of where the Silverado pickup truck was parked. This truck

was examined and it was discovered that the ignition had been punched, leading to the conclusion that Barrera had been attempting to steal it.

Inside the truck, a folding knife was found on the passenger seat. Mr. Garcia said that he did not recognize the knife and it did not belong to him. A knife was also found on the street where Sergeant Salinas said that Barrera had swung a knife at him. This knife, which had a broken tip, was collected (see Item 1, Attachments 1, 4 and 6). Metal fragments collected from inside the punched ignition showed similarity in size, color, edge contour, physical appearance, and continuity of random striations with the broken knife blade.

A bent coat hanger was found in the street near the truck at the intersection of 5th Street and G Street, further corroborating the fact that Barrera was in the process of committing an auto burglary or attempted auto theft. This evidence was photographed in place and collected by the Oxnard Police Department. There were also some metal fragments collected from the driver's floorboard.

At autopsy, an empty knife sheath was located connected to a belt that Barrera wore. Barrera also had a spoon and syringe in his pocket. The syringe was half-bent. This evidence corroborates other information concerning Barrera's background as a narcotics abuser.

The tool set that Barrera threw at Sergeant Salinas was tested for DNA. It contained a mixture of four sources. Barrera was included among the population that could have contributed to the mixture. Because the DNA levels are low, the corresponding population numbers are too low to

call it a match. With low levels of DNA, few genetic markers can be found. With higher levels, enough markers can be located to make the probability that some other person contributed the sample astronomically remote. In this case, because of the limited number of genetic markers, one can only determine that one in seven Hispanics and whites would share those same limited genetic characteristics as Barrera and the DNA from the tool set. One in nine African Americans would also share those same few genetic markers.

All of the evidence from the scene was photographed in place and collected. Although Barrera was hit with three shots, it is clear from the evidence that Sergeant Salinas actually fired four rounds. There were four shell casings collected from the scene. The bullet that was fired and missed was not recovered, but that is not unusual as unimpeded spent rounds can travel substantial distances. Even the bullet that exited the thigh was not recovered.

## OFFICER REACTION TIMES AND SHOOTING DYNAMICS IN LETHAL FORCE ENCOUNTERS

Dr. Bill Lewinski is one of the nation's foremost experts in shooting dynamics in a law enforcement setting. Dr. Lewinski is a behavioral scientist specializing in law enforcement-related issues. He has a Ph.D. in police psychology and is a tenured full professor in the law enforcement program at Minnesota State University, Mankato, where he has taught for the last 23 years. He is also the founder and director of Force Science Research Center at the school.

Much of his research has focused on subject and officer movement in lethal force encounters, as well as action and reaction time parameters. His research has been published in peer-reviewed national law enforcement publications and has also been highlighted on the television program *48 Hours Investigates*. His recent work involved a technologically sophisticated investigation into the perceptual and psychological factors that impact on an officer's reaction time. In an article first published in September 2005 for *The Scene, Journal of the Association of Crime Scene Reconstruction*, Dr. Lewinski and three other researchers[1] studied the phenomena where an officer perceives a frontal threat, yet shots entered the suspect's back or side.

Dr. Lewinski points out that studies of reaction time in response to stimuli (known as mental chronometry) go back as far as 1865. This type of research had not permeated the law enforcement field until the last decade, despite the fact that an understanding of the principles of mental chronometry is sometimes critical in understanding the dynamics of a police shooting. Dr. Lewinski notes several studies that address reaction time in such a way that they can extrapolate the results to apply to the analysis of police shootings. For example, in one study published in 1997[2], researchers measured the reaction times in firing drawn sidearms in response to stimuli and compared those measurements with the time it takes for a person to turn their torso away (90 to 180° from the officers after posing a threat). The average time to fire a drawn weapon was .677 seconds. They also found that the average person can turn his or her torso 90° in .31 seconds and 180° in .676 seconds. In other words, in the time it took an officer with a

---

[1] Jeffery Baumgarner, Ph.D., Texas Christian University; William Hudson, Ph.D., Minnesota State University; Sergeant Craig Sapp, Tempe Police Department.

[2] Tobin and Fackler, "Officer Reaction Response in Firing a Handgun," *Wound Ballistics Review Journal* of the International Wound Ballistics Association, 3, 1997, pp.1, 6-9.

drawn firearm to fire his or her weapon at a threat, the suspect could have already turned 180°
away from the officer at the moment of discharge.

In his article for *Police Marksman* (November/December 2000), Dr. Lewinski published his own
research on time measurements of various movements by suspects that can occur in police
shooting scenarios. In this study, Lewinski used undergraduates in the law enforcement program
at Minnesota State University, Mankato. The students were asked to perform motions that were
similar to real life actions known to have taken place in actual officer-involved shootings and
reflect real life threats or circumstances. The motions were recorded on a digital video camera in
frame mode. The speed of the camera was 30 frames per second. The camera and motions were
cross-matched with a digital timer that was accurate to 1/1,000 of a second. One motion studied
was similar to that which occurred in the shooting of Mr. Barrera, only the weapon simulated
was a gun rather than a knife. The average time from the start of the pulling of the gun to turning
toward the officer to firing was 23/100 of a second. The fastest was a mere 9/100 of a second.
This demonstrates that the threat that Sergeant Salinas encountered occurred in mere fractions of
a second.

Another movement that was studied by Dr. Lewinski was where the subject would turn toward
the officer, fire the weapon, and then continue the turning motion until his back was facing the
officer. This is very close to the movement by Mr. Barrera absent the firing of the weapon. The
actual time for this motion was less than one second, and of most significance was that the time
for the person to go from lowering the weapon to the full back position facing the officer was
just 37/100 of a second. Some made the turning movement much more quickly. In one case, the

subject was able to go from a drop-off position after firing to a square back position in just 10/100 of a second.  Since Barrera's momentum was already going towards Salinas, his turning motion away to the square back position would have likely been very rapid and 10/100 of a second is not unreasonable to cover that movement.  Given the reaction time of an officer to fire in response to a threat stimulus, it is not surprising that shots entered Barrera's back.  Dr. Lewinski did find that where a subject's momentum was already heading in the direction of the turn, they were able to complete the turn much more rapidly.  Where momentum was going with the turn, the entire movement, including the firing of the weapon and turning to a full back position took just 58/100 of a second on the average.  The fastest time was 33/100 of a second.  In those circumstances, an officer reacting as quickly as humanly possible to the perceived threat would still end up shooting the subject in the back with an accurate shot.  Once an officer perceives a threat, the research shows that it takes a minimum of .33 seconds up to as long as two full seconds for the officer's brain to process the information, complete his reaction, and fire his weapon in full self-defense.  That is why Dr. Lewinski concludes that "in some deadly force confrontations which are fully justified, the threatening suspect may end up being hit in the back as a result of your reactive deadly force response."

A corollary to the implications of the time measurements is the difficulty an officer (or any human being) has in "turning off" a reactionary decision made in a moment once the danger ceases.  Once an officer decides to shoot at a suspect in response to some threatening stimulus, it is nearly impossible to abort that decision.

Dr. Lewinski studied reaction time in starting and stopping in response to a threat stimulus using the Tempe (Arizona) Police Department[3]. In the Tempe study, Dr. Lewinski used 102 police officers from the Tempe Police Department in experiments to measure the following four things: (1) reaction time to a visual stimulus, (2) the time it takes to stop pulling the trigger once the threat has passed, (3) simple decision-making and, (4) the role of anticipation.

Reaction time was measured by use of a stimulus board that displayed a pattern of nine clusters of lights, three on each row. Officers were told to observe the light clusters in the upper left hand corner with their firearms drawn and their fingers on the trigger. They were told to pull the trigger immediately once a particular green light was illuminated. This study revealed that, as previously discussed, the average trigger pull was .31 seconds after illumination. It took .25 seconds to process that the light was on and .06 to pull the trigger. Less than adequate lighting conditions could also slow down reaction by delaying perception of the threat. The area of 5th Street and Hobson Way, although lit by a street lamp, does not provide optimal lighting conditions and could have slowed down Sergeant Salinas' reaction slightly.

In studying the stop time, officers were asked to fire as many times as they could when they saw the green light. However, they were also told to immediately stop when the light would go off. On average, participating officers stopped pulling the trigger within 0.35 seconds from when the light went out. Many officers fired one or two shots after the light went out.

---

[3] "The Impact of Visual Complexity, Decision-making and Anticipation, the Tempe Study," *The Police Marskman*, November/December 2003.

In measuring decision-making, Dr. Lewinski repeated the first experiment, but added a go or no go component. In this case, the subjects were told to only pull the trigger if all three of the lights in a cluster were illuminated instead of just one. This requirement delayed the reaction time to an average of .56 seconds. The range was .44 seconds to .69 seconds. This means that reaction time was slowed with a more complex set of stimuli. Another experiment conducted in this study presented participants with a pattern of lights on the stimulus board illuminating at intervals. The lights were of different colors. Participants were instructed to fire when the pattern of green was complete and not before. Anticipation sped up reaction time to an average of .46 seconds.

The implications of the Tempe study are evident when evaluating officer-involved shootings. The study demonstrates that not only does reaction take time, but so does turning off a reaction.

Dr. Lewinski also studied how quickly rounds can be discharged once an officer begins to fire. Dr. Lewinski has worked with Dr. Parris Ward, who heads a computer animation firm named Biodynamics Engineering. They were able to determine that the officers in a particular police lethal force case were able to shoot in the range of .233 to .268 of a second per round[4]. Drs. Lewinski and Ward determined that in that particular case 11 rounds were fired by just two officers in only 1.6 seconds. Jim Roberts, firearms analyst for the Ventura County Sheriff's Department crime laboratory, confirms that Salinas' duty weapon, the 9-millimeter Beretta, will fire shots at the same rate as the Glocks used by the two officers in the above case. There is always some minor variation in considering the human element. Many shots can be discharged

---

[4] Joshua Lego, *Shooting Dynamics,* Force Science Institute, 2008 CDAA Summer Conference.

in a very short period of time in high-stress, lethal-force encounters.  Virtually no human being can immediately cease firing under high stress circumstances.

Given reaction times and delays in processing information, as well as the rapidity of human body dynamics combined with the fact that officers cannot stop shooting instantaneously, it is not surprising that 70 percent of officer-involved shootings involve shots to the back or side[5].

## BACKGROUND OF THOMAS BARRERA

Thomas Lazos Barrera was a methamphetamine user with a moderate to extensive criminal history.  In 2004, he was convicted by a jury of being under the influence of narcotics, pursuant to Health and Safety Code section 11550(a).  In 2005, he was convicted of a felony for possession of methamphetamine, pursuant to Health and Safety Code section 11377(a).  Later that same year, he was convicted again on a misdemeanor violation of Health and Safety Code section 11550(a).  In 2006, he was arrested for possession of narcotics, as well as vandalism, but was not convicted for that arrest.  That same year, he was convicted of resisting, obstructing, or delaying an officer in the performance of his/her duties, pursuant to Penal Code section 148.  In 2007, he was convicted of another 11550(a), as well as providing false information to an officer. For this offense, he received a 90-day jail sentence.

In addition to his drug use, Barrera was a known associate of the Colonia Chiques criminal street gang.  Oxnard police have documented Barrera as being present on 16 separate occasions with other Colonia Chiques gang members.  Barrera had no obvious gang tattoos, but did have "OX"

---

[5] *What Happens When Police Kill*, BBC News, October 13, 2006, Tom Tanner, Producer.

(for Oxnard) tattooed on his left bicep.  On November 13, 2000, while a student at Pacifica High School in Oxnard, Barrera was involved in a fistfight with another student.  In his interview with the police on that occasion, he openly admitted that he "backs up Colonia" and that the boy he was fighting was from Southside Chiques, a rival criminal street gang in south Oxnard and Port Hueneme.

In June 2006, there was a rivalry between Colonia gang members and a local tagging (graffiti) crew.  Barrera was a known Colonia associate, and a confidential witness was a member of the tagging crew.  The confidential witness was advised that Barrera was in the area, armed with a knife.  The confidential witness said he later ran into Barrera, who showed a knife concealed in his pant leg, and said in a challenging way, "What's up?"  The confidential witness told Barrera to put his weapon away and said, "I got something for your ass, too."  Barrera reached for the large knife in his pant leg, and the confidential witness pulled out a gun.  Barrera said, "If you're gonna pull out a gun on me, you better use it."  The confidential witness then hit Barrera over the eye twice with the butt of the gun and Barrera fled.  For purposes of keeping the confidential witness safe, his identity has been withheld.

## LEGAL PRINCIPLES

Homicide is the killing of one human being by another.  Homicide can be either lawful or unlawful.  Lawful homicide is excusable or justifiable.  The shooting of another person in self-defense is justifiable.

The law of self-defense is currently set forth in Penal Code sections 197, 198 and 199 as it relates to homicide cases. The killing of another person is not unlawful when the person who does the killing *actually* and *reasonably* believes: (1) that there is imminent danger that the person will either kill him or inflict great bodily injury, and (2) that it is necessary under the circumstances to use deadly force to prevent death or great bodily injury from being immediately inflicted upon him. This principle is set forth in California Criminal Jury Instructions (CALCRIM) No. 505. The test of self-defense is one of apparent necessity. Accordingly, the slayer must harbor an honest and reasonable belief in the apparent peril and the need to use deadly force. (Also see 1 Witkin CALCRIM Law Defenses No. 6.)

In determining whether a person using deadly force in self-defense acted properly upon the appearance of danger, the law recognizes that a person experiencing a stressful event is not able to reflect upon his actions and the perceived threat against him to the same degree as a person who is not being confronted with an emergency situation.

<u>ANALYSIS</u>

Sergeant Salinas did not fire his weapon when Barrera threw the wrench set at him. Sergeant Salinas did not believe he was confronted with deadly force at that time. When Barrera pulled out a knife and swung it in the direction of Sergeant Salinas, Barrera created a circumstance which caused Sergeant Salinas to have an honest and reasonable fear for his own life. Based upon his training and experience, Sergeant Salinas was well aware of the dangers of a knife-wielding man seven to ten feet away from him.

As soon as Barrera pulled the knife out, Sergeant Salinas' focus was completely on the knife and the immediate threat that was within seven to ten feet of him. Sergeant Salinas was acting under the stress and adrenalin of the moment, and it is reasonable to believe that once he saw the knife he did not hear clearly what, if anything, was said by Barrera. Sergeant Salinas exercised his right of self-defense when he fired his duty weapon. To fail to do so could have put his own life at great and unnecessary peril. Sergeant Salinas acted out of fear for his own life when he fired and fatally shot Barrera.

Dr. Lewinski reports that a study of the Los Angeles County Sheriff's Department published in 1998 revealed that in 348 officer-involved shootings, 90 percent of the officers experienced some perceptual disturbance, 51 percent involved sounds being quieter and 45 percent experienced tunnel vision. This is not surprising given the obvious stress in sudden lethal-force encounters. It would be reasonable to conclude that words could have been spoken by Barrera that Salinas may not have heard or understood due to the stress of the situation creating some perceptual loss.

Witness Veronica Tafoya said she heard someone say, "Hey, don't shoot me, man." This is a statement that was not heard by other witnesses, including Elias and Margaret Olmos, Antonio Mendoza, Delia Ramirez, and Pamela Rabidoux, who were just as close to the incident as Tafoya. However, assuming that statement was made, once Barrera pulled the knife out and turned towards Sergeant Salinas swinging the knife, it was simply too late. Sergeant Salinas was focused on the knife and Barrera's immediate actions. It is reasonable to believe that he did not hear words spoken by Barrera.

The physical evidence corroborates the sequence of events related by Sergeant Salinas.  The wrench set and knife Barrera wielded were found in the street.  The knife was previously used by Barrera to try to punch out the ignition of the truck for the purpose of stealing it.  The knife itself had a broken blade from that incident.

Dr. Lewinski has documented the incredible speed in which officer-involved shootings can occur.  The Tempe Study demonstrated how principles of perception, processing, and reaction apply to officer-involved shootings.  The study documented that it was impossible to stop or interrupt a trigger pull once the process has begun, and that shots were often fired after the light stimulus to stop the shooting occurred.[6]

As previously detailed, research by Dr. Lewinski shows that a person can turn toward an officer, fire a weapon, disengage and turn away with his back to the officer in as quickly as 33/100 of a second.  It takes longer than that to perceive the threat and fire back.

When Barrera swung the knife toward Salinas, it is likely that Salinas' gun was visible to Barrera.  Upon seeing the gun, Barrera likely continued the same motion, pivoting his body so that his back was facing Sergeant Salinas who had begun firing once he saw the knife blade.  By the time the shots entered Barrera's body, his back was facing Salinas.

Barrera's death is unfortunate, but was the result of poor choices that he made.  Barrera was caught in the act of trying to steal a truck.  Rather than surrender, he tried to run away from a

---

[6] *Reaction Times In Lethal Force Encounters* by Dr. Bill Lewinski and Dr. Bill Hudson, published in *The Police Marksman*, September/October 2003.

uniformed officer who had a right to detain him.  When it appeared he might be apprehended, he threw a wrench set at the pursuing sergeant.  Barrera refused to comply with all lawful orders and ultimately made the conscious choice of pulling out a knife and swinging it in the direction of Sergeant Salinas.  Once that happened, Sergeant Salinas was justified in the use of deadly force.  It is also evident from the statement of the confidential witness that this is not the first time that Barrera has shown a willingness to pull out a knife and use it.

<u>CONCLUSION</u>

It is the conclusion of the District Attorney that the death of Thomas Barrera was the result of Sergeant Salinas' acting in lawful self-defense and is, therefore, a justifiable homicide.

# ATTACHMENT 1



# ATTACHMENT 2



# ATTACHMENT 3



# ATTACHMENT 4



# ATTACHMENT 5



# ATTACHMENT 6

FOLLOW-UP REPORT                    - 12 -                    CASE  NO. 07-25163

| | | | |
|---|---|---|---|
| 132.536 | -38.037 | -0.453 | |
| 121.490 | -37.347 | -0.457 | (Nikon Item Numbers 15 – 18) |

## PHYSICAL EVIDENCE

### PHYSICAL EVIDENCE DESCRIPTIONS:

The physical evidence described in this section corresponds with the numbered items in the Physical Evidence Measurement List and Physical Evidence Diagram. At the crime scene,

### Item 1:

This item is a knife (1) left by Suspect Barrera. (Nikon item number 22 from third set of measurements)

### Item 2:

This item is a bullet casing (2) left by Sergeant Andrew Salinas's weapon upon being fired. (Nikon item number 21 from third set of measurements)

### Item 3:

This item is a bullet casing (3) left by Sergeant Andrew Salinas's weapon upon being fired. (Nikon item number 20 from third set of measurements)

### Item 4:

This item is a bullet casing (4) left by Sergeant Andrew Salinas's weapon upon being fired. (Nikon item number 19 from third set of measurements)

### Item 5:

FOLLOW-UP REPORT                    - 13 -                    CASE NO. 07-25163

This item is a bullet casing (5) left by Sergeant Andrew Salinas's weapon upon being fired. (Nikon item number 18 from third set of measurements)


Item 6:

This item is a Pittsburg multi-set Allen Wrench (6) possibly left by Suspect Barrera. (Nikon item number 17 from third set of measurements)


### PHYSICAL EVIDENCE


### PHYSICAL EVIDENCE DESCRIPTIONS (Continued):


Item 7:

This item is a cell phone (7) belonging to Suspect Barrera. (Nikon item number 23 from third set of measurements)


Item 8:

This item is coagulated blood (8) from Suspect Barrera. (Nikon item number 24 from third set of measurements)


Item 9:

This item is a possible bullet strike (9) left by a bullet fired by Sergeant Andrew Salinas. (Nikon item number 63 from third set of measurements)


Item 10:

This item is a coat hanger (20) possibly left by Suspect Barrera. (Nikon item number 4 from first set of measurements)


Item 11:

FOLLOW-UP REPORT                    - 14 -                    CASE  NO. 07-25163

This item is an orange 1-speed boys bicycle (BIKE) used by Suspect Barrera. (Nikon item numbers 5 –
6 from first set of measurements)


Item V-1:

This item (V1) is a white over blue Chevrolet Silverado pick-up truck, California License Plate 8H10852.
Vehicle 1 (V-1) was located upright on its wheels facing in a easterly direction along the south curb of
Fifth Street just east of G Street. (Nikon item numbers 7 – 10 from first set of measurements)

# ATTACHMENT 7



# ATTACHMENT 8





**PROOF OF SERVICE**

I am employed in the county of Ventura, State of California. I am over the age of eighteen and not a party to the within action, and my business address is: Law Offices of Kim D. Scovis, 223 E. Thousand Oaks Blvd., Suite 412, Thousand Oaks, CA 91360.

On June 26, 2009, I served the following document(s):

**PLAINTIFFS MOTION IN LIMINE NO. 10 TO EXCLUDE ANY EVIDENCE THAT TOMMY BARRERA ASSAULTED AND/OR BATTERED ANY OTHER INDIVIDUAL UTILIZING A KNIFE**

on the interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

Law Office of Alan E. Wistosky          Law Office of Gregory A. Yates, P.C.
Attention: Mr. Dirk DeGenna              Attn: Gregory Yates
300 Esplanade Drive, Suite 1500         16830 Ventura Blvd., #250
Oxnard, CA 93036                        Encino, CA 91436

                                        Daniel C. Morgan & Assoc.
                                        1591 Spinnaker Doctor., #205
                                        Ventura, CA 93001

X  I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices, in the United States mail at Thousand Oaks, California.

Fed Ex overnight service.

_____ By Personal Service, I caused such envelope to be delivered by hand to the above address(es).

_____ By facsimile, I caused such document to be transmitted via facsimile machine, to the above address(es)

_____ (State) I declare under penalty of perjury under the laws of the State of

California that the foregoing is true and correct.

_X_    (Federal)  I declare that I am employed in the office of a member of the bar

of this court at whose direction the service was made.

Executed on June 26, 2009, at Thousand Oaks, California

Roschelle Ayonayon