Jenny Scovis, Esq., State Bar No. 87026
Kim D. Scovis, Esq., State Bar No. 182059
**LAW OFFICES OF KIM D. SCOVIS**
223 East Thousand Oaks Boulevard, Suite 412
Thousand Oaks, California 91360
Telephone: (805) 496-6413   Facsimile: (805) 379-3966

Attorneys for Plaintiff, MARIA LAZOS as an individual, and *THE ESTATE OF THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA LAZOS, *THE ESTATE OF THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF OXNARD; OXNARD POLICE DEPARTMENT; POLICE CHIEF JOHN CROMBACH; ANDREW SALINA, and DOES 1-10<br><br>Defendants.<br><br>AND CONSOLIDATED ACTION | Case No. CV08-02987-RGK (SHx)<br><br>(consolidated w/ CV 08-05153 RGK )<br><br>**PLAINTIFFS MOTION IN LIMINE NO. 11 TO EXCLUDE ANY EVIDENCE AND/OR EXPERT TESTIMONY AS TO WHETHER SGT SALINAS WAS SUFFERING FROM PTSD AND/OR FROM PROVIDING ANY OTHER OPINION AS TO SGT SALINAS' CREDIBILITY AND/OR RATIONALE FOR DIFFERING ACCOUNTS OF THE INCIDENT**<br><br>DATE: August 11, 2009<br>TIME:<br>DEPT: "850" |

Plaintiffs, MARIA LAZOS, TOMAS BARRERA and *THE ESTATE OF THOMAS BARRERA BY AND THROUGH ITS SUCCESSORS IN INTEREST MARIA LAZOS and TOMAS BARRERA* do hereby submit their Motion in Limine seeking an Order Excluding any and/or all Evidence and Expert Testimony that Sgt. Salinas was suffering from PTSD and from any other testimony offered to explain any discrepancies/errors in Sgt. Salinas'

testimony.

This motion is made on the grounds that credibility of a witness is a determination for the trier of fact. The case of *Westcott v. Joseph Crinklaw, et al.,* (1995) 68 F.3d. 1073, is directly on point. In the *Westcott* case, supra, the United States Court of Appeals held that it was reversible error to allow expert testimony to provide an explanation to the jury as to why an Officer provided differing statement as to the events surrounding his shooting of another on different occassions. The Court stated as follows:

"Dr. Sherrets' testimony impermissibly bolstered Crinklaw's credibility by providing a psychological explanation for Crinklaw's varying accounts of the shooting. As a result of Dr. Sherrets' testimony, "the jury may well have relied on his opinion and 'surrendered their own common sense in weighing testimony. . ..'" Id. (quoting Bernard, 490 F.2d 907 (9th Cir. 1973), cert. denied, 416 U.S. 959 (1974)). The district court abused its discretion in permitting Dr. Sherrets' testimony.......... The testimony before us, however, is the same type, as it provides a psychological label or diagnosis as a way of excusing or justifying [**9] Crinklaw's statements made immediately after the shooting. The accuracy of these statements is a pure question of credibility. Azure and Whitted plainly stand for the proposition that expert testimony going to the issue of credibility is not admissible."

In the case at bar, Sgt. Salinas has proffered several different versions of what occurred both prior and during the shooting of Tommy Barrera. Defendants have included in their expert designation Dr. William Lewinski. Dr Lewinski has stated in his report that he intends to testify as to how humans form their memory and recall a critical incident. He further opines as to why and how "these processes, including the interview process, can lead to errors either in the recording, understanding or reporting phase that an officer goes through after a critical incident". (report, parg. 7, page 5).

///
///
///
///

1  This testimony is inadmissible as it is solely intended to convince the jury that Sgt.
2  Salinas is credible and honest. This is a purview for the jury alone, and thus should not be
3  admitted in this case.

4  DATED: June 26, 2009          LAW OFFICES OF KIM D. SCOVIS

5  
6                                 JENNY SCOVIS
                                   Attorneys for Plaintiff
7  

8  DATED: June 26, 2009          LAW OFFICES OF GREGORY A. YATES

9  
10                                 GREGORY A. YATES
                                   Attorneys for Plaintiff

---
3
PLAINTIFFS' MOTION IN LIMINE

# Exhibit "1"

# FORCE SCIENCE INSTITUTE, Ltd.

124 East Walnut Street - Suite 120   Mankato, MN 56001 USA
T 507-387-1290   F: 507-387-1291
William J. Lewinski, Ph.D.
E-mail: bl@forcescience.org

May 12, 2009

Mr. Dirk DeGenna
Law offices of Alan E. Wisotsky
Financial Plaza Tower
300 Esplanade Drive, Suite 1500
Oxnard, CA 93036

**RE: Lazos/Barrera v. City of Oxnard, et al.
Court and Court Number TBD**

Dear Mr. DeGenna

Thank you for the kind invitation to consult on this case. I have reviewed and considered the following material:

Items Received December 29, 2008.
1. Case Summary
2. City of Oxnard Police Department Crime Report
3. Radio Information
4. Riding Schedules
5. Oxnard Police Department Detective Reports
6. Oxnard Police Department Crime Scene Report
7. Oxnard Police Department Critical Incident Log
8. Oxnard Police Department Patrol Officers Reports
9. Medical Examiner- Coroner, Ventura County Death Investigation Report
10. Medical Examiner-Coroner, County of Ventura Autopsy Report
11. Oxnard Police Department Autopsy Report
12. Oxnard Police Department Homicide Unit Autopsy Worksheet
13. Ventura County Sheriff's Department Forensic Sciences Laboratory Report
14. Oxnard Police Department Follow-up Report including Interview of Sgt. Salinas
15. Oxnard Police Department Photos/Arrest Records of Thomas Barrera, Jr.
16. Simi Valley Police Department Arrest Records for Thomas Barrera
17. Victim Vehicle History
18. Oxnard Police Department Follow-up Report including Physical Evidence List
19. Oxnard Police Department Follow-up Report Diagrams and Sketches
20. Oxnard Police Department B.I. Reports

1



21. Oxnard Police Department Firearms Analyzed Evidence Report
22. Oxnard Police Department Evidence List
23. Lab Requests and Reports
24. Oxnard Police Department Follow-up Reports including Witness Statements
25. 4 CDs containing Photos of Witnesses, Scene and Autopsy

Items Received April 10, 2009:
26. Evidence Reports and diagrams
27. CD with audio of Interview with Sgt. Andrew Salinas
28. CD with video of Walkthrough with Sgt. Andrew Salinas

Items Received April 20, 2009:
29. Deposition transcript of Elias Olmos
30. Deposition transcript of Maragret Olmos
31. Deposition transcript of Antonio Mendoza
32. Deposition transcript of Josephine Estrada
33. Deposition transcript of Rosario Duran
34. CD containing Investigation Recordings
35. CD containing Dispatch Recordings
36. CD containing Investigation Recordings
37. District Attorney's Report

First I will introduce myself to those who are reading this report and are unfamiliar with either myself, or the Force Science Research Center and the Force Science Institute.

1. I am the executive director of the Force Science Research Center at Minnesota State University, Mankato, Mankato, Minnesota, U.S.A., where I have been a professor in the Law Enforcement Program for 27 years. My professional background and experience in the training and evaluation of police officer shootings and in the analysis of human perception, memory, reaction time, etc., are outlined in the attached CV and related materials and won't be repeated here except for the brief paragraphs below. Those supporting documents provide the foundation for the professional opinions that follow.

2. I and Force Science Research Center and Institute are conducting the leading research into human performance in lethal force encounters. I have examined hundreds of officer-involved shootings in minute detail and interviewed, advised or counseled well over twelve hundred officers who have been in lethal force encounters. My current research focus is on subject and officer movement in lethal force encounters as well as action/reaction parameters (including judgment time), perception and memory. My research has been presented in the Journal for the Association of Crime Scene Reconstruction and in the Law Enforcement Executive Forum, at peer-reviewed conferences in criminal justice, psychology and engineering. It has been published in national law enforcement publications, websites and e-news lines and been presented nationally and internationally in law enforcement conferences and seminars throughout North America and the United Kingdom. It was highlighted on *48 Hours Investigates*. The BBC also filmed our research work for a science documentary for Panorama that was aired in Oct. of 2007. My most recent studies involved a very technologically sophisticated investigation into

2

the perceptual and psychological factors that impact on an officer's perception and reaction time and ability to report on information from a lethal force encounter. All publications and news lines that contain our research are available on the Force Science Research Center's website at www.forcescience.org. My analysis of the time and motion elements of shootings and the subsequent issues of perception and memory have been accepted throughout the United States in Grand Juries, Criminal Courts, State and Federal Courts. The Force Science Research Center News Line delivers our research as well as that of other universities to the law enforcement community has an estimated combined distribution of 750,000 officers worldwide. Select articles are loaded up by the International Association of Chiefs of Police on their password protected website for distribution to police chiefs worldwide.

3. I have qualified as an expert on action/reaction, perception and memory in force or lethal force encounters in criminal courts in Arizona, Ohio, California, Florida, Maryland, and Manitoba, Canada. I have also qualified as an expert in federal or state courts in California, Oregon, Kansas, Maryland, Texas and Washington on the same topic.

4. Besides having courts in a number of jurisdictions accept my testimony in this area, as indicated, I have had graduate course work in physiological psychology and perception, including a major research project in perception. I have a Ph.D. in Police Psychology with course studies related to and a dissertation focused on training techniques for critical incident decision-making. I was a consulting expert on this topic and contributed to the textbook titled "The Tactical Edge" which is one of the best selling texts in law enforcement in the western world. I also wrote the script on this portion for the "Street Survival Seminar." This seminar information was delivered to over 100,000 law enforcement officers throughout Canada and the United States. I have also taught this topic area in the Law Enforcement Program at Minnesota State University, Mankato. I taught or consulted on this area to the FBI – both regionally and at Quantico, the FAA Sky Marshals, U.S. Customs, and to a variety of other federal, state and local agencies through international, national and regional seminars. For example, in October of 2007, I presented on the Force Science Research Center and its research to an international seminar of law enforcement executives, convened by the FBI and conducted at the national leadership training center (Bramshill) in England. I have also done two presentations on our research in London, England, to a Criminal Justice Committee and a Human Rights Committee from both the House of Commons and the House of Lords. I wrote an article for the Police Marksman on, "Stress Reactions Related to Lethal Force Encounters." An article coauthored with Dr. Honig, entitled "A Survey of the Research on Human Factors Related to Lethal Force Encounters" was published in The Law Enforcement Executive Forum in August 2008. I recently published an article in December 2008 on our research on "Attention" in the same journal.

5. Publications on our research are or will be posted on the Force Science Research website or the research can be reviewed in the Force Science News.

## REPORT:

Sergeant Salinas interrupted Mr. Barrera while he was engaged in the theft of a truck. After a very brief encounter at the truck, Mr. Barrera fled and was pursued by Sgt. Salinas. Mr. Barrera turned and threw a small wrench tool at Sgt. Salinas  He then turned away started to run again. Sgt. Salinas was within eight to ten feet of him at this point. Mr. Barrera again turned toward

3

Sgt. Salinas. On his second turn he had a knife in his right hand that he swung toward Sgt. Salinas. Sgt. Salinas had already drawn his gun and now raised it to fire at Mr. Barrera. Sgt. Salinas fired four times striking Mr. Barrera in the left rear area of his body and on his lower right area. The bullet path pattern is consistent with Mr. Barrera turning through the plane of gunfire as was described by Officer Salinas.

Action/Reaction:

1. The handgun used by Sgt. Salinas was a Beretta 9mm that has a double action trigger pull for the first shot and a single action trigger pull for every remaining shot. The time for an average officer to pull the trigger on the first shot, for a handgun like this, is approximately a little more than a third of a second when the officer is reacting to the simplest visual stimulus. In our research, if we had the officer make a decision before they pulled the trigger, the simplest decision-making added another quarter of a second to the trigger pull time. Sgt. Salinas states that he decided to shoot at Mr. Barrera when Mr. Barrera had spun on him a second time. The second time that he spun on Sgt. Salinas Mr. Barrera had a knife in his right hand that he swung toward Sgt. Salinas as he was turning.

2. From our research data and other sources, we know that the average officer using this type of handgun in these circumstances (involving perception and judgment) would not actually complete the firing the first round from their handgun until at least a half a second had gone by (this includes perception and decision time). Sgt. Salinas, by his own report, instead of simply pulling the trigger on his gun, then had to raise his handgun to a firing position. This would add another brief period of approximately another quarter of a second or so for the average officer. Therefore, given our time frames from our research -- all of the action engaged in by Sgt. Salinas (perception, judgment, and movement of the gun upward) would take the average officer at least three quarters of a second from the moment they saw the knife in the hand until they fired the first shot. The average officer would then fire the remaining three shots in approximately another one second. Therefore, if Sgt. Salinas is an average officer, he would have made the decision to shoot, moved his gun upward and completed firing all four rounds in under two seconds from the moment the knife was seen in Mr. Barrera's hand.

3. Our research and the research of others indicates that the average time for someone to close a distance of 5 to 8 feet and then slash or stab with a knife is well under one second. Therefore Sgt. Salinas' perception that this was a deadly threat situation is accurate. From an action reaction perspective, he could be stabbed or cut before he could raise his gun and fire one round.

4. Sgt. Salinas stated that he was pointing his gun at Mr. Barrera when he started to fire and when he had finished shooting his four rounds, Mr. Barrera had turned completely away from him and was falling. In our studies on "turning subjects", the average person in our study completed a simple 180-degree turn in just over half a second while the fastest turn was completed in slightly over a third of a second. Therefore it is entirely consistent with Sgt. Salina's statement that he fired his first round when Mr. Barrera was turning toward

4

him while swinging the knife around toward him his right hand. It is clear from an action/reaction perspective that by the time Sgt. Salinas could fire his first round, Mr. Barrera could very easily be well into finishing his turn and facing to some degree away from Sgt. Salinas. Further, by the time Sgt. Salinas fired all four rounds and recognized that Mr. Barrera was no longer a threat, Mr. Barrera had fully turned away from him, been shot in the back area three times and was falling forward.

5. The level of threat and the officer's attentional focus to engage that threat in a rapidly unfolding visually complex environment also informs us about the ability of that officer to notice, in the middle of his shooting that his subject, Mr. Barrera in this case, was also simultaneously engaged in turning away from him. The threatening nature of the situation, the attentional processes required to aim, or point and aim and then fire a handgun and the abbreviated time frame of a shooting such as this, all contribute toward Sgt. Salinas or any officer being unable to note the precise movement of Mr. Barrera during this shooting. These conditions would also impair the officer's ability to detect the turn of Mr Barrera and stop his gunfire before the turn and fall were completed. Therefore, the research, the forensic evidence and Sgt. Salinas' report of this incident are all congruent.

6. The attentional problems of officers performing in this type of high stress encounter have been well documented and researched. Our own research (available from our news line and website) supports the findings that officers who are scanning and focusing in this type of encounter often miss vast quantities of information. This would especially be true of an incident that occurred with the behavioral and visual complexity and level of threat of this incident and that took only a few seconds to occur. Therefore it is not at all unusual that Sgt. Salinas did not note the verbalization of Mr. Barrera as reported by others, if it occurred, while he was focused on the threat and shooting to stop the threat and save his life. His being unable to note this verbalization would be an example of a classical byproduct of a focused attention and has been well researched and also accommodated for in the law enforcement world for over 30 years.

7. Human beings do not form memory as a visual or auditory recording does. Human beings cannot simply rerun an incident frame by frame and provide a complete and accurate report on the event. Humans, particularly police officers generally perceive a critical incident and events therein with a particularly narrow interest and attentional process, a narrow field of vision and a particular use of peripheral cues to make assumptions about facts or activities. All of these processes, including the interview process can lead to errors either in the recording, understanding or reporting phase that an officer goes through after a critical incident.

8. During this encounter Mr. Barrera, who had a knife in his right hand, apparently released the knife, as he was turning and being shot by Sgt. Salinas. We know this because Sgt. Salinas first saw the knife in Mr. Barrera's right hand and also noted the sound of the knife travelling along the pavement after he completed firing. The knife was found some distance away from the approximate area of the shooting. A rapid turn generates a considerable amount of force. A knife released from the hand of someone engaged in a

5

rapid turn and fall and then travelling across a hard surface can easily travel 30 feet or more before coming to rest. Therefore, the location of the knife and the distance of it from the shooting site are also consistent with the reported behavior of Mr. Barrera, the sound reported by Sgt. Salinas and the nature of both the apparently hard, smooth surface of the knife and the hard surface of the roadway.

If I can provide any further information, please contact me.

I reserve the right to amend this report should further information become available to me.

I also reserve the right to illustrate the points made in this report with demonstrations and demonstrative videos.

Sincerely,

William J. Lewinski, Ph.D.

6

|   |   |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | I am employed in the county of Ventura, State of California. I am over the age of |
| 3 | eighteen and not a party to the within action, and my business address is: Law Offices of Kim |
| 4 | D. Scovis, 223 E. Thousand Oaks Blvd., Suite 412, Thousand Oaks, CA 91360. |
| 5 | On June 26, 2009, I served the following document(s): |
| 6 | **PLAINTIFFS MOTION IN LIMINE NO. 11 TO EXCLUDE ANY EVIDENCE** |
| 7 | **AND/OR EXPERT TESTIMONY AS TO WHETHER SGT SALINAS WAS** |
| 8 | **SUFFERING FROM PTSD AND/OR FROM PROVIDING ANYOTHER** |
| 9 | **OPINION AS TO SGT SALINAS' CREDIBILITY AND/OR RATIONALE FOR** |
| 10 | **DIFFERING ACCOUNTS OF THE INCIDENT** |

on the interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

| Law Office of Alan E. Wistosky | Law Office of Gregory A. Yates, P.C. |
|---|---|
| Attention: Mr. Dirk DeGenna | Attn: Gregory Yates |
| 300 Esplanade Drive, Suite 1500 | 16830 Ventura Blvd., #250 |
| Oxnard, CA 93036 | Encino, CA 91436 |

Daniel C. Morgan & Assoc.
1591 Spinnaker Doctor., #205
Ventura, CA 93001

__X__ I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices, in the United States mail at Thousand Oaks, California.

Fed Ex overnight service.

_____ By Personal Service, I caused such envelope to be delivered by hand to the above address(es).

PROOF OF SERVICE

|   |   |   |
|---|---|---|
| 1 | _____ | By facsimile, I caused such document to be transmitted via facsimile |
| 2 |   | machine, to the above address(es) |
| 3 | _____ | (State)  I declare under penalty of perjury under the laws of the State of |
| 4 |   | California that the foregoing is true and correct. |
| 5 | _X_ | (Federal)  I declare that I am employed in the office of a member of the bar |
| 6 |   | of this court at whose direction the service was made. |
| 7 |   | Executed on June 26, 2009, at Thousand Oaks, California |

*/s/ Roschelle Ayonayon*
Roschelle Ayonayon

PROOF OF SERVICE