1    Jenny Scovis, Esq., State Bar No. 87026
     Kim D. Scovis, Esq., State Bar No. 182059
2    **LAW OFFICES OF KIM D. SCOVIS**
     223 East Thousand Oaks Boulevard, Suite 412
3    Thousand Oaks, California 91360
     Telephone: (805) 496-6413   Facsimile: (805) 379-3966
4

5    Attorneys for Plaintiff, MARIA LAZOS as an individual, and *THE ESTATE OF*
     *THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*
6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11
     MARIA LAZOS, *THE ESTATE OF*          )   Case No. CV08-02987-RGK (SHx)
12   *THOMAS BARRERA, By and Through its*  )
     *Successor in Interest, MARIA LAZOS*  )   (consolidated w/ CV 08-05153 RGK )
13                                         )
            Plaintiff,                     )
14                                         )   **PLAINTIFFS  MOTION  IN  LIMINE**
     vs.                                   )   **NO. 12 TO EXCLUDE ANY EVIDENCE**
15                                         )   **FOUND IN THE TRUCK BELONGING**
     CITY OF OXNARD; OXNARD POLICE         )   **TO LUIS GARCIA**
16   DEPARTMENT; POLICE CHIEF JOHN         )
     CROMBACH; ANDREW SALINA, and          )
17   DOES 1-10                             )
                                           )
18                                         )   DATE: August 11, 2009
            Defendants.                    )   TIME:
19   _____)   DEPT: "850"
                                           )
20   AND CONSOLIDATED ACTION_____)

21

22         Plaintiffs, MARIA LAZOS, TOMAS BARRERA and *THE ESTATE OF THOMAS*

23   *BARRERA BY AND THROUGH ITS SUCCESSORS IN INTEREST MARIA LAZOS and*

24   *TOMAS BARRERA* do hereby submit their Motion in Limine seeking an Order Excluding any

25   and/or all Evidence found in the truck belonging to Luis Garcia (hereinafter "the truck"). The

26   truck was the vehicle that decedent, Tommy Barrera, was allegedly attempted to break into

27   when this incident commenced.

28         Shortly after the incident at issue in this case, counsel for both plaintiffs contacted

                                         1

1 │ defendants via their counsel, and requested that all evidence be preserved for inspection

2 │ and/or testing by Plaintiffs' experts.

3 │     The Truck belonged to an individual names Luis Garcia. Mr. Garcia was deposed

4 │ on April 28, 2009. During the deposition, Mr. Garcia testified that the truck was released to

5 │ him without any instruction to preserve the truck, make the truck available, etc and that

6 │ Officer Mancha was the Oxnard Police Department representative who he always spoke with

7 │ regarding the truck. Mr. Garcia further testified that he was contacted by both counsel for

8 │ Plaintiffs wherein he ws asked whether they could inspect his truck.  Mr. Garcia then

9 │ contacted Officer Mancha who informed Mr. Garcia that he "could do what he wants" with

10 │ "the truck", that he could "sell it" or "destroy it". Officer Mancha also advised Mr. Garcia

11 │ that he did not have to speak to anyone, including plaintiffs or their counsel.

12 │     Spoliation of evidence is the destruction or alteration of evidence. Although a party

13 │ need not have acted in ``bad faith'' to be held responsible for spoliation of evidence [see

14 │ Glover v. BIC Corp. (9th Cir 1993) 6 F3d 1318, 1329], a party must have had notice that

15 │ documents were relevant or potentially relevant to litigation before the documents were

16 │ destroyed for spoliation of evidence to have occurred [United States ex rel. Aflatooni v.

17 │ Kitsap Physicians Serv. (9th Cir 2002) 314 F3d 995, 1001; Akiona v. United States (9th Cir

18 │ 1991) 938 F2d 158, 161].

19 │     While a litigant is under no duty to keep or retain every document in its possession

20 │ once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should

21 │ know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible

22 │ evidence, is reasonably likely to be requested during discovery, and/or is the subject of a

23 │ pending discovery request [National Ass'n of Radiation Survivors v. Turnage (ND Cal 1987)

24 │ 115 FRD 543, 556–557, citing Wm. T. Thompson Co. v. General Nutrition Corp. (CD Cal

25 │ 1984) 593 F Supp 1443; see also Zubulake v. UBS Warburg LLC (SDNY 2003) 220 FRD

26 │ 212, 216].

27 │ A range of sanctions is available for spoliation of evidence under the court's inherent powers

28 │ [see, e.g., Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp. (9th Cir 1992) 982 F2d

1   363, 368. Courts are invested with inherent powers that are governed not by rule or statute,

2   but by the control necessarily vested in courts to manage their own affairs so as to achieve

3   the orderly and expeditious disposition of cases [Chambers v. NASCO, Inc. (1991) 501 US

4   32, 43–49, 111 S Ct 2123, 115 L Ed2d 27].

5        The following types of sanctions are examples of those imposed under this authority:

6   •    Exclusion of evidence [see, e.g., Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.

7   (9th Cir 1992) 982 F2d 363, 368].

8   •    Dismissal [see, e.g., ; Leon v. IDX Sys. Corp. (9th Cir 2006) 464 F3d 951, 958 Halaco

9   Eng'g Co. v. Costle (9th Cir 1988) 843 F2d 376, 380].

10  •    An award of attorney's fees against a party or counsel who has acted in bad faith,

11  vexatiously, wantonly, or for oppressive reasons [Leon v. IDX Sys. Corp. (9th Cir 2006) 464

12  F3d 951, 961].

13      In cases in which the drastic sanctions of dismissal or default are ordered, the range of

14  discretion for a district court is narrowed, and the losing party's noncompliance must be due

15  to willfulness, fault, or bad faith [Leon v. IDX Sys. Corp. (9th Cir 2006) 464 F3d 951, 958].

16  A finding of any of these circumstances may justify the sanction of dismissal [Halaco Eng'g

17  Co. v. Costle (9th Cir 1988) 843 F2d 376, 381].

18      The existence and degree of prejudice to the wronged party is a factor in the

19  determination of whether to impose a severe sanction such as dismissal [Leon v. IDX Sys.

20  Corp. (9 Cir 2006) 464 F3d 951, 958]. In some published cases, the Ninth Circuit has

21  referred to this factor as optional [see, e.g., Halaco Eng'g Co. v. Costle (9th Cir 1988) 843

22  F2d 376, 382].

23  25.97[2][e]  Imposition of Severe Sanctions Requires Consideration of Public Interest and

24  Policy.

25  Before imposing a harsh sanction such as dismissal, the district court must consider the

26  public interest in expeditious resolution of litigation, the court's own need to manage its

27  dockets, and the public policy favoring disposition of cases on the merits [Leon v. IDX Sys.

28  Corp. (9th Cir 2006) 464 F3d 951, 958].

1   25.97[3]   Sanction Must Be Commensurate With Degree to Which Evidence Was

2   Compromised or Destroyed.

3   In the Ninth Circuit, the particular sanction levied under the court's inherent power depends

4   on [see, e.g., Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp. (9th Cir 1992) 982 F2d

5   363, 369]:

6   •      The degree to which the evidence was altered, lost, or destroyed.

7   •      The degree of the responsible party's culpability.

8   •      Surrounding circumstances such as the parties' previous ability to view or test that

9   evidence prior to its spoliation.

10         When the plaintiff insurer destroyed an electric heater and a boat prior to filing an

11   action against the heater manufacturer for subrogation based on the allegation that the heater

12   cause a fire in the boat, the proper sanction was exclusion of evidence regarding the alleged

13   defect in the heater [see Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp. (9th Cir

14   1992) 982 F2d 363, 369].

15         When appropriate, a party that destroyed potential evidence should show that he or

16   she did not do so in response to the litigation, perhaps by indicating that the evidence was

17   destroyed prior to litigation and before the party could have any reasonable indication that

18   litigation would be brought relative to that evidence [see, e.g., Akiona v. United States (9th

19   Cir 1991) 938 F2d 158, 161, cert. denied, 503 US 962 (1992)].

20         A party should only be penalized for destroying documents if it was wrong to do so,

21   and that requires, at a minimum, some notice that the documents are potentially relevant

22   [Akiona v. United States (9th Cir 1991) 938 F2d 158, 161, cert. denied, 503 US 962 (1992)].

23   A party should only be penalized for destroying documents if it was wrong to do so, and that

24   requires, at a minimum, some notice that the documents are potentially relevant [Akiona v.

25   United States (9th Cir 1991) 938 F2d 158, 161, cert. denied, 503 US 962 (1992)].

26         In the case at bar, there was an officer involved shooting resulting in the death of a

27   young individual.   The decedent was alleged to have been attempted to break into "the

28   truck", an alleged activity that gave rise to the chase which culminated in the killing of Mr.

Barrera by an Oxnard Police Department.  Certainly this set of circumstances would alert even the most simple of administrators that litigation is possible if not probable, and that the truck, and all the contents therein, were relevant to any such litigation.

In fact, both of Plaintiffs counsel, on separate occassions, sent correspondence to Defendants asking them to preserve all evidence.  Counsel for Maria Lazos specifically requested access to the truck in correspondence separately addressed to each defendant. Furthermore, Maria Lazos filed a Claim Against Public Entity on October 07, 2009 and the truck was released on October 09, 2009.   Therefore, Defendants cannot state that they were unaware of any potential litigation.

The release of the truck to Mr Garcia absent any admonition, request, or without the provision  of any other type of caveat  or proviso that the truck need be preserved and/or made available to Plaintiffs counsel was clearly done in bad faith and with the intent to deprive plaintiffs of access to the truck.   Defendants had both actual and/or constructive knowledge that the truck need be preserved.

In essence, defendants put themselves in the best of circumstances.   Defendants abused their status as public entities, especially as law enforcement defendants.  There is inherent power in such a status, and Plaintiffs proffer to this Court that because of this fact, defendants should be under a more stringent standard than private parties.   Defendants clearly knew that the truck was essential to plaintiffs' case in chief, and furthermore knew and exploited the fact that Luis Garcia, who was the owner of the truck, was afraid of any involvement with this case.   Luis Garcia testified that he informed Officer Mancha that he was scared.

Plaintiffs strongly believe that Defendants had a **direct** and **absolute**  duty to hold the truck until it was clear that no other party wanted to inspect the truck, and/or the statute of limitations expired.   Defendants had specific knowledge that a claim had been filed against them, and that they truck had been specifically delineated in this claim.  Even if Defendants were unable to procure possession of said truck for an extensive amount of time (although there is no known reason they could not), they **minimally** had a duty to ask and/or

1  encourage Luis Garcia to make the truck available to Plaintiffs and/or their counsel.  The

2  opposite occurred in this case.  Defendants intentionally released the truck expeditiously, and

3  actively encouraged Mr. Garcia to sell and/or destroy the truck.

4     It is for this reason that Plaintiffs respectfully request that the Court order the

5  exclusion of any evidence found inside the truck, exclude any evidence of decedent

6  attempting to commit any crimes in the truck, and/or exclude any evidence relating in any

7  way to the truck.

8  DATED: June 26, 2009     LAW OFFICES OF KIM D. SCOVIS

9

10     JENNY SCOVIS
    Attorneys for Plaintiff

11

12  DATED: June 26, 2009     LAW OFFICES OF GREGORY A. YATES

13

14     GREGORY A. YATES
    Attorneys for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit

# "1"

# VEHICLE REPORT

NOTE: CHP 180 IS FURNISHED TO ALL PEACE OFFICERS BY THE CALIFORNIA HIGHWAY PATROL

CHP 180 (Rev. 2-99) OPI 061

| REPORTING DEPARTMENT | LOCATION CODE | DATE / TIME OF REPORT | NOTICE OF STORED VEHICLE DELIVERED PERSONALLY ☐ | FILE NO. |
|---|---|---|---|---|
| ~ARD   P.D | 5604 | 10-3-07/070 | | 07-25163 |

| LOCATION TOWED / STOLEN FROM | ODOMETER READING | VIN CLEAR IN SVS? ☒YES ☐NO | DATE / TIME DISPATCH NOTIFIED | LOG NO |
|---|---|---|---|---|
| | 06489 | LIC CLEAR IN SVS? ☒YES ☐NO | | |

| YR | MAKE | MODEL | BODY TYPE | COLOR | LICENSE NO. | ☐ ONE | MONTH / YEAR | STATE |
|---|---|---|---|---|---|---|---|---|
| | CHEVY | SILVERADO | P/U | WHT | 8H10852 | ☒ TWO | 12/07 | CA |

| VEHICLE IDENTIFICATION NO. | ENGINE NO | VALUATION BY ☒OFFICER ☐OWNER |
|---|---|---|
| 1GCDC14H2CS118308 | | ☐ 0-300   ☒ 301-4000   ☐ 4001+   $ |

REGISTERED OWNER

☐ SAME AS R/O

LEGAL OWNER

---

☐ STORED   ☐ IMPOUNDED   ☒ RELEASED   ☐ RECOVERED - VEHICLE / COMPONENT

| TOWING / STORAGE CONCERN (NAME, ADDRESS, PHONE) | STORAGE AUTHORITY / REASON  EVIDENCE |
|---|---|
| OXNARD TOWING | 22655.5(a) V.C   INVOLVED IN CRIME |

TOWED TO / STORED AT

1001 STURGIS RD OXNARD, CA

| AIRBAG? ☐YES ☒NO   ☐1  ☐2 | DRIVEABLE? ☒YES ☐NO | ☐ JUNK  ☐ UNK | VIN SWITCHED? ☐YES ☒NO |
|---|---|---|---|

| CONDITION | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | TIRES / WHEELS | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCKED | | ☒ | SEAT (FRONT) | | ☒ | REGISTRATION | | | CAMPER | | ☒ | LEFT FRONT | WORN |
| STRIPPED HULK per 431(c) VC | | | SEAT (REAR) | | ☒ | ALT / GENERATOR | | | VESSEL AS LOAD | | | RIGHT FRONT | |
| VANDALIZED | | | RADIO | | | BATTERY | | | FIREARMS | | | LEFT REAR | |
| ENG/TRANS. STRIP | | | TAPE DECK | | | DIFFERENTIAL | | | OTHER | | | RIGHT REAR | |
| PARTS STRIP | | | TAPES | | | TRANSMISSION | | | | | | SPARE | NONE |
| TOTAL STRIP | | | OTHER RADIO | | | AUTOMATIC | | | | | | HUB CAPS | NONE |
| STRIP per 431(b) VC | | | IGNITION KEY | | ☒ | MANUAL | | ☒ | | | | SPECIAL WHEELS | NONE |

| RELEASE VEHICLE TO | ☒ R/O OR AGENT | ☐ AGENCY HOLD | ☐ 22850 3 VC | GARAGE PRINCIPAL / AGENT STORING VEHICLE (SIGNATURE) | DATE / TIME |
|---|---|---|---|---|---|

| NAME OF PERSON / AGENCY AUTHORIZING RELEASE | I.D NO | DATE | CERTIFICATION. I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT I AM LEGALLY AUTHORIZED AND ENTITLED TO TAKE POSSESSION OF THE ABOVE DESCRIBED VEHICLE |
|---|---|---|---|
| MANCHA | 4804 | 10-09-07 | |

SIGNATURE OF PERSON AUTHORIZING RELEASE
M

SIGNATURE OF PERSON TAKING POSSESSION
X

---

☐ STOLEN VEHICLE / COMPONENT   ☐ EMBEZZLED VEHICLE   ☐ PLATE(S) REPORT

| DATE / TIME OF OCCURRENCE | DATE / TIME REPORTED | NAME OF REPORTING PARTY (R/P) | DRIVER LICENSE NO. / STATE |
|---|---|---|---|
| DRIVER OF VEHICLE | DATE / TIME | ADDRESS OF R/P | TELEPHONE OF R/P ( ) |

I CERTIFY OR DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT

SIGNATURE OF PERSON MAKING REPORT

---

## REMARKS
[LIST PROPERTY, TOOLS, VEHICLE DAMAGE, ARRESTS]

| R/P'S NAME | ARRESTED / SECTION? ☐YES ☒NO | REPORTED BY OXPD | CARGO / TYPE? ☐YES ☐NO | VALUE $ ☐ BILL OF LADING ATTACHED |
|---|---|---|---|---|

VEHICLE WAS RELEASED TO THE R/O ON 10-9-07/1445 HOURS.

---



FRONT   LEFT SIDE   RIGHT SIDE   REAR   TOP

| SIGNATURE OF OFFICER TAKING REPORT | I.D. NO. | SUPERVISOR | REQUIRED NOTICES SENT TO REGISTERED AND LEGAL OWNERS PER 22852 VC ☐YES ☐NO | DATE NOTIFIED |
|---|---|---|---|---|
| MANCHA | 4804 | | | |

00472

NOTICE OF STORED VEHICLE (22852 VC)

COPY OF CHP 180 IS FURNISHED TO ALL PEACE
OFFICERS BY THE CALIFORNIA HIGHWAY PATROL

| REPORTING DEPARTMENT | | LOCATION CODE | DATE / TIME OF REPORT | NOTICE OF STORED VEHICLE DELIVERED PERSONALLY | | FILE NO. |
|---|---|---|---|---|---|---|
| ...ARD  P D | | 51-04 | 10.3.07/04 | ☐ | | |

| ...ON TOWED / STOLEN FROM | ODOMETER READING | VIN CLEAR IN SVS? | DATE / TIME DISPATCH NOTIFIED | LOG NO |
|---|---|---|---|---|
| | 06489 | ☑ YES ☐ NO   LIC. CLEAR IN SVS? ☑ YES ☐ NO | | |

| ...AR | MAKE | MODEL | BODY TYPE | COLOR | LICENSE NO | | MONTH / YEAR | STATE |
|---|---|---|---|---|---|---|---|---|
| | CHEVY | SILVERADO | P/U | WHT | 8410552 | ☐ ONE ☐ TWO | 12/07 | CA |

| VEHICLE IDENTIFICATION NO. | ENGINE NO. | VALUATION BY ☑ OFFICER ☐ OWNER |
|---|---|---|
| 1GCDH14H2C5173098 | | ☐ 0-300  ☑ 301-4000  ☐ 4001 +  ☐ $ |

| REGISTERED OWNER | LEGAL OWNER |
|---|---|
| ☐ SAME AS R/O | |

☐ STORED          ☐ IMPOUNDED          ☑ RELEASED          ☐ RECOVERED - VEHICLE / COMPONENT

| TOWING / STORAGE CONCERN (NAME, ADDRESS, PHONE) | STORAGE AUTHORITY / REASON |
|---|---|
| OXNARD TOWING | 22852 5(a) V EVIDENCE |

| TOWED TO / STORED AT | AIRBAG? | DRIVEABLE? | VIN SWITCHED? |
|---|---|---|---|
| 301 STURGIS RD OXNARD, CA | ☐ YES ☑ NO ☐ 1 ☐ 2 | ☑ YES ☐ NO ☐ JUNK ☐ UNK | ☐ YES ☑ NO |

| CONDITION | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | TIRES / WHEELS | | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ...CKED | | | SEAT (FRONT) | ✓ | | REGISTRATION | ✓ | | LEFT FRONT | | |
| ...NED HULK per 431(c) VC | | | SEAT (REAR) | | ✓ | ALT. / GENERATOR | | | RIGHT FRONT | | GOOD |
| ...DALIZED | | | RADIO | | | BATTERY | | | LEFT REAR | | |
| ...TRANS. STRIP | | | TAPE DECK | | | DIFFERENTIAL | | | RIGHT REAR | | |
| ...TS STRIP | | | TAPES | | | TRANSMISSION | | | SPARE | | |
| ...TAL STRIP | | | OTHER RADIO | | | AUTOMATIC | | | HUB CAPS | | NONE |
| ...STRIP per 431(b) VC | | | IGNITION KEY | ✓ | NO | MANUAL | ✓ | | SPECIAL WHEELS | | NONE |

| ...SE VEHICLE TO ☑ R/O OR AGENT ☐ AGENCY HOLD ☐ 22850 3 VC | GARAGE PRINCIPAL / AGENT STORING VEHICLE (SIGNATURE) | | DATE / TIME |
|---|---|---|---|

| ...OF PERSON / AGENCY AUTHORIZING RELEASE | ID NO | DATE | CERTIFICATION  I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT I AM LEGALLY AUTHORIZED AND ENTITLED TO TAKE POSSESSION OF THE ABOVE DESCRIBED VEHICLE |
|---|---|---|---|
| WAL... | 1794 | 10.22.07 | |

| SIGNATURE OF PERSON AUTHORIZING RELEASE | SIGNATURE OF PERSON TAKING POSSESSION |
|---|---|
| M... | X ... |

SEE REVERSE FOR INFORMATION

00473

NOTICE OF STORED VEHICLE FORM FURNISHED TO ALL PEACE OFFICERS BY THE CALIFORNIA HIGHWAY PATROL

| REPORTING DEPARTMENT | | LOCATION CODE | DATE / TIME OF REPORT | NOTICE OF STORED VEHICLE DELIVERED PERSONALLY ☐ | FILE NO. |
|---|---|---|---|---|---|
| ARD  P D | | 5604 | 10 3 07/04 | | 07-2003 |

| ON TOWED / STOLEN FROM | | | ODOMETER READING 06489 | VIN CLEAR IN SVS? ☒ YES ☐ NO | DATE / TIME DISPATCH NOTIFIED | LOG NO |
|---|---|---|---|---|---|---|

| MAKE | MODEL | BODY TYPE | COLOR | LICENSE NO | ☐ ONE ☒ TWO | MONTH / YEAR | STATE |
|---|---|---|---|---|---|---|---|
| CHEVY | PICKUP | P/U | WHT | 8H10832 | | 12/07 | CA |

| VEHICLE IDENTIFICATION NO | ENGINE NO | VALUATION BY ☒ OFFICER ☐ OWNER ☐ 0-300 ☒ 301-4000 ☐ 4001+ ☐ $ |
|---|---|---|
| 1 G C D C 14H 2 C S 113 0 4 8 | | |

REGISTERED OWNER      ☐ SAME AS R/O      LEGAL OWNER

☐ STORED      ☐ IMPOUNDED      ☒ RELEASED      ☐ RECOVERED - VEHICLE / COMPONENT

| TOWING / STORAGE CONCERN (NAME, ADDRESS, PHONE) | STORAGE AUTHORITY / REASON CVC 22 -LE |
|---|---|
| XNARD TOWING | 22685 (a) V C |

TOWED TO / STORED AT
31 STURGIS RD OXNARD, CA

| | AIRBAG? ☐ YES ☒ NO ☐ 1 ☐ 2 | DRIVEABLE? ☒ YES ☐ NO | ☐ JUNK ☐ UNK | VIN SWITCHED? ☐ YES ☒ NO |
|---|---|---|---|---|

| CONDITION | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | TIRES / WHEELS | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LOCKED | | ☒ | SEAT (FRONT) | ☒ | | REGISTRATION | ☒ | | CAMPER | | ☒ | LEFT FRONT | |
| BURNED HULK per 431(c) VC | | | SEAT (REAR) | | ☒ | ALT / GENERATOR | | | VESSEL AS LOAD | | | RIGHT FRONT | |
| VANDALIZED | | | RADIO | | | BATTERY | | | FIREARMS | | | LEFT REAR | |
| TRANS. STRIP | | | TAPE DECK | | | DIFFERENTIAL | | | OTHER | | | RIGHT REAR | |
| TS STRIP | | | TAPES | | | TRANSMISSION | | | | | | SPARE | |
| METAL STRIP | | | OTHER RADIO | | | AUTOMATIC | | | | | | HUB CAPS | NONE |
| STRIP per 431(b) VC | | | IGNITION KEY | | ☒ | MANUAL | | | | | | SPECIAL WHEELS | NONE |

| RELEASE VEHICLE TO | ☒ R/O OR AGENT | ☐ AGENCY HOLD | ☐ 22850 3 VC | GARAGE PRINCIPAL / AGENT STORING VEHICLE (SIGNATURE) | DATE / TIME |
|---|---|---|---|---|---|

| NAME OF PERSON / AGENCY AUTHORIZING RELEASE | ID NO | DATE |
|---|---|---|
| MANHA | 424 | 10 5 07 |

SIGNATURE OF PERSON AUTHORIZING RELEASE

CERTIFICATION  I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT I AM LEGALLY AUTHORIZED AND ENTITLED TO TAKE POSSESSION OF THE ABOVE DESCRIBED VEHICLE

SIGNATURE OF PERSON TAKING POSSESSION

SEE REVERSE FOR INFORMATION

00474

# Exhibit

# "2"

Depo of Luis Garcia transcript

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA LAZOS, ET AL.,      )
                        )
                        )
                        )  (PAGES 1-85)
           PLAINTIFFS,  )
                        )
                        )
      -vs-           )  CASE NO. CV 08-02987
                        )  RGK (SHx)
CITY OF OXNARD, ET AL.,   )
                        )  CONSOLIDATED WITH
                        )  CASE NO. CV 08-05153
                        )  RGK (SH)
         DEFENDANTS.   )
                        )
AND CONSOLIDATED ACTION.  )
                        )

DEPOSITION OF LUIS GARCIA

TUESDAY, APRIL 28, 2009, 10:14 A.M.

OUR FILE NO:  090428GAS(1)

REPORTED BY:  GINA A. STACY, C.S.R. 7927

                                         1

DEPOSITION OF LUIS GARCIA, TAKEN AT 10:14 A.M.,

TUESDAY, APRIL 28, 2009, AT 300 EAST ESPLANADE DRIVE,

Depo of Luis Garcia transcript

7   truck?

8       A    No.

9       Q    So you don't -- do you know whether fingerprints

10  were taken in your truck?

11      A    I don't know.  Because the police -- what they

12  did is they took my saliva to check the DNA to see if it

13  was on there, if it was mine.

14      Q    On where?

15      A    Well, the police department took a test to see

16  if -- see if my fingerprints.

17      Q    On the knife?

18      A    No.  Not on the knife.

19           Simply just to -- they did a test on me that they

20  wanted to be sure that it wasn't -- because they asked me

21  if those things were mine.

22      Q    Meaning the chisel and the knife?

23      A    Uh-huh.

24      Q    So they took saliva from your mouth for DNA?

25      A    Yes.

66

1       Q    Mr. Garcia, did anybody at any time between the

2   morning of the shooting and to the day that you picked up

3   the truck from Mr. Vargas -- did anybody from the city,

4   the police, anybody from the government tell you hold on

5   to the truck and don't get rid of it.

6       A    No.

7       Q    Did anybody tell you from the police department,

8   the government, or their attorneys, Mr. DeGenna or other

9   people -- did anybody tell you that the Tommy Barrera's

10  people wanted the truck?

Page 58

                         Depo of Luis Garcia transcript
11    A    No.

12          I was the one that -- I told them that they were

13   calling me, they wanted to rent me a car.  And I told

14   Mr. Mancha, and he said, well, let them take it.  He said

15   there be wouldn't be any trouble.

16   BY MR. DeGENNA:

17    Q    Who would be in trouble --

18          MR. DeGENNA:  Misstates his testimony.

19          MS. JENNY SCOVIS:  I didn't understand his

20   testimony.

21          THE WITNESS:  He told me that, if I wanted to

22   leave the truck with them, if they wanted to take it,

23   that it was my belonging and that they had already

24   finished with their investigation.

25   BY MS. JENNY SCOVIS:

                                                        67


1     Q    Who told you that, sir?

2     A    Luis Mancha.  The truck -- I could -- I could

3    destroy it or do whatever I wanted with it or use it to

4    work.  So I didn't want it anymore.

5     Q    Did somebody -- did Maria Lazos tell you she

6    wanted to rent you a truck so she could take the truck

7    that was involved that night?

8     A    I don't know who it was, but they called me.

9     Q    Somebody called you?

10    A    Yes.  And they told me that they were the

11   attorneys.

12    Q    And they said that they wanted the truck and we

13   will rent you another truck meanwhile?

14    A    Yes.  Something like that.

Depo of Luis Garcia transcript

15      Q     Okay.  Did anybody -- did whoever called you --

16   was it somebody from Tommy Barrera's side, young Tommy

17   Barrera?

18      A     Yes.  They were attorneys.  That is what they

19   told me.

20      Q     The attorneys?

21      A     Yes.

22      Q     Okay.  Now, did they also offer to buy the truck

23   from you?

24      A     No.

25      Q     Nobody offered to buy it?

68

1      A     No.

2      Q     Now, when you were offered to be given a rental

3   car, did you say yes, or no?

4      A     I told them that I had already sold the truck

5   because I had it down in Los Angeles.

6      Q     That you sold the truck?

7      A     Yes.  I told them that.  They can check their

8   notes.

9      Q     Now, did you sell the truck when you told them

10   you sold the truck?

11      A     It was -- the deal was done.  It was a business

12   deal that we had done, but it was never finished.

13      Q     So how come it wasn't finished?

14      A     Because my cousin thought not fixing it -- he

15   wanted to paint it and all.  But -- rebuild it all, but

16   then it was going to be too much money.  So he said he

17   didn't want it after all.

18      Q     Did your friend not want it because it was

Page 60

Depo of Luis Garcia transcript
19  involved in the shooting?

20       MR. DeGENNA:  Calls for speculation.

21       THE WITNESS:  I don't know.  That could be

22  possible.

23  BY MS. JENNY SCOVIS:

24    Q    Did you, Mr. Garcia, specifically ask Officer

25  Mancha what to do with your truck?  Is that correct?

                                                    69


1     A    I asked him.

2     Q    And when did you ask Officer Mancha what to do

3  with the truck?

4       MR. DeGENNA:  Objection.  Misstates his testimony

5  as to -- misstating his testimony.  He didn't ask him

6  what to do with the truck.

7  BY MS. JENNY SCOVIS:

8     Q    Did you talk to Officer Mancha about your truck?

9     A    Yes.

10    Q    And did you talk to Officer Mancha about your

11  truck before you picked it up from Herman Vargas' lot?

12    A    Yes.

13    Q    And when you called Officer Mancha to talk to him

14  about your truck before it got picked up from Mr. Vargas,

15  what did you ask Officer Mancha as well as you can

16  remember?

17    A    That if I could sell it or destroy it.  And he

18  told me yes.

19    Q    That you could sell it or destroy it?

20    A    Yes.

21       Well, first I took it to Los Angeles.  I was

22  going to sell it.  But they didn't want it.  So I had to

Depo of Luis Garcia transcript

23  destroy it.

24  Q   Who didn't want it sold?

25  A   My cousin.

70

1   Q   Did the police care whether you sold it or

2   destroyed it?

3       MR. DeGENNA:   Objection.   Calls for speculation.

4   BY MS. JENNY SCOVIS:

5   Q   That you know of.

6       Go ahead and answer.

7   A   No.   No because they told me that it was my

8   vehicle.

9   Q   And that is what Officer Mancha said, in fact --

10  it's your vehicle, do what you want?

11  A   Yes.

12  Q   Okay.   Thank you.

13      Now -- and that was before you picked it up from

14  Mr. Vargas?

15  A   Yes.   But that it -- if I wasn't going to need it

16  back or whatever, what would I do with it.

17  Q   Who said that?

18  A   Well, I thought.   That is why I asked if I

19  could --

20  Q   If you could what?

21  A   Get rid of it.   Sell it or trash it.

22  Q   Mr. Garcia, was that the only conversation that

23  you had with anybody from the police department regarding

24  your truck --

25  A   Yes.

71

Depo of Luis Garcia transcript

8  was -- I went with them.  It was about the truck to -- I

9  wanted to know when they would give it to me or what they

10 were going to do.  And I asked them.

11      And they told me you could use it to work.  If

12 there is any trouble, you could just call or come in if

13 anything is bothering you or whatever.  But I didn't want

14 it anymore.

15  Q   So you -- did you express to Officer Mancha some

16 worry that there may be trouble from the -- Tomas Barrera

17 and the Cholos?

18  A   I told him.

19  Q   And you told him that -- was that after Tomas

20 Barrera came to see you and tell you that he has the --

21  A   Yes.

22  Q   Okay.  And besides Tomas Barrera -- I can't

23 pronounce anybody's name today.

24      MS. KIM SCOVIS:  Barrera.

25 BY MS. JENNY SCOVIS:

74

1  Q   Barrera.

2      Did other Cholos come to see you about the truck?

3  A   No.

4  Q   You were just -- you had some worry in the back

5 of your mind that it might be trouble?

6  A   Yes.  That is why I never left it on the street.

7  Q   Okay.  I understand.

8      Was there talk that you're aware of after the

9 shooting that somebody called the police to tell them

10 that somebody was breaking into the truck?

11  A   No.

Page 65

Depo of Luis Garcia transcript

12    Q    Do you know whether there was a call -- do you
13  think there was a call to the police to tell them that
14  somebody was messing with the truck?

15    A    No.

16    Q    And you never called the police to say anything
17  about the truck; is that correct?

18    A    No.

19    Q    No.

20         Now, when you told Officer Mancha and his
21  companion that you had the worries that we just talked
22  about, what did they tell you to do?

23    A    That there wasn't any problem.  If anybody
24  bothered me, to just call the police department.

25    Q    Did Officer Mancha or anybody else in the police

                                                        75


1  department ever tell you that the lawyers representing
2  Tommy's mother Maria Lazos or Tomas Barrera wanted the
3  truck to look at?

4         MR. DeGENNA:  Objection.  Asked and answered.

5         THE WITNESS:  No.  No.  I was the one that told
6  them that.

7  BY MS. JENNY SCOVIS:

8    Q    Okay.  So when you told them that, what did they
9  tell you to do?

10    A    That it was my vehicle.  I could do whatever I
11  wanted with it.  That they no longer needed it.  They had
12  already done what they had to do.  So if I wanted to lend
13  it to anybody or sell it, it wouldn't be any problem.

14    Q    Okay.  Did they ever advise you to make the truck
15  available to Tommy's people?

                    Page 66

Depo of Luis Garcia transcript

16   A   No.  No.  They never told me.

17   Q   And the reverse.  Did they ever tell you to not

18 make the truck available to Tommy's people?

19   A   No.  No.

20       MS. JENNY SCOVIS:  Just one moment, and I may be

21 done.

22   Q   Did your cousin ever have a collision with that

23 truck?

24   A   No.

25   Q   There was no car accident with the truck?

76

1   A   No.

2   Q   Was that something you told Maria Lazos?

3   A   The about accidents?  No.  No.  I don't remember.

4 About accidents?  No.  Because only thing that they

5 called me, and I told them that I had scrapped it.

6   Q   Scrapped it meaning you smashed it; right?

7   A   (Indicating.)

8   Q   Okay.  That's very descriptive.

9       Did Maria Lazos -- when she called you, did she

10 ask you to talk to her lawyer, me?

11   A   I believe so.  I don't remember.  I didn't speak

12 much with -- well --

13   Q   You just wanted out of all this mess; right?

14   A   Yes.

15   Q   By the way, do you still live in the same area

16 that you lived at the time of the shooting?

17   A   If I live at the same what?

18   Q   Area of Oxnard.

19   A   Yes.  Almost on the corner.  On the other side.

Page 67

## PROOF OF SERVICE

I am employed in the county of Ventura, State of California. I am over the age of eighteen and not a party to the within action, and my business address is: Law Offices of Kim D. Scovis, 223 E. Thousand Oaks Blvd., Suite 412, Thousand Oaks, CA 91360.

On June 26, 2009, I served the following document(s):

**PLAINTIFFS MOTION IN LIMINE NO. 12 TO EXCLUDE ANY EVIDENCE**

**FOUND IN THE TRUCK BELONGING TO LUIS GARCIA**

on the interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

Law Office of Alan E. Wistosky
Attention: Mr. Dirk DeGenna
300 Esplanade Drive, Suite 1500
Oxnard, CA 93036

Law Office of Gregory A. Yates, P.C.
Attn: Gregory Yates
16830 Ventura Blvd., #250
Encino, CA 91436

Daniel C. Morgan & Assoc.
1591 Spinnaker Doctor., #205
Ventura, CA 93001

X   I am readily familiar with the business' practice for collection and processing of correspondence and mailing with the United States Postal Service; such correspondence would be deposited with the United States Postal Service the same day of deposit in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date, following ordinary business practices, in the United States mail at Thousand Oaks, California.

Fed Ex overnight service.

_____ By Personal Service, I caused such envelope to be delivered by hand to the above address(es).

_____ By facsimile, I caused such document to be transmitted via facsimile machine, to the above address(es)

_____ (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

PROOF OF SERVICE

1    __X__    (Federal)  I declare that I am employed in the office of a member of the bar

2             of this court at whose direction the service was made.

3             Executed on June 26, 2009, at Thousand Oaks, California

4

5                                          Roschelle Ayonayon

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28