Jenny Scovis, Esq., State Bar No. 87026
Kim D. Scovis, Esq., State Bar No. 182059
**LAW OFFICES OF KIM D. SCOVIS**
223 East Thousand Oaks Boulevard, Suite 412
Thousand Oaks, California  91360
Telephone: (805) 496-6413   Facsimile: (805) 379-3966

Attorneys for Plaintiff, MARIA LAZOS as an individual, and *THE ESTATE OF THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA LAZOS, *THE ESTATE OF THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS* | Case No. CV08-02987-RGK (SHx) |
| | (consolidated w/ CV 08-05153 RGK ) |
| Plaintiff, | |
| vs. | **PLAINTIFFS MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| CITY OF OXNARD; OXNARD POLICE DEPARTMENT; POLICE CHIEF JOHN CROMBACH; ANDREW SALINA, and DOES 1-10 | |
| Defendants. | |
| AND CONSOLIDATED ACTION | |

TO THE COURT AND ALL INTERESTED PARTIES:

Plaintiffs, MARIA LAZOS, TOMAS BARRERA and *THE ESTATE OF THOMAS BARRERA BY AND THROUGH ITS SUCCESSORS IN INTEREST MARIA LAZOS and TOMAS BARRERA* do hereby submit their Memorandum of Fact and Law as follows:

///

///

///

1

# I.

## SUMMARY OF PLAINTIFFS CONTENTIONS OF FACT

It is Plaintiff's contention that the following acts will be supported by the evidence:

On Oct 03, 2007, Sgt. Andrew Salinas was driving his assigned black and white police vehicle. He was driving eastbound of 5th street, west of "G" street. Sgt. Salinas saw a bike laying on the sidewalk, next to a truck with the passenger door open. After parking his police vehicle, SALINAS observed the door to be closed. The decedent, Thomas Barrera, Jr. (Hereinafter " Tommy") was in the area for reasons unknown. Without identifying himself or stopping to ascertain the circumstances that brough Tommy to that specific area, Salinas began chasing after Tommy. In response, Tommy started running. Salinas continued to chase him, and continued to fail to identify himself. Tommy ran westbound on 5th street, first on sidewalk then ran in the middle of the street.

After Tommy went onto the  street, Plaintiffs believe that Tommy started taking items from his pocket and discarding them on the street. This included a broken knife that Tommy paused to throw on the ground. It was very dark. Again, Salinas never identified himself, his only verbal action was to scream at Tommy in the dark to "get down on the Ground".

After pausing, Tommy turned around to begin running again. The next few seconds are somewhat unclear, but the following facts have been determined:   All witnesses heard Tommy yell at Salinas "Don't Shoot me!" or "Don't shoot me Man"!. This plea was followed seconds later but the sounds of shooting. Some of the witnesses further testify, which comports with the deposition testimony of Salinas himself, that *after* being shot in the back,  Tommy crawled on the ground and wailed his plea not to be shot again.   As Salinas testified, the reaction to said plea was a "failure drill".

In his Deposition, Sgt. Salinas stated that the last shot was an intentional shot aimed at Salinas's head,  a technique he called a  " failure drill". A failure drill is a

2

1  technique taught by the Oxnard Police Department.  It is to be used **when a suspect  is**

2  **coming at an officer creating a situation for the Officer of  high risk of bodily harm**

3  or death.  The **"failure drill"** is supposed to be one shot  to the head.  This shot is

4  intended to kill the "suspect" when the Officer  or  another  is in danger of being severely

5  wounded or killed.  Furthermore, Salinas admitted that Tommy no longer  posed a danger

6  after the first two shots.  In fact, Salinas stated that Tommy "crumbled" to the ground

7  immediately although there is some evidence that Tommy continued to beg for his life

8  while **crawling** away from Salinas.  Also, Salinas did not attempt two shots at Tommy's

9  body and one shot to Tommy's head.  He shot him in the back  either two or three times,

10  then took another measured shot **at the back of Tommy's head.**

11      It is extremely clear that Tommy's back was to Salinas at the time he was shot.  It

12  is also very clear that Tommy was **not** in the process of turning back around after

13  threatening Salinas with a knife as stated by Defendants.

14      Defendants are attempting to maintain that when  Salinas turned back around (to

15  resume the chase), Tommy, allegedly  had a knife in his hand.  Allegedly,  Tommy held

16  the knife in his  right  hand with the blade exposed and swung the  knife out in direction

17  of Sgt. Salinas as if he was  attempting to strike Salinas  with knife.

18      In the police report, it states that it was not until **after** Tommy tried to strike him

19  with the  knife, that  Salinas unholstered his gun and shot Tommy to defend himself from

20  the "assault".    After the first three shots, and **AFTER** Tommy stumbled and fell unto his

21  knees Salinas **waited one full second or three quorters of a second** and discharged his

22  weapon **again** in what Salinas calls a **"failure drill".  A "failure drill"** talks about a

23  shot to the head of the victim if the police officer feels his life is in danger.  Here, Tommy

24  Barrera had been shot with injuries to one of his buttocks and another shot lodged in

25  Tommy's spine (mid back) .  Tommy was stumbling and falling to  his knees when

26  Salinas took his last shot (the one he named the "failure drill").  The last shot destroyed

27  Tommy's heart and part of his lung.  Following the last shot ("failure drill"), Tommy

28  was  handcuffed and "taken into custody".   Tommy died as result of wounds.

1    The physical evidence and a reenactment recently performed by Plaintiffs' experts

2    clearly support Plaintiffs' position.  Furthermore, there is no physical way the incident

3    occurred as maintained by Defendants.  Officer Salinas testified that he could "see" the

4    knife in Tommy's hand when he fell, and that the knife "spurted" approximately thirty-

5    five feet **uphill** after Tommy fell down.   This is a physical impossibility.

6    Furthermore, the first two officers who responded to the scene of the incident stated in

7    their official report that when they arrived at the scene, Salinas was breathing  heavily  as

8    if he had just exerted himself.  Purnell asked Salinas what happened.  Salinas replied: "he

9    turned on me. I saw something in his hand. I **THINK** it was a knife. Then he turned on

10   me."  When questioned later, Purnell reiterated that all Salinas said was "he turned on

11   me" to explain   the shooting.  The Officers heard there were cartridge casings and  a

12   wrench set at scene, **but the Officers did not personally observe  them at the scene.**

13   The evidence was definitively manipulated if not "planted" by Salinas and/or

14   other officers at the scene.   If other officers were involved, the would not be the first time

15   that Salinas either directly shot a civilian or was involved in a shooting, only to be

16   protected and **promoted** by his fellow officers and Oxnard Police Department as a whole.

17   Salinas produced records of his shooting qualifications in discovery.   It appears

18   from the records produced, that he did not qualify **since 2002.**

19   Oxnard Police policy allows for the use of deadly force "to effect the arrest or

20   prevent the escape of suspected felon when the officer has probable cause to believe that

21   the suspect poses a significant threat of death or serious bodily injury to officers or to

22   others.   Officer should give verbal warning before using deadly force"

23   The written policies and procedures also dictate that an "Officer may use deadly

24   force to protect himself or others from what he/she reasonably believe would be an

25   imminent threat or death or serious bodily injury".  However, an Officer is only supposed

26   to use that amount of  force reasonable under circumstances and **respond to changing**

27   **circumstances** that may impact his/her decision."

28   Salinas cannot state with any realistic credence that breaking and entering into a

4

1    truck constituted a crime that places others in risk of bodily harm and/or death.  As stated

2    above, Salinas testified he was not panicked at the time of the shots, and was thinking

3    clearly.  The last measured shot was intentional.  This is not a reasonable response to a

4    man, shot and "crumbling" to the ground.

5          The known reaction of Defendants to all of the Shootings by Salinas?  The fact that

6    there were several shooting by the same officer should suffice as prima facie evidence of

7    propensity towards violence and inability to control ones actions.  Salinas had left several

8    dead bodies in his wake.  He has been involved in a minimum of **four** other shootings as

9    an Oxnard Police Officer, in addition to a plethora of additional violent acts.

10         Despite knowledge of this fact, City of Oxnard, Oxnard Police Department and

11   Chief John Crombach not only hired Salinas despite actual and constructive knowledge of

12   his violent tendencies, they actually **promoted** him when these tendencies became realities

13   in the form of the shooting of civilians.   Salinas became the virtual "poster boy" for

14   Oxnard Police Department and the City of Oxnard.  He was nominated as Officer of the

15   Year, promoted, given "choice" assignment, made head of several state and government

16   run  programs.   The Defendants' reaction to Tommy's shooting was to place Salinas back

17   on the streets where he has consistently proven himself as a danger to innocent civilians.

18         The admitted response to Salinas' known propensity to shoot first ask later is to

19   promote him, let him act as spokesperson for City of Oxnard, give him money and to let

20   him run City of Oxnard and Oxnard Police Department programs funded and designed to

21   help the citizens of Oxnard, and to nominate him as Officer of the Year.   In fact, Plaintiffs

22   have evidence that the response to a police shooting, without fail, is promote the police

23   officer involved.  This is virtually prima facie Monell Liability.

24   ///

25   ///

26   ///

27   ///

28   ///

PLAINTIFFS' MEMORANDUM OF FACT AND LAW

## II

## SUMMARY OF PLAINTIFFS' CONTENTION OF THE LAW

### SUMMARY STATEMENT OF PLAINTIFF'S CLAIMS

The following Causes of Action have been plead:

1.  Deprivation of civil rights in violation of 42 U.S.C. §1983 by all defendants;

2.  Wrongful death as to all defendants (except John Crombach by Tomas Barrera);

3.  Violation of California Civil Code §§43,51, 51.7, and 52.1 as to all defendants except John Crombach (By Tomas Barrera);

4   Intentional Infliction of Emotional Distress as to all defendants;

5.  Negligence as to all defendants; and

6.  Negligent employment as to all defendants except Andrew Salinas.

## III.

### SUMMARY OF THE LAW

In Ryder v. City of Topeka (1987) 814 F.2d 1412; the Court held: "While it is not always clear just when minimal police interference becomes a seizure . . . there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment....It is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." Id. at 8 (citing United States v. Ortiz, 422 U.S. 891,895, 45 L. Ed. 2d 623, 95 S. Ct. 2585 (1975); Garcia v. Miera, J.D.( 10th Circuit 1987) 817 F.2d 650; 1987 U.S. App. LEXIS 5460 "Rochin . . . must stand for the proposition that, quite apart from any 'specific' of the Bill of Rights, application of undue force by law enforcement officers deprives a suspect of liberty without due process of law. If Rochin suffered such a violation of his constitutional rights by the police as to be entitled to invalidation of a conviction obtained as a consequence, he also was the victim of a violation sufficient to sustain an action under the Civil Rights Act."

PLAINTIFFS' MEMORANDUM OF FACT AND LAW

1         The Court in the landmark case of <u>Terry v. Ohio</u>, 392 U.S. 1, 28-29,20 L. Ed. 2d

2    889, 88 S. Ct. 1868 (1968) state: "We note that the use of deadly force does not occur only

3    when the suspect actually dies". See <u>Pruitt v. City of Montgomery</u>, 771 F.2d 1475, 1479

4    (11th Cir. 1985); <u>Acoff v. Abston</u>, 762 F.2d 1543 (11th Cir. 1985). Several courts of

5    appeals have adopted the Model Penal Code definition of deadly force. <u>Pruitt</u>, 771 F.2d at

6    1479 n.10; <u>Mattis v. Schnarr</u>, 547 F.2d 1007, 1009 n.2 (8th Cir. 1976) (en banc), vacated

7    as moot sub nom. <u>Ashcroft v. Mattis</u>, 431 U.S. 171, 52 L. Ed. 2d 219, 97 S. Ct. 1739

8    (1972). The Model Penal Code defines "deadly force" as: force that the actor uses with the

9    purpose of causing or that he knows to create a substantial risk of causing death or serious

10   bodily harm.  Purposely firing a firearm in the direction of another person or at a vehicle in

11   which another person is believed to be constitutes deadly force. Model Penal Code @

12   3.11(2) (1985); see also Comment, Deadly Force to Arrest: Triggering Constitutional

13   Review, 11 Harv. C.R.-C.L. L. Rev. 361, 363 (1976) (describing deadly force as "such

14   force as under normal circumstances poses a  high risk of death or serious injury to its

15   human target, regardless of whether or not death, serious injury or any harm actually

16   results in a given case"). See, e.g., American Law Institute, Model Penal Code @

17   2.02(2)(c) (1985) ("A person acts recklessly with respect to a material element of an

18   offense when he consciously disregards a substantial and unjustifiable risk that the

19   material element exists or will result from his conduct."

20        In Acoff, the Eleventh Circuit held that "the officer must give some warning

21   regarding the possible use of deadly force." <u>Garner</u> refers only to"some warning." 471

22   U.S. at 11. We decline to decide what warning would be sufficient a police officer in a

23   dangerous and unreasonable situation. Therefore, we conclude that whether a particular

24   seizure is reasonable is dependent on the"totality of the circumstances," id. at 9, and **not**

25   **simply on whether the suspect was actually armed**. See <u>Carter v. City of Chattanooga</u>,

26   803 F.2d 217 (6th Cir.1986).

27        In <u>Monroe v. Pape</u> (1961) 365 U.S. 167 [5 L.Ed.2d 492, 81 S.Ct. 473], the court

28   held that a specific intent to deprive a person of a federal right is not required in actions

1   under section 1983. Instead section 1983 "should be read  against the background of tort

2   liability that makes a man responsible for the natural consequences of his actions."

3   (Monroe at p. 187 [5 L.Ed.2d at p. 505].)

4          An officer may respond with deadly force to the attenuated threat presented by a

5   fleeing suspect only if two conditions are met. First, there must be reasonable cause to

6   believe that the suspect is dangerous and will escape to a location where he will be able to

7   cause physical harm to others. And, second, the officers **must** identify themselves and give

8   the suspect a chance to surrender, unless giving the warning would itself risk serious harm

9   to the officers or to members of the public, or materially increase the likelihood of escape.

10  "Of course, a law enforcement officer must justify every use of deadly force as necessary

11  and proper; **he may not keep pulling the trigger, regardless of changed circumstances.**

12  We confronted precisely this situation in <u>Hopkins v. Andaya,</u> 958 F.2d 881, 887 (9th Cir.

13  1992), where the officer kept  shooting **after the suspect ceased being dangerous.** We

14  rejected the officer's claim of qualified immunity, holding that the  justification  for the use

15  of deadly force does not continue indefinitely. If circumstances change, and the danger

16  abates, it will be unreasonable to continue using deadly force.  (Emphasis added.)

17         In *Monroe v. Pape* (1961) 365 U.S. 167 [5 L.Ed.2d 492, 81 S.Ct. 473], the court

18  held that a specific intent to deprive a person of a federal right is not required in actions

19  under section 1983 , Instead, section 1983 "should be read  against the background of tort

20  liability that makes a man responsible for the natural consequences of his actions." (

21  Monroe at p. 187 [5 L.Ed.2d at p. 505].)

22         *Irwin v. City of Hemet* (1994) 22 Cal. App. 4th 507;   stated the following in

23  holding a county accountable for the suicide of a prisoner:

24  "Municipalities are among those persons to whom section 1983 applies. (Monell v.

25  New York City Dept. of Social Services, supra, 436 U.S. at p. 690 [56 L.Ed.2d at p. 635,

26  98 S.Ct. at p. 2035].)   However, section 1983 does not "impose liability vicariously on

27  governing bodies solely on the basis of the existence of an employer-employee

28  relationship with a tortfeasor." (436 U.S.   at p. 692 [56 L.Ed.2d at p. 636, 98 S.Ct. at p.

2036].) Thus, a local government is not liable under section 1983 "for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." (436 U.S. at p. 694 [56 L.Ed.2d at p. 638, 98 S.Ct. at pp. 2037-2038].) In short, ". . .a municipality can be found liable under §1983 only where the municipality itself causes the constitutional violation at issue." ( Canton v. Harris (1989) 489 U.S. 378, 385 [103 L.Ed.2d 412, 425, 109 S.Ct. 1197, 1203].)

*Aaitui v. Grande Properties (1994)* 29 Cal.App.4th  136, discussing liability of municipalities for constitutional deprivations, stated: "The cases opening the way for possible liability involve direct conduct between the offending public entity and the claimed victim: Monell, pregnant employee compelled to take medically unnecessary unpaid leaves of absence; Pembaur, police chopped down door to physician's office; Canton, woman needing medical care arrested and given no care; Graham, diabetic injured during arrest."

Ninth Circuit Manual of Model Jury Instructions (Civil) **No. 9.5  SECTION 1983 CLAIM AGAINST LOCAL GOVERNING BODY DEFENDANTS BASED ON ACT OF FINAL POLICYMAKER—ELEMENTS AND BURDEN OF PROOF**

In order to prevail on their § 1983 claim against defendant *City of Oxnard and City of Oxnard PD*  alleging liability based on the act of a final policymaker, the plaintiff must prove each of the following elements by a preponderance of the evidence:

1.      *Chief John Crombach* acted under color of law; 2.the act[s] of *Chief John Crombach* deprived the plaintiffs of their particular rights under the *United States Constitution* as explained in later instructions;  3.*Chief John Crombach* had final policymaking authority from defendant *City of Oxnard and City of Oxnard PD* concerning these act[s]; and  4.when *Chief John Crombach* engaged in these act[s], [he] [she] was acting as a final policymaker for defendant *City of Oxnard and City of Oxnard PD* .

1    As noted in the Introductory Comment to this Chapter, § 1983 liability of a local

2  governing body lies only when "action pursuant to official municipal policy of some

3  nature caused a constitutional tort," and not on the basis of *respondeat superior*. *Monell v.*

4  *Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978)); *see also Bd. of County Comm'rs of*

5  *Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997).

6    Such *Monell* liability may attach based on a policy of inaction that demonstrates

7  deliberate indifference to constitutional rights:  '[A] local governmental body may be

8  liable if it has a policy of inaction and such inaction amounts to a failure to protect

9  constitutional rights.'  *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992), citing *City of*

10  *Canton v. Harris*, 489 U.S. 378, 388 (1989)). The policy of inaction must be a conscious

11  or deliberate choice among various alternatives.  *Berry v. Baca*, 379 F.3d 764, 767 (9th

12  Cir.2004).

13    In order to impose liability based on a policy of deliberate inaction, the

14    "plaintiff must establish: (1) that he possessed a constitutional right of

15    which he was deprived; (2) that the municipality had a policy; (3) that this

16    policy 'amounts to deliberate indifference' to the plaintiff's constitutional

17    right; and (4) that the policy [was] the 'moving force behind the

18    constitutional violation." *Oviatt*, 954 F.2d at 1474 (quoting *City of Canton*,

19    489 U.S. at 389–91).*Berry,* 379 F.3d at 767.

20  Ninth Circuit Manual of Model Jury Instructions (Civil) **No.  9.7**

21    "In evaluating the nature and quality of the intrusion, [a court] must

22  consider 'the type and amount of force inflicted'" in making an arrest.  *Id*. at 651-52

23  (quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir.1994)).

24    Moreover, as the Ninth Circuit has noted, the Supreme Court did not limit the

25  reasonableness inquiry to the factors set forth in *Graham*:

26    Because the test of reasonableness under the Fourth Amendment is not

27    capable of precise definition or mechanical application," the reasonableness

28    of a seizure must instead be assessed by carefully considering the objective

1   facts and circumstances that confronted the arresting officers.  In some

2   cases, for example, the availability of alternative methods of capturing or

3   subduing a suspect may be a factor to consider.

4   *Smith v. City of Hemet*, 394 F.3d at 701 (citations omitted).

5   On the other hand, it is not error for a trial court to decline to instruct

6   explicitly on the availability of "alternative courses of action" when the instructions as a

7   whole "fairly and adequately cover[ed] the issues presented."  *Brewer v. City of Napa*, 210

8   F.3d 1093, 1096–97 (9th Cir.2000).  If "it is or should be apparent to the officers that the

9   individual involved is emotionally disturbed, that is a factor that must be considered in

10  determining, under *Graham*, the reasonableness of the force employed."  *Drummond v.*

11  *City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir.2003).

12  Ninth Circuit Manual of Model Jury Instructions (Civil) **No.** 9.22

13  As far as the negligence causes of action, most courts summarize the elements of

14  actionable negligence as a legal duty of care owed by defendant either to plaintiff or to the

15  class of which plaintiff is a member, an act or omission by defendant that is a breach of the

16  duty owed to plaintiff, injury and damages to plaintiff, and defendant's breach as an actual

17  (or direct) and legal (or proximate) cause of plaintiff's injury and damages; generally, the

18  courts consolidate these separate elements of actionable negligence, which the plaintiff has

19  the burden of pleading and proving, into either three or four separate elements [see Hoyem

20  v. Manhattan Beach City Sch. Dist. (1978) 22 Cal. 3d 508, 513–514, 150 Cal. Rptr. 1, 585

21  P.2d 851; United States Liab. Ins. Co. v. Haidinger-Hayes, Inc. (1970) 1 Cal. 3d 586, 594,

22  83 Cal. Rptr. 418, 463 P.2d 770; Koepke v. Loo (1993) 18 Cal. App. 4th 1444,

23  1448–1449, 23 Cal. Rptr. 2d 34].

24  The elements of a prima facie case of intentional infliction of emotional distress

25  are the following:

26  • Outrageous conduct by the defendant;

27  • The defendant's intention of causing, or reckless disregard of the probability of

28  causing, emotional distress;

• The plaintiff's suffering severe or extreme emotional distress; and

• Actual and proximate causation of the emotional distress by the defendant's outrageous conduct [Hernandez v. General Adjustment Bureau (1988) 199 Cal. App. 3d 999, 1007, 245 Cal. Rptr. 288; Fletcher v. Western Nat'l Life Ins. Co. (1970) 10 Cal. App. 3d 376, 394, 89 Cal. Rptr. 78; seeDavidson v. City of Westminster (1982) 32 Cal.3d 197, 209, 185 Cal. Rptr. 252, 649 P.2d 894; Agarwal v. Johnson (1979) 25 Cal. 3d 932, 946, 160 Cal. Rptr. 141, 603 P.2d 58; Cervantez v. J. C. Penney Co. (1979) 24 Cal. 3d 579, 593, 156 Cal. Rptr. 198, 595 P.2d 975].

The elements of a wrongful death cause of action is as follows:

A wrongful death action is an action for damages for the death of one person when that death is caused by the wrongful act or neglect of another [ Code Civ. Proc. § 377.60[Deering's]].

In the case at bar, there is not dispute that the actions of Salinas caused Tommy Barrera's death.    In fact, all of the defendants' actions caused Tommy's death.  As did their failures to act.  All of which were wrongful as discussed in more full detail herein.

Salinas, who had a known propensity to shoot first and ask questions 2nd, was promoted in concert with each separate act of violence.   One of the cases in which he was involved became the landmark case that set the standard as prima facis wrongful police interrogation tactics. In that case, Salinas yelled for his partner, Maria Pena, to shoot a suspect shouting, "he has my gun"!   It is extremely doubtful that the suspect did have Salinas' gun.   This case, which was certainly not Salinas' first brush with perpetrating violence upon unsuspecting civilians, brought his actions into the public eye.   Oxnard responded by promoting Salinas.

It is interesting to note that when Salinas shot Tommy Barrera, Maria Pena was one of the officers assigned to the investigative team. Salinas' love of the gruesome and his trigger happy methods were ignored yet another time after he shot young Tommy Barrera. He was put back into active duty prior to any investigative results were returned.   The

PLAINTIFFS' MEMORANDUM OF FACT AND LAW

1  City once again treated Salinas like a hero rather than a threat to the Civilians on the street.
2  It would seem that defendants had a heightened duty to do so as the very reason that they
3  were employed by those same civilians was to help procure lawfullness, and protection of
4  the innocent.   This is not a goal accomplished by allowing an officer who freely shoots
5  civilians to forgo shooting qualifications, by giving him control of large sums of money
6  designated for governmental programs organized to help make the streets of Oxnard a
7  safer place, and by promoting said individual.   Any other law enforcement officer would
8  garner from such acts the thinly veiled attitude of  protect the police before the public,
9  stick together at any cost, and the unspoken policy of promoting the law enforcement
10  individuals who deign to take the law into their own hands.

11        It is important that the perspective of  these same officers who are supposed to
12  enforce the law rather than enforce their own violent set of canons and ethics not be
13  utilized when applying the  "reasonable officer" test.   Certainly, no reasonable officer
14  with a mind toward enforcing the law applicable to **all** including themselves, would
15  believe that Tommy Barrera posed any type of threat after he was shot in the back twice,
16  and was in the process of crawling after falling down.   Salinas testified that he took a
17  "measured" shot at the back of Tommy Barrera after he fell down and after he clearly did
18  not pose any threat to Salinas.  Tommy was wailing and pleading with Salinas not to shoot
19  him while he slowly crawled on the dirty concrete.  In cold blood, Salinas decided to quiet
20  this individual on a permanent basis. So Salinas paused.  Salinas aimed.  And Salinas
21  pulled the trigger.  And he did so knowing that he would be "supported" by his own
22  private gang of police officers.  And Salinas was right in that assumption.

23                    **ANTICIPATED EVIDENTIARY ISSUES**
24        All parties have filed several motions in limine.  The parties will certainly attempt
25  to pursuade the Court on opposing sides as to whether the trial should be
26  birfurcated as to individual vs entity liability.   This is not an appropriate case for
27  bifurcation, for in this action, these issues are so intertwined so as make separation
28  of the issues impossible. Furthermore, bifurcation would only serve to confuse the

1        trier of fact.

2            Plaintiffs have also filed to have a large amount of Defendants evidence

3    precluded on the grounds that Defendants either consumed or disposed of almost the

4    entirety of the DNA and biological evidence.   In the same vein, Plaintiffs have asked the

5    Court to preclude any evidence and/or reference to the truck that Defendants attempt to

6    allege Tommy was breaking into at the time Salinas began chasing him.   Counsel for both

7    plaintiff wrote to defendants requesting access to said truck separetly and both within one

8    to two months of the incident.

9            The owner of the truck testified in his deposition that the truck was released to him

10   without any other instruction than: it is your truck, you can sell it, scrap it, do whatever

11   you want with.   The owner also tesitified that he contacted Oxnard Police department

12   when he was contacted by Plaintiffs counsel.  Mr. Garcia was advised that he had "no

13   duty" to make the truck available, and that he can go ahead and dispose of the truck.

14   Plaintiffs were never notified that the truck was being released to Mr. Garcia, never

15   contacted about the fact that Mr. Garcia felt afraid for his life if he cooperated with

16   plaintiffs, etc.

17

18                                   **IV.**

19                      **REQUEST FOR TRIAL BY JURY**

20       Both parties timely requested trial by jury.

21

22                                   **V.**

23                        **ATTORNEY'S FEES**

24       Plaintiffs are making claims pursuant to 42 U.S.C. §1983.  Their attorneys are

25   therefore entitled to attorney's fees pursuant to 42 U.S.C. §1988 if Plaintiffs prevail.

26   ///

27   ///

28   ///

1

## VI.

2

## ABANDONMENT OF ISSUES

3

There have been no abandonment of issues to date.

4

Dated: July 09, 2009       LAW OFFICES OF KIM D. SCOVIS

5

6

_____

7

JENNY SCOVIS
Attorneys for Plaintiff

8

9

Dated: July 10, 2009       LAW OFFICES OF GREGORY A. YATES

10

11

_____

12

GREGORY A. YATES
Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM OF FACT AND LAW