1  Jenny Scovis, Esq., State Bar No. 87026
2  Kim D. Scovis, Esq., State Bar No. 182059
   **LAW OFFICES OF KIM D. SCOVIS**
3  223 East Thousand Oaks Boulevard, Suite 412
   Thousand Oaks, California 91360
4  Telephone: (805) 496-6413   Facsimile: (805) 379-3966

5  Attorneys for Plaintiff, MARIA LAZOS as an individual, and *THE ESTATE OF*
6  *THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*

7
8                          UNITED STATES DISTRICT COURT
9                         CENTRAL DISTRICT OF CALIFORNIA
10
11 MARIA LAZOS, *THE ESTATE OF*          ) Case No. CV08-02987-RGK (SHx)
12 *THOMAS BARRERA, By and Through its*  )
   *Successor in Interest, MARIA LAZOS*  ) (consolidated w/ CV 08-05153 RGK )
13                                        )
14                 Plaintiff,             ) **PLAINTIFFS OPPOSITION TO**
                                          ) **DEFENDANTS' MOTION IN LIMINE**
15         vs.                            ) **NO. 3 REGARDING LESSER USE OF**
                                          ) **FORCE**
16 CITY OF OXNARD; OXNARD POLICE          )
   DEPARTMENT; POLICE CHIEF JOHN          )
17 CROMBACH; ANDREW SALINA, and           )
   DOES 1-10                              )
18                                         ) DATE: August 11, 2009
                                          ) TIME:
19                 Defendants.            ) DEPT: "850"
                                          )
20                                        ) AND CONSOLIDATED ACTION
                                          )
21

22 Plaintiffs, MARIA LAZOS, TOMAS BARRERA and *THE ESTATE OF THOMAS*
23 *BARRERA BY AND THROUGH IT'S SUCCESSORS IN INTEREST MARIA LAZOS and*
24 *TOMAS BARRERA* do hereby submit their Opposition to Defendants' Motion in Limine
25 seeking an Order prohibiting Plaintiffs from introducing Evidence that Defendant Salinas
26 could have used lesser Force as follows:
27       On Oct 03, 2007, Sgt. Andrew Salinas was driving his assigned black
28 and white police vehicle. He was driving eastbound of 5th street, west of "G" street.

---
1
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

1  Sgt. Salinas saw a bike laying on the sidewalk, next to a truck with the passenger door open.
2  After parking his police vehicle, SALINAS observed the door to be closed. The decedent,
3  Thomas Barrera, Jr. (Hereinafter "Tommy") was in the area for reasons unknown. Without
4  identifying himself or stopping to ascertain the circumstances that brough Tommy to that
5  specific area, Salinas began chasing after Tommy. In response, Tommy started running.
6  Salinas continued to chase him, and continued to fail to identify himself. Tommy ran
7  westbound on 5th street, first on sidewalk then ran in the middle of the street.
8  After Tommy went onto the street, Plaintiffs believe that Tommy started taking items
9  from his pocket and discarding them on the street. This included a broken knife that Tommy
10 paused to throw on the ground. It was very dark. Again, Salinas never identified himself,
11 his only verbal action was to scream at Tommy in the dark to "get down on the Ground".
12 After pausing, Tommy turned around to begin running again. The next few seconds
13 are somewhat unclear, but the following facts have been determined: All witnesses heard
14 Tommy yell at Salinas "Don't Shoot me!" or "Don't shoot me Man"!. This plea was
15 followed seconds later but the sounds of shooting. Some of the witnesses further testify,
16 which comports with the deposition testimony of Salinas himself, that *after* being shot in
17 the back, Tommy crawled on the ground and wailed his plea not to be shot again. As
18 Salinas testified, the reaction to said plea was a "failure drill".
19  In his Deposition, Sgt. Salinas stated that the last shot was an intentional shot aimed
20 at Salinas's head, a technique he called a "failure drill". A failure drill is a technique
21 taught by the Oxnard Police Department. It is to be used **when a suspect is coming at an**
22 **officer creating a situation for the Officer of high risk of bodily harm** or death. The
23 "**failure drill**" is supposed to be one shot to the head. This shot is intended to kill the
24 "suspect" when the Officer or another is in danger of being severely wounded or killed.
25 Furthermore, Salinas admitted that Tommy no longer posed a danger after the first two
26 shots. In fact, Salinas stated that Tommy "crumbled" to the ground immediately although
27 there is some evidence that Tommy continued to beg for his life while crawling away from
28 Salinas. Also, Salinas did not attempt two shots at Tommy's body and one shot to Tommy's

head. He shot him in the back either two or three times, then took another measured shot at the back of Tommy's head.

It is extremely clear that Tommy's back was to Salinas at the time he was shot. It is also very clear that Tommy was **not** in the process of turning back around after threatening Salinas with a knife as stated by Defendants.

Defendants are attempting to maintain that when Salinas turned back around (to resume the chase), Tommy, allegedly had a knife in his hand. Allegedly, Tommy held the knife in his right hand with the blade exposed and swung the knife out in direction of Sgt. Salinas as if he was attempting to strike Salinas with knife.

In the police report, it states that it was not until **after** Tommy tried to strike him with the knife, that Salinas unholstered his gun and shot Tommy to defend himself from the "assault". After the first three shots, and **AFTER** Tommy stumbled and fell unto his knees Salinas **waited one full second or three quarters of a second** and discharged his weapon **again** in what Salinas calls a "**failure drill**". A "**failure drill**" talks about a shot to the head of the victim if the police officer feels his life is in danger. Here, Tommy Barrera had been shot with injuries to one of his buttocks and another shot lodged in Tommy's spine (mid back). Tommy was stumbling and falling to his knees when Salinas took his last shot (the one he named the "failure drill"). The last shot destroyed Tommy's heart and part of his lung. Following the last shot ("failure drill"), Tommy was handcuffed and "taken into custody". Tommy died as result of wounds.

The physical evidence and a reenactment recently performed by Plaintiffs' experts clearly support Plaintiffs' position. Furthermore, there is no physical way the incident occurred as maintained by Defendants. Officer Salinas testified that he could "see" the knife in Tommy's hand when he fell, and that the knife "spurted" approximately thirty-five feet **uphill** after Tommy fell down. This is a physical impossibility. Furthermore, the first two officers who responded to the scene of the incident stated in their official report that when they arrived at the scene, Salinas was breathing heavily as if he had just exerted himself. Purnell asked Salinas what happened. Salinas replied; "he turned on me. I saw

3

OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

something in his hand. I **THINK** it was a knife. Then he turned on me." When questioned later, Purnell reiterated that all Salinas said was "he turned on me?" to explain the shooting. The Officers heard there were cartridge casings and a wrench set at scene, **but the Officers did not personally observe them at the scene.**

The evidence was definitively manipulated if not "planted" by Salinas and/or other officers at the scene. If other officers were involved, the would not be the first time that Salinas either directly shot a civilian or was involved in a shooting, only to be protected and **promoted** by his fellow officers and Oxnard Police Department as a whole.

Salinas produced records of his shooting qualifications in discovery. It appears from the records produced, that he did not qualify since 2002.

Oxnard Police policy allows for the use of deadly force "to effect the arrest or prevent the escape of suspected felon when the officer has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to officers or to others. Officer should give verbal warning before using deadly force."

The written policies and procedures also dictate that an "Officer may use deadly force to protect himself or others from what he/she reasonably believe would be an imminent threat or death or serious bodily injury". However, an Officer is only supposed to use that amount of force reasonable under circumstances and **respond to changing circumstances that may impact his/her decision."**

First of all, Plaintiffs intend to introduce evidence that Defendants did not properly train Salinas and other officers as to when to use force, how much force to use, and the type of force used. This is clearly relevant and directly goes to the *Monell* Liability of all Defendants with the exception of Salinas.

A claim that defendant was justified in using force (because he was arresting plaintiff, for instance) is an admission that a battery occurred. Although a few courts shift the burden to the defendant to prove that the battery was justified and that the force used was not excessive,[n1] the majority require plaintiff to show not only that a battery occurred but that the force used during an arrest was beyond that needed to effect the arrest.[n2] Thus, his

1  burden, in essence, is to anticipate the defense of reasonable force and to meet it before it is
2  even raised
3  *McNeill v. Durham County ABC Bd.*, 87 N.C. App. 50, 359 S.E.2d 500 (1987), *rev'd on*
4  *other grounds*, 322 N.C. 425, 368 S.E.2d 619 (1988), *reh'g denied*, 371 S.E.2d 278 (N.C.
5  1988). In a case where plaintiff's skull was fractured, defendant admitted that he had used
6  a flashlight as a club and that it was a deadly weapon.
7     Misuse of a weapon may be actionable in either or both negligence and intentional
8  tort. Because use of a weapon requires at least a duty of reasonable care--if not more--it is
9  critical to know the basic situations giving rise to potential liability.  *See* Greenstone,
10  *Liability of Police Officers for Misuse of Their Weapons*, 16 Clev.-Mar. L. Rev. 397 (1967).
11  *Kyle v. City of New Orleans*, 353 So. 2d 969, 973 (La. 1977). Among factors were "known
12  character" of the arrestee, "risks and dangers" to officers, "nature of the offense," "chances of
13  escape," "alternative methods of arrest," "sizes of both parties," and "exigencies of the
14  moment."*Harris v. Carter*, 768 So. 2d 827, 832-35 (La. Ct. App. 2000), *writ denied* 778 So.
15  2d 602 (La. 2001).  A shooting during a blown buy and bust undercover operation was
16  negligent under *Kyle* and *Mathieu* where (a) there was no evidence decedent drug dealer was
17  armed or was even an apparent threat, and there were alternative methods of arrest.  *Zerbe*
18  *v. Town of Carencro*, 884 So. 2d 1224 (La. App. 2005), *writ denied*, 889 So. 2d 271, 270
19  (La. 2005). *Kyle* followed.
20     The leading case endorsing municipal liability on both respondeat superior and
21  negligent-training principles is *McAndrew v. Mulcahy*, 33 N.J. 172, 162 A.2d 820 (1960), where
22  a reserve police officer with no firearms training intervened in an argument among plaintiff,
23  three friends, and a tow-truck operator who had been called to haul plaintiff's car out of a
24  muddy area at 2:00 a.m. Plaintiff was afraid and tried to run away but the officer shot him.
25  The court found that even had the shooting been accidental, there would be liability if lack
26  of training and skill were responsible for the injury. "Extraordinary care" was required
27  because "[l]oaded revolvers are dangerous instruments."5 In addition, the court repudiated
28  the doctrine that municipalities were only liable for acts of commission of "high standing"

agents rather than "ordinary" employees." Pruett v. Prueitt, 143 N.C. App. 612, 550 S.E.2d 166, 172 (2001)

The landmark case of Kyle v. City of New Orleans, 353 So. 2d 969, 973 (La. 1977) states as follows:

"'the use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result. LSA-C.C. Art. 2320; Picou v. Terrebonne Parish Sheriff's Office, La.App., 343 So.2d 306 (1977), writ refused, La., 345 So.2d 506 (1977); Cheatham v. Lee, La.App., 277 So.2d 513 (1973); Bourque v. Lohr, La.App., 248 So.2d 901 (1971); Taylor v. City of Baton Rouge, La.App., 233 So.2d 325 (1970).'"Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case. A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers. Picou v. Terrebonne Parish Sheriff's Office, supra; 6A C.J.S. Arrest § 49(a), p. 112; 6A C.J.S. Assault and Battery § 97, p. 491. The degree of force employed is a factual issue. Picou v. Terrebonne Parish Sheriff's Office, supra; Castriotta v. Cronvich, La.App. 277 So.2d 744 (1973); Espenan v. Carona, La.App., 179 So. 119 (1938). As such, the trial court's finding is entitled to great weight. Canter v. Koehring Co., La., 283 So.2d 716 (1973).Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment. See Picou v. Terrebonne Parish Sheriff's Office, supra; Logan v. Swift, La.App., 327 So.2d 168 (1976); Crawford v. Maryland Casualty Co., La.App. 169 So.2d 612 (1964); Restatement (Second) of Torts, Volume 1, § 132, comment c, p. 237 (1965); Comment, Tort Liability of Law Enforcement Officers: State Remedies, 29 La.L.Rev. 130"

A shooting during a blown buy and bust undercover operation was negligent under Kyle and

1  *Mathieu* where (a) there was no evidence decedent drug dealer was armed or was even an
2  apparent threat, and there were alternative methods of arrest. *Zerbe v. Town of Carencro*,
3  884 So. 2d 1224 (La. App. 2005), *writ denied*, 889 So. 2d 271, 270 (La. 2005). *Kyle*
4  followed.
5
6  Est. of Francis v. City of Rayne, 966 So. 2d 1105, 1110-1111 (La. Ct. App. 2007), *writ
7  denied*, 976 So. 2d 176 (La. 2008). Firing 20 shots and killing a driver who had previously
8  wreaked havoc on the road but who was trapped between police cars, could not escape, and
9  was apparently surrendering was excessive, and a 90% damages apportionment to his estate
10 was upheld.
11     In the case at bar, the crucial issue of fact for the trier of fact as to whether Salinas acted as
12 a reasonable officer under the circumstances as determined by the jury includes their
13 determination of the reasonableness of the use of force. This in turn also involves the
14 underlying question as to the reasonableness as the type of force, including the shooting of
15 Tommy Barrera when his back was turned and crumbling to the ground. Furthermore,
16 *Monell* liability in part rests on the fact that Salinas was not properly trained in what weapon
17 to use, how to use a gun, and when to use a gun. The liability of all defendants is
18 composed on many issues, including what was available to Salinas, what really happened,
19 whether he was really in any imminent danger of harm, and if he did not act reasonably,
20 whether said failure was due to *Monell* type issues. Therefore, Deefendants' motion must
21 be denied in its' entirety.
22 DATED: July 16, 2009              LAW OFFICES OF KIM D. SCOVIS
23
24 _____
25 JENNY SCOVIS
26 Attorneys for Plaintiff
27
28 DATED: 7/17, 2009                 LAW OFFICES OF GREGORY A. YATES

7

OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

1

2  GREGORY A. YATES
   Attorneys for Plaintiff

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28