Jenny Scovis, Esq., State Bar No. 87026
Kim D. Scovis, Esq., State Bar No. 182059
**LAW OFFICES OF KIM D. SCOVIS**
223 East Thousand Oaks Boulevard, Suite 412
Thousand Oaks, California 91360
Telephone: (805) 496-6413   Facsimile: (805) 379-3966

Attorneys for Plaintiff, MARIA LAZOS as an individual, and *THE ESTATE OF THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA LAZOS, *THE ESTATE OF THOMAS BARRERA, By and Through its Successor in Interest, MARIA LAZOS*<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF OXNARD; OXNARD POLICE DEPARTMENT; POLICE CHIEF JOHN CROMBACH; ANDREW SALINA, and DOES 1-10<br><br>Defendants.<br><br>AND CONSOLIDATED ACTION | Case No. CV08-02987-RGK (SHx)<br><br>(consolidated w/ CV 08-05153 RGK )<br><br>**PLAINTIFFS OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 6 TO PRECLUDE EVIDENCE THAT OFFICER CREATED DANGER USING FORCE**<br><br>DATE: August 11, 2009<br>DEPT: "850" |

Plaintiffs, MARIA LAZOS, TOMAS BARRERA and *THE ESTATE OF THOMAS BARRERA BY AND THROUGH ITS SUCCESSORS IN INTEREST MARIA LAZOS and TOMAS BARRERA* do hereby submit their Opposition to Defendants' Motion in Limine seeking an Order Excluding Evidence that as follows:

On Oct 03, 2007, Sgt. Andrew Salinas was driving his assigned black and white police vehicle. He was driving eastbound of 5th street, west of "G" street. Sgt. Salinas saw a bike laying on the sidewalk, next to a truck with the passenger door open.

1
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

After parking his police vehicle, SALINAS observed the door to be closed. The decedent, Thomas Barrera, Jr. (Hereinafter "Tommy") was in the area for reasons unknown. Without identifying himself or stopping to ascertain the circumstances that brought Tommy to that specific area, Salinas began chasing after Tommy. In response, Tommy started running. Salinas continued to chase him, and continued to fail to identify himself. Tommy ran westbound on 5th street, first on sidewalk then ran in the middle of the street.

Salinas did not wait for back up. He did not radio in his exact position. He never even saw Barrera in the process of committing any felonious or any other type of criminal act. What Salinas observed was a truck with the door open. A period of time later, *after* Salinas drove, turned around, and parked his car, he observed Tommy Barrera **near the truck**. At no time did Salinas ever observe Tommy break into the truck, nor was Tommy ever observed even touching the truck. After parking his vehicle, Salinas walked to Tommy and began chasing hi.

The events occurred late in the evening. It was extremely dark. Salinas began to chase Tommy without identifying himself, asking Tommy Barrera to put his hands in the air, failed to do any action or make any statement that would have easily ameliorated and/or avoided the situation in its' entirety. Salinas does not contend that he knew the identity of Barrera at the time of the incident.

The facts clearly prove the fact that Salinas created the situation which ended up in the loss of a young persons life. The situation was clearly dangerous, for we have an officer chasing down a young individual, in the dark, without any attempt whatsoever to make sure that Tommy knew he was a police officer. Salinas was the danger, not Tommy.

After Tommy went onto the street, Plaintiffs believe that Tommy started taking items from his pocket and discarding them on the street. This included a broken knife that Tommy paused to throw on the ground. It was very dark. Again, Salinas never identified himself, his only verbal action was to scream at Tommy in the dark to "get down on the Ground".

After pausing, Tommy turned around to begin running again. The next few seconds are somewhat unclear, but the following facts have been determined: All witnesses heard

Tommy yell at Salinas "Don't Shoot me!" or "Don't shoot me Man"!. This plea was followed seconds later but the sounds of shooting. Some of the witnesses further testify, which comports with the deposition testimony of Salinas himself, that *after* being shot in the back, Tommy crawled on the ground and wailed his plea not to be shot again. As Salinas testified, the reaction to said plea was a "failure drill".

In his Deposition, Sgt. Salinas stated that the last shot was an intentional shot aimed at Salinas's head, a technique he called a " failure drill". A failure drill is a technique taught by the Oxnard Police Department. It is to be used **when a suspect is coming at an officer creating a situation for the Officer of high risk of bodily harm** or death. The **"failure drill"** is supposed to be one shot to the head. This shot is intended to kill the "suspect" when the Officer or another is in danger of being severely wounded or killed. Furthermore, Salinas admitted that Tommy no longer posed a danger after the first two shots. In fact, Salinas stated that Tommy "crumbled" to the ground immediately although there is some evidence that Tommy continued to beg for his life while **crawling** away from Salinas. Also, Salinas did not attempt two shots at Tommy's body and one shot to Tommy's head. He shot him in the back either two or three times, then took another measured shot **at the back of Tommy's head.**

It is extremely clear that Tommy's back was to Salinas at the time he was shot. It is also very clear that Tommy was **not** in the process of turning back around after threatening Salinas with a knife as stated by Defendants.

Defendants are attempting to maintain that when Salinas turned back around (to resume the chase), Tommy, allegedly had a knife in his hand. Allegedly, Tommy held the knife in his right hand with the blade exposed and swung the knife out in direction of Sgt. Salinas as if he was attempting to strike Salinas with knife.

In the police report, it states that it was not until **after** Tommy tried to strike him with the knife, that Salinas unholstered his gun and shot Tommy to defend himself from the "assault". After the first three shots, and **AFTER** Tommy stumbled and fell unto his knees Salinas **waited one full second or three quorters of a second** and discharged his weapon

**again** in what Salinas calls a **"failure drill"**. A **"failure drill"** talks about a shot to the head of the victim if the police officer feels his life is in danger. Here, Tommy Barrera had been shot with injuries to one of his buttocks and another shot lodged in Tommy's spine (mid back). Tommy was stumbling and falling to his knees when Salinas took his last shot (the one he named the "failure drill"). The last shot destroyed Tommy's heart and part of his lung. Following the last shot ("failure drill"), Tommy was handcuffed and "taken into custody". Tommy died as result of wounds.

The physical evidence and a reenactment recently performed by Plaintiffs' experts clearly support Plaintiffs' position. Furthermore, there is no physical way the incident occurred as maintained by Defendants. Officer Salinas testified that he could "see" the knife in Tommy's hand when he fell, and that the knife "spurted" approximately thirty-five feet **uphill** after Tommy fell down. This is a physical impossibility. Furthermore, the first two officers who responded to the scene of the incident stated in their official report that when they arrived at the scene, Salinas was breathing heavily as if he had just exerted himself. Purnell asked Salinas what happened. Salinas replied: "he turned on me. I saw something in his hand. I **THINK** it was a knife. Then he turned on me." When questioned later, Purnell reiterated that all Salinas said was "he turned on me" to explain the shooting. The Officers heard there were cartridge casings and a wrench set at scene, **but the Officers did not personally observe them at the scene.**

The evidence was definitively manipulated if not "planted" by Salinas and/or other officers at the scene. If other officers were involved, the would not be the first time that Salinas either directly shot a civilian or was involved in a shooting, only to be protected and **promoted** by his fellow officers and Oxnard Police Department as a whole.

Salinas produced records of his shooting qualifications in discovery. It appears from the records produced, that he did not qualify **since 2002.**

Oxnard Police policy allows for the use of deadly force "to effect the arrest or prevent the escape of suspected felon when the officer has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to officers or to others. Officer

4
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

should give verbal warning before using deadly force"

The written policies and procedures also dictate that an "Officer may use deadly force to protect himself or others from what he/she reasonably believe would be an imminent threat or death or serious bodily injury". However, an Officer is only supposed to use that amount of force reasonable under circumstances and **respond to changing circumstances that may impact his/her decision."**

First of all, Plaintiffs intend to introduce evidence that Defendants did not properly train Salinas and other officers as to when to use force, how much force to use, and the type of force used. This is clearly relevant and directly goes to the *Monell* Liability of all Defendants with the exception of Salinas.

## Causes of Action

The following Causes of Action have been plead:

1. Deprivation of civil rights in violation of 42 U.S.C. §1983 by all defendants;
2. Wrongful death as to all defendants (except John Crombach by Tomas Barrera);
3. Violation of California Civil Code §§43, 51, 51.7, and 52.1 as to all defendants except John Crombach (By Tomas Barrera);
4. Intentional Infliction of Emotional Distress as to all defendants;
5. Negligence as to all defendants; and
6. Negligent employment as to all defendants except Andrew Salinas.

## The Law

Negligence may be involved in pre-shooting situations. Thus, *Munoz v. Olin* n14 found liability where the police--staking out an area of possible arson--were positioned 300 feet from a factory and their view was partially blocked. The plaintiff was shot in his own courtyard after the officers had failed to warn him that he was a suspect. Planned actions prior to a shooting which actually and foreseeably create a risk of harm to bystanders will create liability. In *Dyson v. Schmidt*, officers returning the fire of a fleeing felon may have been negligent where they attempted to arrest the felon in a crowded theater and could have

foreseen that he would resist arrest with force. . Dyson v. Schmidt, 109 N.W.2d 262 (Minn. 1961) .

Scott v. Henrich, 958 P.2d 709, 711-713 (Mont. 1998) . An unreasonable approach to a suspect bandishing a weapon may have been present when officers did not regard him as a "barricaded suspect," violated procedures, and material issues of fact were present re whether the suspect's weapon (a) was even capable of being pointed at officers, and (b) was, in fact pointed, and whether he was shot in the chest or back.

The trial court found that the officer had negligently placed himself in a position of peril, causing the shooting because negligence causing an intentional tort is not immunized. A remand on a § 1983 claim was required under   Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) , because there were no findings of fact on the question of objective reasonableness. A respondeat superior claim against a county on account of a sheriff's negligence was viable under  Silva v. New Mexico, 745 P.2d 380 (N.M. 1987) . Quezada v. County of Bernalillo, 944 F.2d 710, 718-722 (10th Cir. 1991)

Negligence has been found where plainclothes officers have not properly identified themselves. Thus, the court in *Grudt v. City of Los Angeles* 2 Cal. 3d 575, 86 Cal. Rptr. 465, 468 P.2d 825 (1970) permitted a case to go forward where plainclothes officers may have been negligent when they apprehended decedent from an unmarked car after he had been chased by other plainclothes officers. The somewhat-deaf decedent, who may not have heard the officers yell, "police officers--pull over," may have panicked when one approached him with a shotgun. Because uniformed police were approaching and decedent could not escape, it may have been negligent for the plainclothes officers not to permit the uniformed officers to make the arrest for a minor traffic violation. A jury could also find that displaying a shotgun under the circumstances and shooting at a fleeing car constituted negligence.

Shooting should be a last resort, not an immediate resort, unless emergency circumstances reasonably warrant otherwise. The court in *Kyle v. City of New Orleans* n23n24-25 held that a "through the door" shooting during an otherwise-legal arrest constituted unreasonable force when: a massive police presence at the scene insured that

plaintiffs (thought to be armed) could not escape; the arrest could have been delayed with no great risk; the officers saw no weapons when one plaintiff slammed the door on them; and one plaintiff was 65-years-old and weighed 140 pounds..   Richardson v. McGriff, 361 Md. 437, 762 A.2d 48, 83 (2000)   The Montana Supreme Court has held that a Section 1983 federal action which only decided issues of Fourth Amendment objective reasonableness did not preclude a state claim of negligent wrongful death action.

There are a plethora of grounds upon which the Court should deny Defendants' Motion to preclude evidence that Salinas created the danger which resulted in the end of Tommy's life.  These facts are relevant and pertinent to the 4th Amendment and 1983 actions, as well as to the state law causes of action for negligence, et seq.

Under section 1983, a state has no interest in grossly-negligent conduct when balanced against the plaintiff's interest in life under a Fourth Amendment view of a shooting, at least where there was no actual danger to the officer. For example, in a Texas case, an officer was liable where he negligently created the need for the use of deadly force and there was no actual danger.  Young v. City of Killeen, 775 F.2d 1349 (5th Cir. 1985), applying Texas law. Similarly, in a non-police case, an Ohio court has held that public policy did not bar an excessive force-shooting claim because the victim was engaged in a felony. Goldfuss v. Davidson, 79 Ohio St. 3d 116, 679 N.E.2d 1099, 1104-1105 (1997).

The following state cases have permitted civilians to assert that the police have created the need to use deadly force in self-defense:

> (1) an inebriated plaintiff intervened in the arrest of a companion who resisted because the threat to the officers "could have been deadly" (the shooting was appropriate, especially when the use of the gun was not a first reaction), and
> (2) an off-duty officer going to the police station with his wife on a motorcycle was accosted by decedent who tried to start the motorcycle and pulled out a "shiny object," provoking the wife to scream that decedent was about to kill the officer (provocation, self-defense, and no excessive force was present).n10

Although this defense is applicable to intentional-tort claims, one court has held that it was not error to give a jury instruction that self defense was a factor where wantonness was charged.

The self-defense rationale cannot be stretched too far. For instance, shooting at fleeing-armed robbers who had driven past the defendant (who had dropped to the ground when approached and jumped up to shoot) was not self-defense when the "threat of harm ... was no longer imminent."

Heidbreder v. Northampton Township Trs., 64 Ohio App. 2d 95, 411 N.E.2d 825 (1979). Davis v. Hellwig, 24 N.J. 412, 122 A.2d 497 (1956).

Defendants motion must be denied as their conduct at the "pre-shooting stage" of the incident is very much at issue. These facts are relevant and pertinent to both Federal and State causes of action. As stated in more detail herein, Tommy Barrera was not in the process of committing any crime when Salinas, in the dark and without any verbal identification in a high crime neighborhood, gave chase to Mr. Barrera. Salinas had ample time to identify himself to Tommy Barrera, could have and should have called and waited for back up, and could and should have stopped shooting once Tommy Barrera was on the ground, begging for mercy as he lay in a pool of his own blood. The first officers to respond to the scene of the incident stated in their police report that they continuously asked Salinas for his location both prior and after the shooting, but Salinas would not reply. Defendants motion must be denied.

DATED: July 16, 2009              LAW OFFICES OF KIM D. SCOVIS

                                  _____
                                  JENNY SCOVIS
                                  Attorneys for Plaintiff

1 | DATED: 7-16, 2009　　　　LAW OFFICES OF GREGORY A. YATES

*[signature: Gregory Yates]*

GREGORY A. YATES

Attorneys for Plaintiff